# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI ST. JOSEPH DIVISION

| | | |
|---|---|---|
| JET MIDWEST INTERNATIONAL CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 5:18-cv-06019-FJG |
| | ) | |
| JET MIDWEST GROUP, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# ORDER

The Court held a bench trial in this matter from November 20 – 24, 2019. This order is quite lengthy and detailed, but such detail was necessary in order to explain the relationships amongst all of the various entities and individuals involved in this case and to decipher and recount the numerous complicated financial transactions which took place between the parties over a number of years. The Court has liberally incorporated the Findings of Fact and Conclusions of Law proposed by plaintiff as they provided an excellent roadmap for navigating the issues in this case. The Court hereby makes the following findings.

## FINDINGS OF FACT

### A. The Parties

1. Jet Midwest International is a Hong Kong limited company headquartered in Beijing. *See Jet Midwest Int'l Co. v. Jet Midwest Group, LLC*, 932 F.3d 1102, 1105 (8th Cir. 2019). *See also* P288 (Hong Kong registration); P375 (Articles of Association).

2.      The F. Paul Ohadi Trust dated December 15, 1999 (the "Ohadi Trust") is a trust

        organized in the State of Illinois.  *See* 11/20/19 Tr. at 792:10-17.  *See also*

        Answer of Ohadi Trust, Paul Ohadi, Ken Woolley, KMW Business Jets, LLC

        ("KMW") and Alta Airlines Holdings, LLC ("Alta") (Docket No. 345) (the

        "Ohadi/Woolley Answer") ¶ 33.

3.      F. Paul Ohadi ("Paul Ohadi") is the trustee of the Ohadi Trust.  *See* 11/20/19 Tr.

        at 754:25-755:2; Ohadi/Woolley Answer ¶ 47b.

4.      Paul Ohadi maintains a bank account at MB Bank, and uses that account to

        receive and make cash payments on behalf of the Ohadi Trust.  *See* P793.

5.      Kenneth M. Woolley ("Woolley") resides in Utah.  *See* Ohadi/Woolley Answer ¶

        31.

6.      Ken Woolley is the sole owner of Alta and KMW, both of which are LLCs

        organized in Utah.  *See* Ohadi/Woolley Answer ¶¶ 18, 32; 11/19/19 Tr. at 569:24-

        25.

7.      Alta is a lender to JMG. Alta is owned by Ken Woolley and was created to fund

        loans to and purchase transactions with JMG. Tr. 569: 11-22-25.

8.      Prior to the filing of this case, Alta and KMW did not maintain their own bank

        accounts.  *See* White Dep. Tr. at 21:15-22:10; 66:15-67:4; 69:7-10; 71:20-25;

        73:2-7; 74:18-23.  The funds of Alta and KMW were pooled in a single bank

        account at Wells Fargo, which was maintained solely in the name of Ken

        Woolley.  *Id.*

9.      Ken Woolley describes Paul Ohadi as a "friend," and a "partner for many years"

        in various business ventures.  *See* 11/19/19 Tr. at 561:1-2; 11/20/19 Tr. at

755:17-20.

10.  Each year, Paul Ohadi travels to Thailand for approximately two months (in January and February), and, during those two-month periods, Ken Woolley acts as attorney in fact for the Ohadi Trust. *See* 11/20/19 Tr. at 631:7-11; 788:3-18.

11.  Ken Woolley also acts as attorney in fact for the Ohadi Trust when Paul Ohadi travels abroad for other extended periods of time. *See* 11/20/19 Tr. at 631:7-11; 788:3-18.

12.  Brad Helsten, Esq. who is not a party to this case, is business counsel for Paul Ohadi; the Ohadi Trust; Ken Woolley; KMW, and Alta (the "Ohadi/Woolley Defendants"). *See* Ohadi/Woolley Answer ¶ 59; 11/19/19 Tr. at 570:1-5.

13.  Defendant / Judgment-Debtor, Jet Midwest Group, LLC ("JMG") is a Delaware LLC formed in 2009. *See* Answer of JMG (Docket No. 558) (the "JMG Answer") ¶ 26. JMG is headquartered in Kansas City and was formed to handle complex acquisitions and trades of aircraft, aircraft engines and parts. Tr. 462, 6:17.

14.  Karen Kraus is the majority owner and Chief Operating Officer ("COO") of JMG. *See* 11/19/19 Tr. at 305:12-16. Karen Kraus resides in Missouri. *See* Kraus / JM Inc. Answer ¶ 18.

15.  Paul Kraus is Chief Executive Officer ("CEO") of JMG. *See* 11/19/19 Tr. at 354:12-13. Paul Kraus resides in California and works at JMG's office in Los Angeles. *See* Answer of Paul Kraus, Karen Kraus and Jet Midwest, Inc. (Docket No. 352) (the "Kraus / JM Inc. Answer") ¶ 18.

3

16. Karen Kraus owns 99% of JMG's shares and Paul Kraus owns 1% of JMG's shares. *See* 11/19/19 Tr. at 335:21-25.

17. Asked how many employees JMG has, Karen Kraus responded: "[T]oday there's zero. Well, Paul and I are the only two people." *See* 11/19/19 Tr. at 335:16-17.

18. Asked who works in JMG's office in Los Angeles, Paul Kraus responded: "Just me." *See* 11/19/19 Tr. at 464:5-6.

19. Paul Kraus and Ken Woolley have known each other since 2012, when they agreed to jointly acquire Dynamic International Airways, LLC ("Dynamic"). *Id.* at 552:2-19.

20. Paul Kraus, Ken Woolley and the other individual Defendants in this case deal with each other on a first-name basis ("Ken," "Paul," etc.). *See, e.g.*, P834. In addition, Paul Kraus' only stated basis for supporting the proposed foreclosures by the Ohadi/Woolley Defendants is his assertion that Paul Ohadi and Ken Woolley are "good people." *See* 11/19/19 Tr. at 381:7-8.

21. Jet Midwest Inc. ("JM Inc.") dismantles aircraft and engines to harvest parts, and manages inventory for consignors around the world. Tr. 461:8-12. JMG hires JM Inc. to dismantle aircraft, handle assets, and be a consignee of parts since JMG does not have the physical facilities, infrastructure, or capabilities to dismantle aircraft or handle aircraft logistics. Tr. 336: OW 313. JM Inc. is owned 51% by Karen Kraus, 48% by Patrick Kraus and 1% by Paul Kraus. Tr. 336: 13-20.

22. JMG "began the wind down of its operations in 2018." *See* P102 (the "McDonough Report") at 23.

4

23.    JMG and Jet Midwest, Inc. ("JM Inc.") are affiliates.  *See* P213 ¶ 8.

24.    JM Inc. was incorporated in 1997.  *See* 11/19/19 Tr. at 461:4-5.

25.    JM Inc.'s facility is in Kansas City, Missouri.  *See* P213 ¶ 8; Kraus / JM Inc.

       Answer ¶ 18.

26.    Paul Kraus owns a minority of the shares of JM Inc. and is the chairman of JM

       Inc.'s board of directors.  *See* 11/19/19 Tr. at 336:19-20; 354:14-16.

27.    Karen Kraus is the majority shareholder of JM Inc.; is President of JM Inc., and is

       on JM Inc.'s board of directors.  *See* 11/19/19 Tr. at 336:13-20.

28.    Mike Logan, who is based in Kansas City, is the Chief Financial Officer ("CFO")

       of JMG and JM Inc., and also does accounting work for non-parties Jet Midwest

       Global, LLC ("JM Global") and Jet Midwest Technik, Inc. ("JM Technik").  *See*

       11/18/19 Tr. at 241:6-242:16; 247:19-21.  He also has done accounting work for

       Dynamic.  *Id*. at 242:25-243:9.

## B. Ownership of JMG

### 1. Ohadi Trust Loans $11 Million to JMG and Becomes 20% Equity Owner

29.    In June 2015, the Ohadi Trust agreed to loan $11 million to JMG and JM Inc.

       *See* P1170.  In exchange, Paul Kraus agreed to give the Ohadi Trust (i) a 20%

       equity interest in both JMG and JM Inc., and (ii) a 12.5% equity interest in

       Dynamic.  *Id*.  Paul Ohadi summarized the terms of the agreement in a July 7,

       2015 email to Ken Woolley and Brad Helsten:

              Dear Ken and Brad

our agreement with paul [Kraus] was as follow

I come up with 11,000,000 in order to help paul K out of the jam losing his company which I did in one day June 19

in return I will get 12.5% of his airline and 20% of his part business
*Id.*

30. The "jam" referred to in Paul Ohadi's email was a problem that had arisen in January 2015. *See* P651. On January 13, 2015, Paul Kraus sent Ken Woolley an email entitled "Urgent Jet Midwest." *Id.* Paul Kraus stated: "I need your help and advice urgently." *Id.*

31. Paul Kraus told Ken Woolley that JMG and JM Inc. were facing foreclosure by a lender named Amur. *See* P651. In Paul Kraus' words: "Amur is 'circling the wagons.'" *Id.*

32. Paul Kraus told Ken Woolley: "We have technical defaults in 2 of our 4 loans." *See* P651. Paul Kraus added: "I am willing to have an equity partner or any ideas you may have. Is there a chance that your friend Paul [Ohadi] could do a short term loan (6 months) so we can have time to weather the storm and finalize our refinance?" *Id.* Paul Kraus continued: "I am truly concerned, have my hat in hand, and am asking for help." *Id.*

33. On February 18, 2015, Paul Kraus emailed Ken Woolley again. *See* P656. Paul Kraus explained that he was "really scared" that Amur was planning to foreclose. *Id.*

34. Paul Ohadi and Paul Kraus then spoke directly by phone. *See* 11/20/19 Tr. at

6

757:11-22. Paul Kraus told Paul Ohadi that there was "a hostile takeover in progress; and if we [Ken Woolley and Paul Ohadi] don't help him, it will be – he [Paul Kraus] will be in trouble." *Id*. at 772:12-14. In response, Paul Ohadi agreed to "make my loan based on certain criteria." *Id*. at 757:16- 758:2.

> He [Paul Kraus] said, What? And I said, If you're going to lose your company, you will not have anything, so how about if you give me 20 percent of your company? And he said okay. And I also told him I want 12 and a half percent of his interest on an airline that he was affiliated with Mr. Woolley. So he said fine. And I said, Okay, based on those – and I will give you the same interest that you were being charged by the other company, which at the time was 18 percent. And I said I will take it and I will give you a loan for one year. That was the deal.

*Id*.

35.    The deal was finalized by Brad Helsten (the Ohadi Trust's business counsel) and David Kulowiec, Esq. (business counsel for JMG and JM Inc.). *See* P1213.

36.    At trial, Paul Ohadi described himself as unsophisticated with respect to legal matters. *See* 11/20/19 Tr. at 794:18-21. Paul Ohadi testified: "I sign paperwork when my lawyer [Brad Helsten] puts it in front of me. I don't read it. I just sign it." *Id*. at 777:20-21.

37.    Brad Helsten and David Kulowiec worked with each other for around one month (from June 23, 2015 through July 22, 2015) to finalize the deal documents. *See* P1228.

38.    The final set of deal documents included a promissory note, backdated to June 18, 2015 (the "Ohadi Note"). The Ohadi Note included the following statement:

7

> In consideration for the loan made by the Lenders, F. Paul Ohadi Trust dtd 12/15/99 shall receive a 20% equity interest in each of the Borrowers and a 12.5% equity interest in Dynamic Airways International, LLC.

*See* P228.

39. On June 19, 2015, the $11 million loan proceeds were transferred to an escrow account to facilitate the settlement with Amur.

40. The Ohadi Note was signed by the Krauses on behalf of JMG and JM Inc. *See* P228.

41. The Ohadi Trust Note contained a term for security in the JMG assets, pursuant to two security agreements in favor of the Ohadi Trust: the Aircraft Mortgage an Security Agreement (the "First Ohadi Security Agreement") and the Security Agreement (the "Second Ohadi Security Agreement." OW Exs. 11, 15-16. The Ohadi Security Agreements were both executed August 14, 2015.

42. The First Ohadi Security Agreement granted a security interest in JMG's airplane related property as follows:

> (i) Equipment (as hereinafter defined), (ii) all proceeds from the sale or other disposition of, all proceeds of insurance due to the Mortgagor on, and all proceeds of any condemnation due to the Mortgagor with respect to, any of the Equipment, (iii) all rents, issues, profits, revenues and other income of the Equipment, (iv) all monies and securities from time to time deposited or required to be deposited with the Secured Party by or for the account of the Mortgagor pursuant to any terms of this Mortgage held or required to be held by the Secured Party hereunder and (v) and all proceeds of the foregoing, whether now owned or hereafter acquired (which property, including all property hereafter specifically subjected to this Mortgage and any other agreement supplemental hereto, is referred to herein as the "Mortgaged Property"), forever with the power granted, to Secured Party, its successors and assigns to dispose of the Mortgaged Property, including

8

without limitation, in accordance with Article IV . . . . OW Ex. 15.

43. On September 1, 2015, the First Security Agreement was recorded in the Federal Aviation Association ("FAA") Civil Aviation Registry (the "FAA Filing").

44. The Second Security Agreement granted a security interest in "Collateral," defined as follows:

> [S]ubstantially all tangible and intangible assets (including, but not limited to, inventory, accounts receivable, plant, machinery, equipment, fixtures, leasehold interests, intellectual property, contracts, license rights and other intangibles, investment property, deposit and security accounts and cash) of the Grantor.

OW Ex. 16.

45. On September 3, 2015, the Ohadi Trust recorded a UCC Financing Statement with the Delaware Department of State:

> All machinery, equipment, aircraft parts, furniture, furnishings, tools, tooling, fixtures, and accessories, and all inventory, accounts receivable, instruments, contract rights and other rights to receive the payment of money, patents, chattel paper, licenses, leases and general intangibles, including all trade names and trade styles and all additions, accessions, modifications, Improvements, replacements and substitutions thereto and therefor, whether now owned or hereafter acquired or arising, and the proceeds, products, and income of any of the foregoing, including insurance proceeds.

OW Exs. 24 (the Ohadi Trust DE Financing Statement), 49 (the KMWBJ DE Financing Statement), and 28 (showing all UCC filings for JMG as of November 14, 2017).

9

46.     Brad Helsten and David Kulowiec also negotiated and agreed upon amendments to JMG's Operating Agreement.  *See* P1228.

47.     Under JMG's Operating Agreement, every member of JMG is, by definition, a managing member of JMG, and has voting rights based on the number of membership units owned by that member.  *See* P407 at 1 (defining JMG as an LLC "Managed by Its Members"); Article I (defining "Member Majority Vote"); § 3.1 ("Management").  JMG's original Operating Agreement, dated March 24, 2009, identified the members of JMG as Karen Kraus and Paul Kraus, with Karen Kraus owning 99 out of 100 membership units (99%) and Paul Kraus owning one out of 100 membership units (1%).  *See* P407 at 21.

48.     The documents negotiated by Brad Helsten and David Kulowiec in June and July 2015 included two amendments to JMG's Operating Agreement, entitled Amendment No. 1 to Operating Agreement of Jet Midwest Group, LLC ("Amendment No. 1") and Amendment No. 2 to Operating Agreement of Jet Midwest Group, LLC ("Amendment No. 2").  *See* P403 and P404.

49.     Amendment No. 1, backdated to June 17, 2015, guaranteed the Krauses an annual bonus of $300,000 to $500,000, so long as JMG made full and timely repayments of the Ohadi Note.  *See* P403.  Amendment No. 1 was signed by the Krauses.  *Id*.

50.     Amendment No. 2, dated August 14, 2015, made the Ohadi Trust a 20% owner of JMG.  *See* P404.  Amendment No. 2, like Amendment No. 1, was signed by the Krauses.  *Id*.  It states that, as of August 14, 2015: (i) Karen Kraus owns 99 out of 125 membership units of JMG (79.2%); (ii) Paul Kraus owns one out of 125

10

membership units of JMG (0.8%), and (iii) the Ohadi Trust owns 25 out of 125 membership units of JMG (20%). *Id*.

51. Brad Helsten and David Kulowiec also negotiated and agreed upon a document entitled "Issuance of Membership Interest." *See* P853; P1228.

52. The Issuance of Membership Interest was signed by Paul Kraus. *See* P853. It states that JMG "hereby issues and sells to F. Paul Ohadi Trust dtd 12/15/99 ('New Member'), a twenty percent (20%) membership interest in Jet Midwest Group, LLC." *Id*.

53. In the emails exchanged between David Kulowiec and Brad Helsten in June and July 2015, neither attorney suggested that any additional documentation was legally necessary in order for the Ohadi Trust to become, as agreed, a 20% owner of JMG. *See* P1228.

54. As these documents were being negotiated and signed, Paul Ohadi visited JM Inc.'s facility in Kansas City, Missouri. *See* P663. Afterwards, Paul Kraus emailed Paul Ohadi, stating: "Thank you [for] coming to KC today. We are excited to have you as a partner." *Id*.

55. At trial, Paul Kraus conceded that he represented to Jet Midwest International's Director, Constance Meng that Paul Ohadi and Ken Woolley were owners of JMG:

   Q. And, in fact, you told Ms. Meng again and again and again in person, that Mr. Ohadi and Mr. Woolley are owners of JMG; isn't that true?

11

A. In our relationship between 2015 and I think the last time I saw her in 2000 – or, excuse me, 2015 and 2016, yes, I did state that.

Tr. 513:10-15.

56. On October 3, 2017 – around three weeks before the entry of the Judgment in the Term Loan Action – Ken Woolley sent an email to Paul Kraus and Brad Helsten, stating as follows:

> Brad: As part of the loan that Paul Ohadi made to Jet Midwest for $11 million a couple of years ago, *Paul asked for and received a 20% interest in I believe Jet Midwest Group and Jet Midwest Inc and Possibly some Other Jet Midwest entity*. The loan has been paid down to about $6.3 million and is in default. Jet Midwest Group is being sued by the Chinese. It is expensive to defend. Since Paul Ohadi has a prior lien on the assets of Jet Midwest Group. It has been suggested by Paul Kraus is to have Paul Ohadi foreclose on his loan by foreclosing and taking the assets of JMG. The assets could then be sold to satisfy the loan. As part of this idea, Paul Kraus says that it would be better for Paul Ohadi not to own 20% of JMG because being both an [sic] creditor and owner puts his position as a creditor in case of bankruptcy or liquidation at some risk. Paul Kraus wants you to have a conference call to discuss this with his attorney today. Are you available?

*See* P834 (emphasis added).

57. When he sent the above-referenced email (P834) in late 2017, Ken Woolley in fact believed that Paul Ohadi was an owner of JMG. *See* 11/20/19 Tr. at 599:24-600:1; 648:24-649:1.

**DEFENDANTS' CURRENT POSITION REGARDING OWNERSHIP**

58. In this litigation, all of the Defendants have taken the position that Ken Woolley and the Ohadi Trust are not, and never have been, members of JMG. *See* Ohadi/Woolley Answer ¶¶ 16, 52, 57, 58, 62, 64; JMG Answer ¶¶ 16, 64.

59. Paul Kraus was asked by the Court why Defendants took this new position. *See* 11/19/19 Tr. at 384:17-385:18. Paul Kraus explained that this new position

12

originated during the Term Loan Action in a discussion with JMG's litigation counsel, Pete Smith, Esq. *Id.* With the impending entry of the Judgment in the Term Loan Action, "we were looking at protecting ourselves from that litigation and speaking with Mr. Pete Smith about bankruptcy." *See id.* at 385:6-8.

60. The October 3, 2017 email referenced above (P834) was "a consequence of the meeting with Pete Smith." *See* 11/19/19 Tr. at 385:17-18. *See also id.* at 383:13-15 (Paul Kraus testifying that the October 3, 2017 email "was in response to a conversation with my counsel, Pete Smith, in regard to the loans and looking at the particular litigation") and 384:3-4 ("Well, I think it's from conversations with Pete Smith, our counsel.")

61. In a declaration filed during the JMG Bankruptcy Case on March 2, 2018, Karen Kraus, on behalf of JMG, represented that JMG had only two owners: herself (99%) and Paul Kraus (1%). *See* P213, ¶ 11. That declaration was filed after the discussion with Pete Smith.

62. Three weeks later – on March 21, 2018 – David Kulowiec (JMG's counsel) emailed JMG's bankruptcy counsel, copying Paul Kraus and Karen Kraus. *See* P869. David Kulowiec stated: "In my opinion there is strong evidence that the F. Paul Ohadi Trust (the 'Trust') holds a 20% ownership interest in JMG." *Id.* He cited the Ohadi Note, Amendment No. 2 to JMG's Operating Agreement, and the Issuance of Membership Interest. *Id.* He then stated:

> As you are aware, at this point, the Trust is unwilling to agree that it
> has an ownership interest in JMG. As far as I can tell, the only reason

13

the Trust is taking this position is that it is afraid it will be deemed an insider or affiliate and this will result in the loss of the Trust's priority with respect to the JMG assets.

*Id.* David Kulowiec added: "The Trust and JMG are likely to lose on the ownership interest because of the existing evidence and this may cast a negative shadow on JMG's transparency with the Bankruptcy Court." *Id.*

63. At David Kulowiec's deposition, counsel for the Ohadi/Woolley Defendants asked if Karen Kraus had committed perjury by representing, in her March 2, 2018 declaration, that she and Paul Kraus were the only members of JMG. David Kulowiec responded: "And what are the elements of perjury?" *See* 4/25/19 Kulowiec Dep. Tr. at 64:12-20. Counsel then decided to move on to a different line of questioning. *Id.*

**Ken Woolley Guarantees $11 Million Dollar Ohadi Loan**

64. Paul Ohadi also received a written guarantee of repayment from Ken Woolley. *See* P1135 (the "Woolley Guaranty"). *See also* Ohadi/Woolley Answer ¶¶ 48g, 75.

65. The Woolley Guaranty is an "irrevocable, absolute, continuing guaranty" of JMG's "payment and performance" of the Ohadi Note. *See* Woolley Guaranty ¶ 2.

66. The Woolley Guaranty also contains a clause that subordinates Ken Woolley's claims against JMG to the Ohadi Trust's claims against JMG. *See* Woolley Guaranty ¶ 5. Under that subordination clause, whenever Ken Woolley receives funds from JMG, Ken Woolley does so "only as a trustee" for the Ohadi Trust. *Id.* Ken Woolley must "promptly pay over" all such funds to the Ohadi Trust for the purpose of satisfying the Ohadi Note. *Id.*

14

67. When asked whether he would have loaned funds to JMG and JM Inc. without the Woolley Guaranty, Paul Ohadi testified: "Would I loan the – no, I don't – I wouldn't know them, so I wouldn't loan them the money, no." *See* 11/20/19 Tr. at 772:21-22. Because of his reliance on the Woolley Guaranty, Paul Ohadi did not conduct any independent due diligence on JMG or its affiliates before making the $11 million loan. *Id*. at 756:7-14.

68. The Court asked Ken Woolley why he didn't simply loan his own funds to JMG. *See* 11/20/19 Tr. at 596:12-21. Ken Woolley responded: "I didn't have the money." *Id*. He also explained that he "wasn't willing to lend money" to JMG. *Id*. at 592:19-593:4.

69. The reason Ken Woolley was unwilling to lend money to JMG was that, in January 2015, at the request of Paul Kraus, he had reviewed certain financial records of JMG and its affiliates. *See* 11/20/19 Tr. at 592:19-593:4; 595:8-14. In that review, Ken Woolley detected "issues," which made him "concerned about whether there was sufficient funding within the corporation." *Id*. In a January 15, 2015 email to Paul Kraus, Ken Woolley described those issues:

- "I have so many questions I don't know where to start."
- JMG was experiencing a "huge negative cash flow."

- JMG appeared to be misusing "money owed to people who consigned goods to you to sell for them and which were sold but the money was not paid."

- JMG was giving millions of dollars to JM Technik, "a money losing operation."

15

- JMG's "biggest asset" was a receivable owed to JMG from its affiliates JM Inc. and JM Global, neither of which was earning a profit.

- Even if JMG could refinance the Amur loan, JMG still would "really need at least another $$6 million to clear the due to consignment, and the $1,300,000 owed on Aero Capital DYN."

*See* P701.

70.    At trial, Ken Woolley was asked why the Ohadi Trust loaned funds to JMG, and why he guaranteed that loan, despite the issues described in the above email (P701). Ken Woolley testified that the Ohadi Trust made the loan because "it's my obligation if it fails." *See* 11/20/19 at 596:10-11. Ken Woolley also testified that, based on his discussions with Paul Kraus, he had sufficient comfort that the Ohadi Note could be repaid if JMG or its affiliates were successful in selling physical inventory. *Id.* at 595:23-596:12.

**The MB Bank Loan Application**

71.    In August 2015, JMG applied for a loan from MB Bank, prompting MB Bank to conduct its own, more detailed due diligence review of JMG's finances and inventory. *See* P673.

72.    The timing of this event was significant because it was: (i) one month *after* the closing of the Ohadi Note transaction, and (ii) one month *before* the closing of the Term Loan transaction between Jet Midwest International and JMG. *See* P673. MB Bank found that JMG was not creditworthy for a loan, even after taking JMG's inventory into account. *Id.* Whatever Paul Kraus may previously have told Ken Woolley about JMG's supposed ability to repay a loan by selling inventory, MB Bank saw no support for any such statement. *See id.*

16

73.   MB Bank's analysis was shared with Paul Ohadi and Ken Woolley.  *See* P673.

However, MB Bank's analysis was not shared with any representative of JM

International.  *See id*.

74.   Paul Ohadi has done his own banking at MB Bank for approximately 50 years.

*See* 11/20/19 at 761:14-23.  He considers the president and vice president of the

bank to be "like friends and family.  We used to go out together; so I'm very close

to them."  *See id*.  Paul Ohadi approached his contacts at MB Bank and told

them: "I would appreciate it if you can look at [JMG] and see if you can give them

some money because they need some new bankers for existence.  And if you

can, lend them some money."  *See id*. at 762:9-12.

75.   JMG and JM Inc. gave Paul Ohadi documents to send to MB Bank.  *See* P669.

The documents included financial records and an appraisal of inventory held by

JM Inc.  *Id*.

76.   After reviewing those records, MB Bank declined to extend any financing to JMG.

*See* 11/20/19 Tr. at 765:5-8.  MB Bank's vice president discussed his findings

with Paul Ohadi.  *Id*.  According to Paul Ohadi, the vice president was "cautious

about certain assets and financial reports"; "kept asking more and more and

more questions," and said that JMG was "not a very stable company," and "not

[a] very reliable company."  *Id*. at 763:1-8; 765:5-8.

77.   MB Bank's vice president expanded upon this analysis in an email to Paul Ohadi

dated August 12, 2015.  *See* P673.  In that email, MB Bank's vice president

stated that:

- "I think any middle market lender would have a hard time financing the company at any level right now, on a complete stand alone basis."

- "[T]here is some good opportunity for improvement in the accounting and record keeping."

- "It's hard to tell if the company is generating cash flow from its core operations, with all due respect to the guys running the company."

- JMG needed audited financials and needed to consolidate with its affiliates.

- It was unclear whether there was "profit in the accounts receivable from Dynamics and Jet Asia? if so that'd be a concern because they [JMG] are not <u>collecting</u> that 'profit.'"

- There was uncertainty regarding "the related company receivables."

- "A new lender would also have to be able to assess the inventory turnover ratio. In other words, lenders prefer to lend on inventory that has demonstrated adequate sales over the past 12 month period."

- The appraisal of the inventory held by JM Inc. was insufficient. JMG needed to obtain an appraisal from "a firm like Gordon Brothers Accuval."

*Id.*

78. Paul Ohadi forwarded the above-referenced MB Bank email to Ken Woolley and Paul Kraus. *See* P673. Referring to MB Bank's analysis, Paul Ohadi stated: "i agree." *Id.*

79. Neither Ken Woolley nor Paul Kraus disagreed with the MB Bank analysis. *See* P673.

80. JMG also never qualified for a loan from any other bank. *See* 11/19/19 Tr. at 466:9-11.

81. Thus, as of August 12, 2015 (the date of the MB Bank email), Ken Woolley and

18

Paul Ohadi had the benefit of a thorough analysis of JMG's financial condition by a banker whom Paul Ohadi knew and trusted. *See* P673. What that analysis told them was: (i) JMG was not creditworthy; (ii) there were multiple red flags indicating that JMG was not a financially viable business, and (iii) JMG's claims regarding its inventory were unreliable. *Id*.

82. At trial, Paul Ohadi claimed that, in light of MB Bank's analysis, he no longer wanted to be an owner of JMG. *See* 11/20/19 Tr. at 787:5-13. However, Paul Ohadi in fact made no such statement to JMG at the time. *Id*. at 787:20. There is no record of Paul Ohadi, either directly or through Brad Helsten, telling JMG that he had decided to reject membership in JMG. *See* P1069 (Responses to RFAs 65 and 66); P1070 (Responses to RFAs 1 and 2).

83. David Kulowiec (JMG's counsel) testified that he was never informed of any decision by the Ohadi Trust to reject membership in JMG. *See* 4/25/19 Kulowiec Dep. Tr. at 83:14-84:20.

84. Paul Ohadi testified that when he executed the promissory note, he intended to acquire 20 percent of JMG and JM Inc. He never obtained the 20 percent, because his banker told him that JMG was unreliable and warned him not to become involved. Tr. 764-765. Ken Woolley also decided not to accept a membership interest in JMG, never agreed in writing to become a member and/or to be bound by the Operating Agreement. Tr. 565:16-566:11.

**JMG's Default on Ohadi Loan**

85.     JMG made periodic interest and principal payments, but in March 2016, JMG

        defaulted on the Ohadi loan and it has not been repaid in full. Tr. 768:4-769:3.

86.     JMG continued to pay interest on the loan subsequent to the default and as long

        as interest was being paid, the Trust granted JMG additional time before

        exercising remedies. Tr. 768:4-16.

87.     On November 6, 2017, when JMG had not pay the remainder due and owing on

        the loan and wasn't making interest payments, Paul Ohadi provided a formal

        notice of default.  OW Ex. 27.

88.     At JMG's request, the Ohadi Lenders agreed to further forbear on the exercise of

        remedies; however, the Ohadi Lenders required a written forbearance

        agreement. In January 2018, as a follow up to verbal discussions regarding a

        forbearance, JMG executed a First Amendment to Security Agreement (the

        "Restated Security Agreement") (P Ex. 765) along with a written forbearance

        agreement, (OW Ex. 29), in order to preserve the Ohadi Lenders rights under the

        Ohadi Security Agreements Tr., 562:14 – 563:18. The purpose of the Restated

        Security Agreement was to confirm the Ohadi Security Agreements and the

        Ohadi Trust Liens.  In sum, Brad Helsten had been advised that the Jet Midwest

        International Judgment had been entered in late 2017.  Brad Helsten retained

        Spencer Fane, Missouri counsel, to confirm the Ohadi Lenders were adequately

        protected under the existing security agreement. Tr. 801:16-802:13.  There was

        no intent to acquire a new lien or extinguish the Ohadi Trust Liens. Tr. 802:24-

        803:1.

**THE ROLE OF DYNAMIC INTERNATIONAL AIRWAYS**

### Ownership Structure of Dynamic

89.  As described below, the Krauses, Ken Woolley and the Ohadi Trust not only became partners at JMG, but also became partners at Dynamic.

90.  In January 2013, Ken Woolley and Paul Kraus acquired 80% of Dynamic.  *See* 11/19/19 Tr. at 397:16-19; 553:9-23.

91.  Following that acquisition, the ownership structure of Dynamic was as follows: (i) 40% was owned by Ken Woolley (through his 100% ownership of NVLV Management LLC ("NVLV")); (ii) 40% was owned by the Krauses (through Commercial Aircraft Services Holdings, LLC ("CASH")), and (iii) the remaining 20% was held by Dynamic's original owner, Michael Stoltzfus.  *See* 11/19/19 Tr. at 397:16-19; 553:9-23; P314 at 17-59.

92.  CASH was formed in 2008, at which time the owners of CASH were: (i) Paul Kraus (49%); (ii) Brian Kraake ("Mr. Kraake") (50%), and (iii) Karen Kraus (1%).  *See* P634.  The CEO of CASH is Paul Kraus, and the COO of CASH is Karen Kraus.  *Id.* ¶ 3.6(a).

93.  On January 1, 2011, Brian Kraake transferred his CASH ownership interest to Paul Kraus.  *See* P635.  Since then, the owners of CASH have been Paul Kraus (99% / CEO), and Karen Kraus (1% / COO).  *See* P636; 11/19/19 Tr. at 309:19310:9; 466:25-467:8.

94.  Because Paul Kraus and Karen Kraus are the sole owners and officers of CASH, they have the authority to "direct, manage and control the business" of CASH.

*See* P634 ¶ 3.1.

95. The Ohadi Note called for 12.5% of Dynamic's equity to be granted to the Ohadi Trust. *See* P228. Accordingly, on August 14, 2015, Dynamic's Operating Agreement was amended. *See* P314 at 60-64. The amendment: (i) eliminated Mr. Stoltzfus' ownership; (ii) made Ken Woolley (through NVLV) as a 50% owner; (iii) reduced CASH's ownership percentage to 37.5%, and (iv) granted the Ohadi Trust a 12.5% ownership share. *Id.*

96. Thus, as of August 14, 2015, Dynamic was owned by: (i) Ken Woolley (through NVLV) (50%); (ii) the Ohadi Trust (12.5%), and (iii) the Krauses (through CASH) (37.5%).

97. Paul Kraus also became the CEO of Dynamic. *See* P317; 11/19/19 Tr. at 397:20-22.

98. In her role at Dynamic, Karen Kraus reported directly to Ken Woolley. *See* P659.

99. On July 19, 2017, Dynamic filed for bankruptcy in North Carolina, Case No. 2:17bk-10814 (the "Dynamic Bankruptcy Case"). *See* P306.[1]

100. The resolution authorizing Dynamic's bankruptcy filing was signed by Paul Kraus, Ken Woolley and Paul Ohadi. *See* P223.

101. In a declaration filed in the Dynamic Bankruptcy Case, Paul Kraus described himself as managing member and CEO of Dynamic. *See* P317 ¶ 3. He

---

[1] Dynamic's reorganization plan in the Dynamic Bankruptcy Case became effective as of March 8, 2018, and Dynamic subsequently was rebranded as Eastern Air Lines. The ownership and management structure of the rebranded entity Eastern Air Lines after March 8, 2018 is not at issue in this case.

22

identified Dynamic's owners as himself, Ken Woolley and the Ohadi Trust. *Id*. ¶¶ 4-5. *See also* P1020.

102. On August 9, 2017, in the Dynamic Bankruptcy Case, Dynamic filed a Statement of Financial Affairs, which was signed under penalty of perjury by Paul Kraus. *See* P303 at 12. In that Statement of Financial Affairs, Paul Kraus represented that the affiliates and insiders of Dynamic included himself, JMG and Ken Woolley. *Id*. at 2.

103. Paul Ohadi has admitted that the Ohadi Trust was a member of Dynamic. *See* P286 ¶ 10.

**Paul Kraus' Personal Debt to Ken Woolley**

104. From the moment Paul Kraus and Ken Woolley acquired Dynamic in early 2013, "Dynamic was making capital calls and was negative cash flow." *See* 11/19/19 Tr. at 555:4-5. "The company was losing – was just bleeding cash." *Id*. at 555:18-19.

105. Dynamic's capital calls exceeded $50 million. *See* 11/19/19 Tr. at 555:13-19.

106. On July 24, 2017, Ken Woolley emailed Paul Kraus and stated that he was "discouraged by what is happening at Dynamic. I see no light at the end of the tunnel." *See* P716.

107. Paul Kraus was unable to fulfill his obligation to match, on a 50/50 basis, Ken Wooley's contributions of capital to Dynamic. *See* 11/19/19 Tr. at 398:4-10. As a result, Paul Kraus came to owe a multi-million-dollar personal debt to Ken Woolley. *Id.*

108.  As of February 24, 2016, Paul Kraus owed Ken Woolley $13,663,458.25.  *See* P680.

109.  As of February 27, 2017, Paul Kraus owed Ken Woolley $21,123,258.39.  *See* P696.

110.  As of November 7, 2017, Paul Kraus owed Ken Woolley $24,223,923.00.  *See* P840.

111.  As of March 6, 2018, Paul Kraus owed Ken Woolley $21,373,656.30.  *See* P864.

**Dynamic's Debt to JMG**

112.  Because JMG was a supplier of parts to Dynamic, and because Dynamic was unable to pay its bills, Dynamic had a multi-million-dollar debt to JMG.  *See* P617-P627.

113.  As of December 31, 2015, Dynamic had a $3,842,803.09 debt to JMG.  *See* P619.

114.  In December 2015, Mr. Logan recorded a bad debt write-off to recognize that the Dynamic receivable was unlikely to be fully collected.  *See* P619; 11/18/19 Tr. at 275:11-23.

115.  Mr. Logan also recorded a total write-off of a separate receivable, in the amount of $3,495,529.16, owed to JMG by Jet Asia.  *See* P619; 11/18/19 Tr. at 275:7-9.

116.  The Dynamic and Jet Asia receivables were JMG's two largest receivables.  *See* P619; 11/18/19 Tr. at 275:3-6.  The uncertainty of JMG collecting those receivables was one of the specific issues that MB Bank's vice president had highlighted.  *See* P673.

117.  JMG never collected either the Dynamic or Jet Asia receivable.  *See* P617-P627.

24

**The Fuel Company Guarantees**

118. In a further effort to prop up Dynamic at the expense of JMG, the Krauses had JMG guarantee Dynamic's debts to Dynamic's fuel suppliers.

119. JMG defaulted on each of those fuel company guarantees.

120. On June 1, 2016, JMG entered into a guarantee (signed by Karen Kraus) of Dynamic's obligation to pay MercFuel, Inc. ("MercFuel"). *See* P1259 at 17-19.

121. On October 19, 2016, MercFuel sent a demand letter to JMG, notifying JMG that Dynamic had defaulted on bills in the total amount of $315,758.29. *See* P1259 at 23-24.

122. JMG failed to pay the amount owed. *See* P1259; Zankich Dep. Tr. at 14:6-12.

123. On January 5, 2017, MercFuel sued Dynamic and JMG to collect this debt. *See* P1259.

124. MercFuel and JMG entered into an agreed judgment, which JMG also failed to pay. *See* Zankich Dep. Tr. at 28:24-29:11; P212 at 16.

125. On April 25, 2016, JMG entered into a guarantee (signed by Karen Kraus) of Dynamic's obligation to pay Associated Energy Group, LLC ("AEG"). *See* P1260 at 12-14.

126. On March 15, 2017, AEG sent a demand letter to JMG, notifying JMG that Dynamic had defaulted on bills in the total amount of $454,044.05. *See* P1260 at 16-17.

127. JMG again failed to pay the amount owed. *See* P1260; Clemente Dep. Tr. at

25

14:10-19.

128. On March 20, 2017, AEG sued Dynamic and JMG to collect this debt. *See* P1260.

129. AEG and JMG ultimately entered into an agreed judgment, which JMG also failed to pay. *See* Clemente Dep. Tr. at 17:15-19:8; 22:3-23:4; 23:13-24:1; P212 at 15.

130. On April 9, 2015, JMG entered into a guarantee (signed by Karen Kraus) of Dynamic's obligation to pay World Fuel Services Corporation ("World Fuel"). *See* P1262.

131. On October 17, 2017, World Fuel sent a demand letter to JMG, notifying JMG that Dynamic had defaulted on bills in the total amount of $142,451.92. *See* P1263.

132. JMG again failed to pay the amount owed. *See* P1261; Portuondo Dep. Tr. at 15:3-16:20.

133. On October 31, 2017, World Fuel sued JMG to collect this debt. *See* P1261.

134. Subsequently, on February 26, 2018, JMG filed the JMG Bankruptcy Case. *See* P211. JMG's bankruptcy schedules listed the fuel company debts as unpaid. *See* P212 at 14-16.

**Relationship of JMG and JM Inc.**

135. JMG has admitted that JMG and JM Inc. are affiliates of each other. *See* P213 ¶ 8.

136. Under the Ohadi Note, the Ohadi Trust was to receive a 20% interest in JM Inc. *See* P228.

26

137. To grant that interest to the Ohadi Trust, David Kulowiec and Brad Helsten created: (i) a stock certificate, and (ii) an amendment to JM Inc.'s Articles of Incorporation. *See* P1228.

138. Karen Kraus signed the agreed-upon JM Inc. stock certificate. *See* P855.

139. A copy of the signed stock certificate was produced by the Ohadi Trust during fact discovery in this litigation. *See* P855 (bearing OHAKMW bates stamp).

140. Paul Kraus, Karen Kraus, and their brother, Patrick Kraus, also signed the agreedupon Amended Articles of Incorporation of Jet Midwest Inc. *See* P938 at 34-35.

141. According to Edward McDonough, Paul Kraus "loaded a lot of excess overhead into Jet Midwest Group that should have been on the books of Jet Midwest Inc., including excess owner's expenses and salaries of employees that don't do the work of JMG." P1046 at 3.

142. JMG's balance sheet contains an entry called "Net Affiliated Receivable," which reflects a debt owed to JMG by JM Inc., JM Global and JM Technik. *See* 11/18/19 Tr. at 243:19-245:23. That debt is, in part, a result of JMG paying those entities' expenses. *Id*.

143. In November 2017, one month after entry of the Judgment, the Net Affiliated Receivable was over $2.6 million. *See* P416 at 2. But at no point did JMG pay down the Judgment by collecting that receivable and allocating the cash to Jet Midwest International. *See* 11/18/19 Tr. at 156:16-19.

**RELATIONSHIP BETWEEN JMG and JET MIDWEST INTERNATIONAL**

144. Paul Kraus was first introduced to Jet Midwest International, then known as Yortime Development Limited and Constance Meng, in mid-2015, through a JMG agent in China. Tr. 467 – 468.

145. Jet Midwest International was interested in becoming involved in the aircraft trading and teardown business and offered to finance the purchase of a Boeing 737-700 bearing MSN 29190 which is the subject of the Term Loan action. Tr. 468-472.

146. The parties had also discussed the possibility of a larger joint venture where each party would contribute $50 million in cash and assets. On December 31, 2015, Paul Kraus contributed $10 million and on January 7, 2016, Jet Midwest International contributed $50 million. Tr. 475.

147. Ultimately, there was a dispute between JMG and Jet Midwest International and the Joint Venture was terminated. Jet Midwest International did not return the $10 million invested by Paul Kraus and this is currently the subject of an ongoing arbitration proceeding in Hong Kong. Tr. 342; 497.

## TERM LOAN TRANSACTION, DEFAULTS AND LITIGATION

### A.    Structure of Transaction

148. In September 2015, Jet Midwest International, as lender, and JMG, as borrower, entered into a $6.5 million loan agreement (the "Term Loan Agreement"). *See* P112.

149. The purpose of the Term Loan was to fund JMG's acquisition of a Boeing 737-700 aircraft (MSN 29190 / N976JM) (the "Term Loan Aircraft"). *See* Term Loan Agreement § 2.9.

28

150. JMG was required to repay the loan within one year. *See* Term Loan Agreement § 2.5.

151. The Term Loan Agreement allowed JMG to sell the Term Loan Aircraft. *See* Term Loan Agreement § 2.10.

152. But the Term Loan Agreement also obligated JMG to "*apply the proceeds of any such sale in prepayment of the Term Loan*." *See* Term Loan Agreement § 2.10 (emphasis added).

153. JMG agreed that, so long as the Term Loan remained unpaid, JMG would not "[c]reate, incur, assume, or suffer to exist" any competing liens over the Term Loan Aircraft. *See* Term Loan Agreement § 6.1.

154. JMG's obligation to repay the Term Loan was guaranteed by Dynamic. *See* P266 (the "Dynamic Guarantee").

155. On September 11, 2015, Paul Kraus sent a memorandum to JMG's files to record JMG's purchase of the Term Loan Aircraft. *See* P384. In that memorandum, Paul Kraus described JMG as the "Sister Company of Dynamic International Airways." *Id*.

**B.    The Ohadi/Woolley Defendants' Knowledge of the Term Loan Transaction**

156. Paul Ohadi, Ken Woolley and their counsel, Brad Helsten, had actual knowledge of the Term Loan transaction when JMG entered into the Term Loan transaction.

157. On September 4, 2015, Paul Kraus emailed David Kulowiec, Brad Helsten and Ken Woolley, copying Karen Kraus. *See* P389. In that email, referring to the

29

Term Loan transaction, Paul Kraus stated: "Just a note that Ken [Woolley] is aware of transaction. Also a note. We are not parting out. We are flipping aircraft." *Id*. *See also* 11/19/19 Tr. at 367:1-10.

158. Ken Woolley, Paul Ohadi and Paul Kraus each personally signed a resolution authorizing Dynamic to be the guarantor of JMG's obligation to repay the Term Loan. *See* P312 at 10-12. The resolution attached a copy of the Dynamic Guarantee. *Id*. at 14-28.

159. At trial, Ken Woolley testified: "I knew that loan [the Term Loan] existed." *See* 11/19/19 Tr. at 582:25. He added: "I also knew that there were substantial negotiations between Paul [Kraus] and the people from Jet Midwest International." *Id*. at 583:4-6.

**C.     The Ohadi Release**

160. On September 5, 2015, Paul Ohadi signed a document entitled "Release," in which he waived, on behalf of the Ohadi Trust, any potential "right," "title" or "interest" with respect to the Term Loan Aircraft. *See* P1116 (the "Ohadi Release"); 11/20/19 Tr. at 778:12-15.

161. The Ohadi Release was not sent to Jet Midwest International in September 2015. *See* 11/19/19 Tr. at 518:22-25; 11/20/19 Tr. at 806:17-22. There is no evidence of Jet Midwest International asking for or being told of the Ohadi Release at that time. A copy of the Ohadi Release was produced to Jet Midwest International during discovery in this case. *See* 11/20/19 Tr. at 806:17-22.

162. When asked if he sent the Ohadi Release, as signed by Paul Ohadi, to JMG (as opposed to sending it to Jet Midwest International) in September 2015, Brad

30

Helsten acknowledged he did: "If Dave Kulowiec sent it to me, I would have returned it." *See* 11/20/19 Tr. at 806:23-807:1.

163. When Paul Kraus was asked if he ever told Jet Midwest International of the existence of the security agreements that gave everything to Paul Ohadi or the Ohadi Trust, when he entered into the agreement with Jet Midwest International, he responded, "I believe so, yes." Tr. 489:1-9.

   **D.    JMG's Sale of the Term Loan Aircraft**

164. JMG sold the Term Loan Aircraft in two separate transactions.

165. First, JMG sold the airframe to Avtrade Limited for $3.75 million. *See* P1151 ("Yormark Report") ¶ 46; P419. This transaction closed on October 30, 2015. *Id.*

166. Second, JMG sold the engines to WWTAI AIROPCO 1 Bermuda Ltd. for $5.6 million. *See* Yormark Report ¶ 46; P420. This transaction closed on December 2, 2015. *Id.*

167. The total sale proceeds were $9.35 million. *See* Yormark Report ¶ 46.

168. These sales were authorized by Jet Midwest International. *See* P372 and P373 (the "Consents").

169. As mentioned above, the Term Loan Agreement required JMG to use the sale proceeds to repay the principal of the Term Loan. *See* Term Loan Agreement §2.10. The Consents did not waive, modify, or otherwise reference that obligation. *See* P372 and P373.

31

170.   Jet Midwest International did not immediately demand repayment of the Term Loan after JMG sold the airframe and the engines. Tr. 293:1-9. JMG did continue making interest payments on the loan. Tr. 292:22- 293:2.

### E.   JMG's Uses of the Term Loan Aircraft Proceeds

171.   JMG never repaid any of the Term Loan principal.  *See* October 25, 2017 Order at 2.

172.   Based on information obtained during post-judgment discovery, Jet Midwest International's forensic accounting expert, Mr. Yormark, uncovered what JMG did with the $9.35 million in Term Loan Aircraft sale proceeds.  Mr. Yormark summarized his findings as follows:

> Q   So, Mr. Yormark, taking the November and December 2015 timeframe as a whole, what was the total amount in proceeds that JMG received by virtue of selling the aircraft?
>
> A  Approximately $9.3 million.
>
> Q  And out of that 9 million in proceeds from the sale of the aircraft, approximately how much was used to repay JM International's $6.5 million loan?
>
> A Nothing.
>
> Q  And how much total approximately went to Mr. Ohadi?
>
> A $4 million.
>
> Q  And how much of that 9 million went to Mr. Woolley?
>
> A  $1 million.

*See* 11/18/19 Tr. at 163:16-164:2.

### 1.   JMG's Use of the Airframe Sale Proceeds

173.   As noted above, JMG sold the Term Loan Aircraft airframe for $3.75 million.

32

174. These funds were approximately 96% of all the cash ($3.92 million) that was available to JMG in November 2015.  *See* Yormark Report, Exhibit 3A.

175. The $3.75 million was wired by the buyer to Federal Aviation Title Company ("FATC").  *See* Yormark Report ¶¶ 33, 47a, 50.

176. On October 30, 2015, per JMG's instructions, FATC wired $950,000 of the $3.75 million to a company known as Kraake & Associates ("Kraake").  *See* Yormark Report ¶¶ 36, 50; P203 at 2.  The background to the Kraake payment was as follows:

- On October 15, 2015, Kraake wired $850,000 to JM Global.  *See* P203 at 1.

- In October 2015, Paul Kraus, on behalf of JMG, signed a promissory note pledging to repay Kraake $950,000.  *See* P204 (the "Kraake Note").

- In the Kraake Note, Paul Kraus promised that the $950,000 would come from the proceeds of the Term Loan Aircraft sale.  *See* Kraake Note at 2.

- Paul Kraus personally guaranteed the Kraake Note.  *See* Kraake Note at 4.

177. In other words: (i) in September 2015, Jet Midwest International loaned funds to JMG so that JMG could buy the Term Loan Aircraft, and JMG promised to use the proceeds from the sale of that aircraft to repay *Jet Midwest International*, and (ii) in October 2015, JMG made a conflicting promise to use the *same proceeds* to repay *Kraake* instead of Jet Midwest International.

178.    At trial, Paul Kraus initially suggested that the purpose of the Kraake loan was to cover a "difference" between "what JM International lent, which was $6.5 million," and the full cost of the Term Loan Aircraft, which, according to Paul Kraus, "was $7.35 million." *See* 11/19/19 Tr. at 447:13-17. Paul Kraus was then confronted with the fact that the Kraake loan was funded over a month after JMG had already acquired the Term Loan Aircraft. *See* P384. *See also* 11/19/19 Tr. at 510:15-511:11. Thus, the Kraake loan could not possibly have been used to buy that aircraft. *Id.* Paul Kraus then changed his story: "I don't know what exact date it was with Kraake. I think the money from Kraake would have a – was borrowed against two Saab aircraft that we had in joint venture." *See id.* at 511:7-11.

179.    There is no evidence that any funds provided by Kraake actually were used by JMG to fund any portion of the Term Loan Aircraft purchase.

180.    There is no evidence of any security agreement between JMG and Kraake.

181.    The evidentiary record in this case includes all of the UCC financing statements that have been filed against JMG in the State of Delaware (the state in which JMG is organized). *See* P760. None of those UCC filings were filed by, or otherwise refer to, Kraake. *Id.*

182.    As noted by Mr. Yormark, the payment to Kraake ultimately benefitted Paul Kraus:

> Q   So just to make sure I understand, if the $850,000 that you referenced a minute ago with respect to the loan from Kraake, if that wasn't repaid to Mr. Kraake as set forth in Exhibit 3B, how would that have impacted Mr. Kraus?
>
> A  Well, that was personally guaranteed by Mr. Paul Kraus, so he would have been on the hook for that money personally.

34

*See* 11/18/19 Tr. at 161:6-11.

183. After the $950,000 was paid to Kraake, and after FATC subtracted its transactional fees, a balance of $2,798,800 was deposited into JMG's Bank of America account at 9:45 a.m. on November 2, 2015. *See* P417. During the remainder of that day, JMG did the following:

- JMG wired the entire amount of $2,798,800 to its affiliate, JM Inc. *See* P417.

- JM Inc. then wired the entire amount of $2,798,800 back to a separate bank account maintained by JMG at Bank of Blue Valley. *See* P532.

- JMG then wired $1,315,708.06 of the $2,798,800 from JMG's Bank of Blue Valley account to Paul Ohadi. *See* P532.

184. JMG's November 2, 2015 payment of $1,315,708.06 to Paul Ohadi (the "11/2/15 Ohadi Cash Transfer") was recorded by JMG as a payment on the Ohadi Note. *See* P376 at 20.

185. By the end of November 2015, only $250,000 was left in JMG's accounts, and none of the principal of the Term Loan had been paid by JMG. *See* Yormark Report, Exhibit 3B.

## 2.    JMG's Use of the Engine Sale Proceeds

186. As noted, JMG received $5.6 million by selling the engines of the Term Loan Aircraft.

187. The $5.6 million was deposited into JMG's Bank of Blue Valley account on December 4, 2015. *See* P418.

35

188. These funds ($5.6 million) represented approximately 91% of all cash ($6.1 million) available to JMG in December 2015. *See* Yormark Report, Exhibit 4A.

189. By the end of December 2015, only $956,000 was left in JMG's bank accounts, and none of the principal of the Term Loan had been paid by JMG. *See* Yormark Report, Exhibit 4A. JMG's uses of the $5.6 million during December 2015 included the following:

   - On December 4, 2015 – the same date on which JMG received the funds – JMG wired $1,330,482.00 to Paul Ohadi (the "12/4/15 Ohadi Cash Transfer"). *See* P418.

   - On December 7, 2015, JMG wired $1 million to Ken Woolley (the "12/7/15 Woolley Cash Transfer"). *Id*.

   - On December 30, 2015, JMG wired $1,315,708.06 to Paul Ohadi (the "12/30/15 Ohadi Cash Transfer"). *Id*.

190. The 12/4/15 and 12/30/15 Ohadi Cash Transfers were recorded by JMG as payments on the Ohadi Note. *See* P376 at 23, 25.

191. Defendants did not offer into evidence a copy of any promissory note, loan agreement, security agreement, or any other written agreement of any kind, between JMG and Ken Woolley, explaining why JMG made the 12/7/15 Woolley Cash Transfer.

192. As previously noted, Ken Woolley testified that, because of the "issues" he detected upon reviewing JMG's financial records in January 2015, he "wasn't willing to lend money" to JMG. *See* 11/20/19 Tr. at 592:16-593:4. If that testimony is accurate, then the 12/7/15 Woolley Cash Transfer could not have been a repayment of a loan owed by JMG.

193. On December 7, 2015, there was no UCC financing statement on file in Delaware, with respect to JMG, perfecting any lien in favor of Ken Woolley, Alta or KMW. *See* P760.

194. At trial, Ken Woolley testified that the purpose of the 12/7/15 Woolley Cash Transfer was for him to be "paid back" a $1 million deposit he had made toward the purchase of certain airplanes from American Airlines. *See* 11/19/19 Tr. at 560:14-18.

195. Exhibit OW-40 is a wire transfer record indicating that, on July 1, 2015, Ken Woolley in fact did make a wire transfer in the amount of $1 million. *See* OW-40. According to that wire transfer record, Ken Woolley did not wire the $1 million to JMG, or to any JMG affiliate, but rather wired the funds to American Airlines directly. *Id.* A handwritten note on OW-40 states "for Paul Kraus." *Id.* At trial, Defendants did not explain what became of the $1 million after Ken Woolley wired that amount to American Airlines. Defendants also did not explain why Ken Woolley was "paid back" over five months after the deposit was made; why JMG (as opposed to Paul Kraus) paid Ken Woolley back if this was not a loan to JMG, or why JMG did so by using the separate funds that JMG obtained by selling the Term Loan Aircraft.

**3. JMG's Contemporaneous, Internal Emails**

196. JMG's contemporaneous, internal emails from September-December 2015 indicate that:

- When JMG used the Term Loan Aircraft sale proceeds to pay the Ohadi Trust, Ken Woolley and Brian Kraake, JMG did so knowingly and deliberately.

- JMG knew that using the proceeds in this way would "cause issues" if Jet Midwest International were to find out about it, but JMG did it anyway. *See* P391.

197. On September 2, 2015, a JMG employee emailed the Krauses to (i) remind them that JMG was required to pay $1,315,708.06 in principal to the Ohadi Trust on November 1, 2015, and (ii) inform them that JMG had only "118k saved toward the interest payment due Oct. 1st nothing towards the Nov. 1st principle [sic] payment." *See* P385. At this time, the Term Loan Agreement was still being negotiated. *See* P312; P313; P314; P315.

198. On September 21, 2015, Karen Kraus emailed a JMG employee, informing him that the Term Loan transaction was about to be finalized. *See* P387. In this email, Karen Kraus stated that "[t]here are obviously more needs than free cash," but that the Term Loan transaction represented "extremely high upside for us if we play our cards right." *See id.*

199. On September 30, 2015, a JMG employee told Karen Kraus: "We need to somehow extend the maturity with Ohadi or there wont [sic] be any excess cash. We are struggling just to pay the interest on that note and its [sic] now jumping to 1.3M a month which is currently more than the usable cash we are collecting on a monthly basis." *See* P926.

200. On October 26, 2015, a JMG employee emailed the Krauses and Mark Allison ("Mr. Allison") (a financial advisor for JMG and JM Inc.) to tell them: "we are now forecast 2M negative by month end still needing one of the 737 transactions to

38

close to cover Ohadi payment." *See* P917. The reference to a "737 transaction," in this and other emails sent at this time, was a reference to the sale of the Term Loan Aircraft (which was a Boeing 737-700). *See* Allison Dep. Tr. at 87:12-13, 1922; 88:2-4; 89:15-21, 25; 90:3-7, 9-15; 100:9-15, 19-20; 102:2-9, 12; 112:18-24; 113:4-8, 12-13; 114:4-8; 119:21-23; 124:10-15; 138:8-9, 14-15.

201.    On November 2, 2015, a JMG employee sent an email noting the receipt of $2,798,800 from the sale of the airframe of the Term Loan Aircraft. *See* P383. The email stated that the money should be used to "immediately pay paul ohadi 1,315,708.06." *Id.*

202.    On November 5, 2015, Karen Kraus sent an email to a JMG employee, subject line "737 sale and cash." *See* P391. Karen Kraus stated: "I'm concerned if we spent the engine money, then I think we have a massive balloon sometime soon??" *Id.* The employee responded:

> I have the same concern *according to the loan agreement we have to notify them of an airframe or engine sale. I think if we notify them we have sold it all and haven't sent them anything it will cause issues.* my recommendation is we payback all the engine proceeds we will still be about 1 million short of paying the loan off.

*Id.* (emphasis added).

203.    On November 17, 2015, a JMG employee emailed the Krauses to tell them:

> We are still forecasting a negative 2.1M at the end of the month after the Ohadi debt payment. We stay positive cashflow up until we pay out the 770k in commissions on the FAT and 737 deal so the longer we can push them the better. I am not including any receipts from 737 engines as I am assuming that goes to repay the loan on the 737 we will still owe about 1M on loan if we apply all engine proceeds to the loan.

*See* P916.

204. But on December 3, 2015, a JMG employee sent an email stating: "We should be receiving a wire tomorrow for 5.6M from fortress for the sale of the 737 engines. Once we receive this we need to Wire Paul Ohadi $1,330,482.00." *See* P380.

205. Thus, on November 5 and 17, 2015, JMG knew the engine sale proceeds were supposed to be used to repay the Term Loan (*see* P391 and P916); but nevertheless, on December 3, 2015, JMG made the decision to give those same proceeds to the Ohadi Trust (*see* P380).

206. At trial, Paul Kraus tried to defend JMG's conduct by suggesting that, in late 2015, JMG and Jet Midwest International "were negotiating a larger business transaction," and "expected that the term loan would be kind of rolled up into that." *See* 11/19/19 Tr. at 473:18-21.

207. JMG offered no evidence that its conduct was motivated by any such agreement or prospective agreement. There is no reference to any such agreement or prospective agreement in JMG's contemporaneous, internal emails.

   F.    **Failure to Repay Term Loan Principal**

208. In early 2016, JMG's financial condition had worsened to such an extent that Mr. Allison was telling the Krauses he was "concerned about the viability of the business that they would not be able to sustain operations." *See* Allison Dep. Tr.at 133:20-23. Mr. Allison was "trying to initiate a wake-up call" and told the Krauses that "spending is out of control," and that "the end is near." *See id*. at 129:22130:2, 7-15. Mr. Allison saw that JMG had "a huge deficit" and needed to "get it under control." *Id*. at 130:16-21.

40

209.  As noted above, JMG defaulted on the Ohadi Note in March 2016.  *See* 11/20/19

Tr. at 611:8-612:6; 612:22-613:8.  At approximately the same time, JMG

developed a new plan to get more "Chinese money."  *See* Allison Dep. Tr. at

135:10-12; 135:19-136:9.

210.  Paul Kraus described this new plan in an email he sent on April 4, 2016.  *See*

P1155.  Paul Kraus explained that he would try to sell aircraft parts to Jet

Midwest International for $38 million.  *Id*.  But instead of using the proceeds to

repay the Term Loan, Paul Kraus would pay his personal debt to Ken Woolley

and JMG's debts to Ken Woolley and the Ohadi Trust.  *Id*.

211.  To convince Jet Midwest International that he had assets worth $38 million, Paul

Kraus reached out to an appraiser – the same appraiser whose prior appraisal

report was deemed, by MB Bank, to be an insufficient basis for loaning funds to

JMG.  *See* P669 at 23-59; P673.

212.  On April 22, 2016, Paul Kraus emailed the appraiser to inform him that a new

appraisal report was needed because, as Paul Kraus put it, he was about to meet

with "the Chinese."  *See* P1140.  The appraiser responded: "Tell me the amount

you see and I'll make sure I'm above it.  And u can tell them I called with

'an amount above $x dollars.'"  *Id*.

213.  Jet Midwest International did not purchase the goods from JMG; JMG failed to

cure its March 2016 Ohadi Note default, and JMG missed its September 2016

deadline to repay the Term Loan.  JMG had "no cash after the year [of] maturity."

*See* Allison Dep. Tr. at 175:16-176:12.

41

### G. Service of Default Notices and Failure to Cure Default

214. On September 5, 12 and 14, a Jet Midwest International representative emailed Paul Kraus to remind him of JMG's September 14, 2016 deadline to repay the Term Loan. *See* P290.

215. On September 22, 2016, Jet Midwest International sent a default notice to JMG, with a copy to Dynamic (the guarantor of the Term Loan obligation). *See* P237.

216. On September 22, 2016, Jet Midwest International sent a default notice to JMG, with a copy to Bank of Utah (the trustee of the trust that held the Term Loan Aircraft). *See* P261.

217. On September 22, 2016, Jet Midwest International sent a default notice to Dynamic. *See* P236.

218. Over *three years* have gone by since these emails and default notices were sent, and, to date, *none* of the Term Loan principal has been paid. *See* 11/19/19 Tr. at 368:3-8.

### H. Filing of Litigation against JMG and Dynamic

219. On January 24, 2017, Jet Midwest International filed the Term Loan Action. *See* JMG Answer ¶ 2.

220. JMG filed a counterclaim regarding the fact that Jet Midwest International had declined to purchase parts from JMG. *See* P145. The Court dismissed the counterclaim, finding that it was subject to mandatory arbitration, and that JMG was improperly conflating that purported counterclaim with JMG's breach of the Term Loan Agreement. *Id*. JMG cannot avoid its contractual obligations by "lumping multiple breach actions as one," as "[t]o do so would ignore the very terms the parties agreed to in each individual contract." *Id*. at 4.

42

221.   Following the dismissal of JMG's counterclaim, Jet Midwest International moved for summary judgment in the Term Loan Action.  This Court granted that motion on October 25, 2017, and entered the Judgment on October 26, 2017.  *See* P138; P148.

222.   Ken Woolley refers to the Term Loan Action in his October 3, 2017 email to Paul Kraus and Brad Helsten (P834). That email was sent prior to entry of the Judgment.  Thus, it is clear that Ken Woolley knew about the Term Loan Action while it was being litigated.

223.   At trial, Ken Woolley claimed that he learned about the Term Loan Action in "[a]pproximately September of 2017, in that range, in that timeframe, September, October 2017."  *See* 11/19/19 Tr. at 582:9-10.

224.   In fact, Ken Woolley and his attorney Brad Helsten must have been aware of the litigation no later than January or February 2017 given the actions taken by Ken Woolley's entity, Alta, at that time.  These actions are discussed below.

225.   On January 3, 2017 (shortly *before* the filing of the Term Loan Action), JMG signed a letter of intent to buy two Boeing 747-409 aircraft and eight Pratt & Whitney PW4056 engines from China Air for $3.8 million.  *See* Yormark Report, Exhibit 9A ¶ 54; P1033.

226.   The funding for the China Air acquisition was provided by Ken Woolley.  *See* OW-270.

43

227.    In February 2017 (shortly *after* the filing of the Term Loan Action), Ken Woolley

and JMG restructured the transaction so that JMG would not be the owner of the

China Air assets.

228.    Two steps were taken to restructure the transaction: (i) first, JMG sold the China

Air assets to Alta, and (ii) second, Alta consigned the assets to JM Inc.  *See* OW-

274; P774.

229.    As Mr. Yormark explained at trial:

> I see that this was on the books and records of JMG in January for
> $3.8 million, and then they actually took that off the books by
> transferring it back to Alta, and then it was in consignment to JM,
> Inc.

*See* 11/18/19 Tr. at 187:20-23.

230.    These actions are indicative of a desire to remove these newly acquired assets

from JMG so that they would not be exposed to collection risk in the Term Loan

Action.

231.    On January 24, 2017, Jet Midwest International also filed a lawsuit (the "Dynamic

Guarantee Action") against Dynamic to enforce the Dynamic Guarantee.  *See*

P1258.

232.    On July 19, 2017, Dynamic filed the Dynamic Bankruptcy Case.  *See* P306.

233.    At trial, Ken Woolley claimed that he was unaware of the Dynamic Guarantee

Action.  *See* 11/20/19 Tr. at 644:24-645:3.

234.    However, as noted, Ken Woolley had personally authorized the Dynamic

Guarantee and the filing of the Dynamic Bankruptcy Case.  *See* P223 at 2; P312

at 10-11.

44

235. Ken Woolley was the principal owner of Dynamic and received detailed reports regarding Dynamic's business affairs. *See* P659; P716.

236. In the Dynamic Bankruptcy Case, Dynamic disclosed Jet Midwest International's lawsuit against Dynamic as a pending legal proceeding that was known to Dynamic. *See* P303 at 3.

I.    **JMG'S FAILURE TO PAY THE JUDGMENT**

237. The Judgment has been pending for over two years (since October 26, 2017). *See* P138.

238. JMG has made no voluntary payments of the Judgment. *See* 11/18/19 Tr. at 156:16-19.

239. Jet Midwest International tried to enforce the Judgment by garnishing JMG's bank accounts.

240. Those bank account garnishments revealed that JMG's accounts had virtually no remaining funds. *See* P139; P170; P252; P253; 11/18/19 Tr. at 156:8-19. One of JMG's bank accounts contained $290.58 at the time of garnishment. *Id*. In every other instance, there were zero funds in the garnished JMG bank account at the time of garnishment. *Id*.

241. In the Dynamic Bankruptcy Case, Jet Midwest International (in its capacity as creditor) received a small distribution from Dynamic's bankruptcy estate. *See* Yormark Report, Exhibit 8.

242. Mr. Yormark computed that as of May 31, 2019, taking into account the receipt of $290.58 (from bank garnishments) and the small distribution from Dynamic's

45

bankruptcy estate, and taking into account post-judgment interest, the Judgment amount was $8,666,159.74. *See* 11/18/19 Tr. at 154:14-15. Mr. Yormark's computation of the Judgment amount was undisputed at trial; as such, JMG's single largest monetary debt is the Judgment.

243. Since May 31, 2019, post-judgment interest has continued to accumulate, and, as a result, the Judgment amount has continued to increase. *See* 11/18/19 Tr. at 154:14-15.

244. In late 2017 – after entry of the Judgment – JMG's CFO, Mr. Logan, prepared a budget for JMG for 2018. *See* 11/18/19 Tr. at 278:5-14. *See also* P379.

245. The budget projected a loss of $1.6 million, and contained no plan for paying any portion of the Judgment. *See* 11/18/19 Tr. at 278:16-23; P379 at 2.

246. Upon filing the JMG Bankruptcy Case, JMG represented to the Bankruptcy Court that it had zero cash remaining in any of its bank accounts. *See* P212 at 2-3.

247. During the JMG Bankruptcy Case, JMG never proposed a reorganization plan. *See* Ohadi/Woolley Answer ¶ 9.

248. JMG ultimately represented to the Bankruptcy Court that it had "no realistic hope of reorganizing." *See* P962 ¶ 14. JMG further represented that it had "virtually no unencumbered assets"; "virtually no cash on hand"; "no net income"; "no way to operate"; "no practical ability to obtain other financing to continue operations," and "nothing to liquidate in favor of creditors." *Id*. ¶ 15. JMG stated: "Continuing in bankruptcy will benefit no one." *Id*.

249. JMG further represented that it had no choice but to end the Bankruptcy Case because the Ohadi Trust no longer consented to the JMG Bankruptcy Case. *See*

P962 ¶ 7.  As noted above, the Ohadi Trust's opposition to the continuation of the

Bankruptcy Case did not occur in a vacuum; it occurred in the context of

David Kulowiec challenging the Ohadi Trust's position that it was not a member

of JMG.  *See* ¶¶ 61-62, *supra*.

250.    On June 1, 2018, the JMG Bankruptcy Case was dismissed.  *See* Ohadi/Woolley

Answer ¶ 9.  This case – which was stayed during the JMG Bankruptcy Case –

then resumed.

### THE PLAN TO "SCRAP" JMG

251.    Following the entry of the Judgment, the management of JMG and JM Inc.

discussed a plan to "scrap" JMG.  *See* P871.

252.    On February 19, 2018, Scott Still emailed Paul Kraus, Patrick Kraus, Karen
Kraus,

Mike Logan and Ken Woolley to discuss the plan.  *See* P871 at 1.

253.    Scott Still's email included the following statement:

> Team,
>
> Several of us have been working on new names for the entity we
> have discussed setting up and we want to get in place. It has been a
> lot more challenging th[a]n we first thought… the project scope was
> to locate (2) new names that tie in with JMW and (2) that are
> completely different – This will allow us to rebrand JMW and come
> out with the new company, new staff, new investment and new path
> forward . . .
>
> Anyway, take a look at what the team and very detail work from Diane has
> come up with….we have a good start.
>
> I would like to determine the new name and path forward by March
> 2nd.  I have cop[i]ed Ken on this one for his feedback from our
> discussions.

47

*See* P871.  The reference to "Ken" in this email is a reference to Ken Woolley.  *Id*.

254.  Scott Still's email attached a 13-page Power Point presentation, entitled "JMW Rebranding Project 2018.pptx."  *See* P871.

255.  The Power Point presentation stated: "Due to current circumstances, company may need to scrap **Jet Midwest Group** and create a new parent/holding company for Jet Midwest Inc. and Jet Midwest Technik."  *See* P871 at 3 (emphasis in original).

256.  The Power Point presentation contains no statement of intent to pay any portion of the Judgment before JMG is scrapped.  *See* P871 at 2-14.

257.  At trial, Scott Still was asked about the origins of the plan to "scrap" JMG.  He responded: "We got serious about it in probably late 2017 and then really got more into it in '18."  *See* 11/19/19 Tr. at 531:9-10.  That is, the plan "got serious" after entry of the Judgment.

**TRANSFER OF AIRBORNE WIRELESS SHARE CERTIFICATES**

258.  On January 19, 2018, Jet Midwest International conducted a post-judgment deposition of JMG through its CFO, Mr. Logan.  *See* 11/18/19 Tr. at 246:19-247:1.

259.  At that deposition, Jet Midwest International learned that JMG's remaining assets included physical share certificates representing shares of a publicly traded company called Airborne Wireless Network ("AWN").  *See* 11/18/19 Tr. at 247:5-14.  *See also* P1157 at 23, 165.

260.  The certificates were located in JMG's Los Angeles office.  *See* 11/18/19 Tr. at 247:12-14.

48

261. One business day later – on January 22, 2018 – Jet Midwest International emailed an application to the Court for a temporary restraining order ("TRO") to prevent JMG from transferring the AWN share certificates. *See* P1157. As required, Jet Midwest International copied JMG's counsel on the email submission of the TRO application. *Id.* at 1.[2]

262. In its TRO application, Jet Midwest International provided evidence that, as of January 19, 2018, AWN shares were trading at $2.20 per share. *See* P1157 at 7 and 393.

263. Jet Midwest International also indicated that, to the best of its knowledge, JMG had 1,250,000 shares of AWN, for a total value of $2,750,000 (*i.e.*, $2.20 x 1,250,000). *See* P1157 at 7.

264. Jet Midwest International also filed a separate application before the U.S. District Court for the Central District of California for an order authorizing the U.S. Marshals Service to seize the share certificates from JMG's Los Angeles office. *See* 1139.

265. JMG reacted to these events by transferring the share certificates to the Ohadi Trust.

266. This transfer began to come to light on January 30, 2018, when JMG responded to Jet Midwest International's TRO application. *See* P137. JMG represented

---

[2] On the docket of the Term Loan Action, the TRO application was filed under seal because it contained information that, at the time, was believed to be potentially confidential. The unsealed version of the TRO application was emailed to Chambers, copying JMG's counsel. *See* P1157.

that, on January 22, 2018 (the day of the TRO application), "JMG sent all of its Airborne Wireless Network share certificates via Fed Ex to F. Paul Ohadi Trust c/o its attorney Brad Helsten." *Id*. at 1.

267. JMG did not deny that, in sending the AWN share certificates to Brad Helsten, it was reacting to the submission, under seal, of the TRO application. *See* P137.

268. On January 31, 2018, officers from the U.S. Marshals Service arrived at JMG's Los Angeles office to try to seize the certificates. *See* P1139. The officers were told by JMG that the certificates were now in Utah (where Brad Helsten's office is located). *Id*.

269. On February 15, 2018, based on JMG's representation that the AWN share certificates were now gone, the Court denied Jet Midwest International's TRO application as moot. *See* P182.

270. Through subsequent discovery, Jet Midwest International obtained a copy of the share certificates that JMG had sent to the Ohadi Trust. *See* P638 and P639. It turned out that, in addition to the share certificate representing ownership of 1,250,000 shares of AWN, JMG had a second share certificate representing ownership of 199,172 shares of AWN. Both share certificates, representing a combined total of 1,449,172 shares of AWN, were sent by JMG to the Ohadi Trust after the TRO application was filed. *See id*.

271. Jet Midwest International learned that JMG *also* executed Irrevocable Stock Powers to "sell, assign and transfer" the shares to the Ohadi Trust. *See* P638 at 3; P639 at 3. On behalf of JMG, Karen Kraus signed two such Irrevocable Stock

Powers (one for each certificate). *Id*. Her signatures are dated January 29, 2018 – five business days after the TRO application. *Id*.

272. At trial, Karen Kraus admitted that each of the Irrevocable Stock Powers was "a transfer of Airborne Wireless Network shares from Jet Midwest Group to the Ohadi Trust." *See* 11/19/19 Tr. at 326:18-23; 328:14-20.

273. Shortly after filing the JMG Bankruptcy Case, JMG represented that the aggregate value of the certificates was $2,842,000. *See* P212 at 4. Mr. Yormark testified that $2,842,000 was an accurate valuation of the certificates at that time because, when JMG filed for bankruptcy (in February 2018), AWN shares were trading at $1.96 per share, and 1.45 million shares at $1.96 per share equals $2,842,000. *See* 11/18/19 Tr. at 170:1-8.

274. Paul Kraus believed the value of the certificates was even higher. According to Paul Kraus, the value "had gone up to over $3 a share, and we had 1.8 million shares. So we had 5.4 of the $6 million we owed" to the Ohadi Trust. *See* 11/19/19 Tr. at 499:13-16.

275. The transfer of the certificates was never treated, by Defendants, as satisfying any debt owed by JMG to the Ohadi Trust, despite the fact that, as noted above, the certificates had significant value. *See* 11/18/19 Tr. at 170:19-171:2; 249:23-250:5.

276. Following the dismissal of the JMG Bankruptcy Case, the trading price of AWN shares declined to approximately 1 cent per share. *See* 11/18/19 Tr. at 170:12-

16.

277. In his report, Edward McDonough did not analyze JMG's transfer of the share certificates. *See* 11/20/19 Tr. at 725:11-726:25.

278. At trial, Mr. Logan confirmed that, after he was deposed on January 19, 2018, JMG sent the certificates to Brad Helsten. *See* 11/18/19 Tr. at 247:15-18. Nobody spoke to Mr. Logan to seek his approval or input before the certificates were sent. *Id*. at 247:25-248:7.

279. An AWN representative, Jason De Mos, was deposed in this case. Mr. De Mos testified that AWN issued the certificates to JMG in exchange for the use of two aircraft to test wireless equipment. *See* De Mos Dep. Tr. at 20:18-21:2. JMG told Mr. De Mos that both aircraft were controlled by Dynamic. *Id*. JMG did not tell AWN that the Ohadi Trust had a lien on such aircraft, or otherwise mention the Ohadi Trust to AWN. *Id*. at 21:7-12.

280. At trial, Brad Helsten testified that, *before* the share certificates were sent to him, the Ohadi Trust did *not* have a perfected lien over them, because, according to Brad Helsten, perfecting a lien over stock certificates requires possession. *See* 11/20/19 Tr. at 810:5-12.

281. Brad Helsten testified that JMG sent the share certificates to him in response to a demand that he made during a phone call with Karen Kraus. *See* 11/20/19 Tr. at 810:5-12.

282. Brad Helsten testified that, in that phone call, Karen Kraus told him that the U.S. Marshals Service was *present at, or already had been to*, JMG office:

> Q  You testified earlier that you had a phone call with Ms. Kraus prior to receiving these certificates, correct?

52

A  I believe so, yes.

Q  Uh-huh. And on that phone call, did Ms. Kraus tell you that the U.S. Marshal Service *was either at or had come by the JMG office in Los Angeles and wanted to take possession of the share certificates*?

A  *Yes*.

Q  And you testified earlier that as a result of that call that you had on or after – *when the U.S. Marshals were at JMG's California offices, you ordered Ms. Kraus to send the AWN certificates to you, correct*?

A  *Yes, correct*.

*See* 11/20/19 Tr. at 822:12-24 (emphasis added).

283.   If Brad Helsten's above-referenced testimony is true, then it also is true that:

- Brad Helsten, knowing that the U.S. Marshals Service was trying to levy on JMG's property, told JMG to send the property to him instead, and JMG complied.

- JMG made a misrepresentation to this Court when, in response to the TRO application, JMG claimed (*see* P137) to have sent the certificates to Brad Helsten on January 22, 2018.  In fact, they could not have been sent any earlier than January 31, 2018 (when the U.S. Marshals Service came to JMG's office).  *See* P1139.

- JMG also made a misrepresentation to the U.S. Marshals Service when the officers came to JMG's office and JMG told them (*see* P1139) that the certificates were already in Utah.  JMG in fact did not send the certificates to Utah until after Paul Kraus told Brad Helsten that the Marshals were at, or had been to, JMG's office.

284.   At trial, no witness disputed Brad Helsten's account of his phone call with Karen Kraus.

53

285. No witness suggested that JMG's transfer of the certificates was triggered by anything *other than* the TRO application and/or the levy attempt by the U.S. Marshals Service.

## THE GARNISHMENT WRIT AND SECURITY AGREEMENT AMENDMENT

### Overview

286. As previously mentioned, the Judgment was entered on October 26, 2017, and this fraudulent transfer case was filed on February 16, 2018.

287. On February 22, 2018, Jet Midwest International served a garnishment writ on JM Inc. – the JMG affiliate that maintains physical possession of JMG's inventory. *See* P135.

288. On February 23, 2018 – just one day after that garnishment writ was served – JMG signed a document entitled First Amendment to Security Agreement. *See* P765 (the "Security Agreement Amendment," or "SAA").

289. The SAA expressly notes that Jet Midwest International had obtained the Judgment against JMG and was making "post-judgment collection efforts." *See* SAA ¶ F.

290. Three days later – on February 26, 2018 – JMG filed the JMG Bankruptcy Case.

291. The SAA is countersigned by Ken Woolley in his capacity as attorney-in-fact for the Ohadi Trust. *See* SAA at 7. Ken Woolley's signature was notarized by Brad Helsten on February 28, 2018 – two days *after* the JMG Bankruptcy Case was filed. *See id*.

292. On March 1, 2018 – one day after the SAA was notarized – the Ohadi Trust and Alta filed notices of appearance in the JMG Bankruptcy Case. *See* P348.

293. The Ohadi/Woolley Defendants have admitted that the SAA was created "in view of Jet Midwest International's attempt to take possession of [JMG's] Spare Parts Inventory by service of its garnishment on JM Inc." *See* Suggestions in Opposition to Plaintiff Jet Midwest International Co., Ltd.'s Motion for Summary Judgment (Docket No. 534) at 12 n. 2.

294. At trial, when Brad Helsten was asked to explain the purpose of the SAA, he responded: "I did not draft it; so I don't know." *See* 11/20/19 Tr. at 801:19-20. He also explained:

> At some point, I believe in the fall of 2017, we were advised or notified that a judgment had been entered, and I went back to the file. And I looked at the file to make sure that we were in a position -- a first priority position. And then the other question was what do we need to do about protecting that security interest from a judgment creditor.

*See* 11/20/19 Tr. at 801:23-802:3.

295. Brad Helsten testified that the task of drafting the SAA was delegated by him to local counsel (who did not testify at trial). *See* 11/20/19 Tr. at 802:4-7.

296. Neither Mike Logan nor Karen Kraus reviewed the SAA before Paul Kraus signed it. *See* 11/18/19 Tr. at 274:7-9; 274:17-19; 274:20-23. *See also* 11/19/19 Tr. at 330:22-331:6.

297. At trial, Paul Kraus claimed not to remember whether he signed the SAA before or after JMG filed for bankruptcy, or before or after Jet Midwest International served its garnishment writ on JM Inc. *See* 11/19/19 Tr. at 404:8-406:25.

298. At trial, Ken Woolley initially testified that he (Ken Woolley) signed the SAA on February 28, 2018 – the date on which it was notarized by Brad Helsten, which

55

was two days after the filing of the JMG Bankruptcy Case. *See* 11/20/19 Tr. at 614:2-615:4.

299. Ken Woolley also claimed that he learned about the JMG Bankruptcy Case "[a] day or two after" the JMG Bankruptcy Case was filed. *See* 11/20/19 Tr. at 616:4-11.

300. In this regard, Ken Woolley's testimony contradicted the testimony of Paul Kraus. When Paul Kraus was asked "Were either Mr. Ohadi or Mr. Woolley consulted prior to the filing of Jet Midwest Group's bankruptcy?", Paul Kraus responded: "I think we spoke about it a little bit, and so they were aware of it." *See* 11/19/19 Tr. at 495:7-10.

301. While still on the stand, Ken Woolley subsequently altered his testimony and claimed that he signed the SAA on February 23, 2018 (the same day it was signed by Paul Kraus), but that Brad Helsten *notarized* it on February 28, 2018 (five days after Ken Woolley signed it). *See* 11/20/19 Tr. at 618:21-619:17. When Ken Woolley was asked how his signature could possibly have been notarized five days after he signed it (given that a notary must witness a signature), Ken Woolley testified: "I don't have an explanation." *Id*. at 619:4-5.

> Q I just want to make sure I understand your testimony, Mr. Woolley. You're saying that you don't remember exactly what day you signed it, or you do?
>
> A I believe I signed it on the 23rd and that it was acknowledged on the 28th that I signed it.
>
> Q So if I understand your testimony, that the notary acknowledged your signature five days later. Is that your testimony?
>
> A It appears that way.

56

Q  Okay. And that notary, again, is Brad Helsten?

A  That's correct.

*Id.* at 619:7-17.

302.  Brad Helsten (Ken Woolley's personal attorney and also the notary) testified that Ken Woolley's statement (while on the stand and under oath) was incorrect.  *See* 11/20/19 Tr. at 820:7-9 (Brad Helsten testifying that Ken Woolley must have been in his presence on February 28, 2018, the date on which Brad Helsten notarized his signature on the SAA).

303.  Edward McDonough offered no opinion regarding the SAA.  *See* 11/20/19 Tr. at 727:8-728:3.

• **Effect of the SAA**

304.  The SAA significantly changed a lien that JMG previously had granted to the Ohadi Trust.

305.  In August 2015, the Ohadi Trust and JMG had entered into two security agreements, both of which stated that their purpose was to secure repayment of the Ohadi Note.

306.  The first such security agreement granted the Ohadi Trust a lien over certain specific aircraft and engines, all of which are separate and distinct from JMG's inventory of spare parts.  *See* P753 (the "First Ohadi Security Agreement," or "FOSA").

307.  The second such security agreement granted the Ohadi Trust a lien in

"substantially all" of JMG's assets.  *See* P756 (the "Second Ohadi Security

Agreement," or "SOSA").

> "Collateral" shall mean *substantially* all tangible and intangible assets (including, but not limited to, inventory, accounts receivable, plant, machinery, equipment, fixtures, leasehold interests, intellectual property, contracts, license rights and other intangibles, investment property, deposit and security accounts and cash) of the Grantor.

*See* SOSA § 1.1(c) (emphasis added).

308.  The SOSA did not define what specific quantities, values or portions (if any) of

JMG's inventory, accounts receivable, or other enumerated categories of

property were considered by JMG and the Ohadi Trust to be "substantially all."

*See* SOSA § 1.1(c).

309.  At trial, Brad Helsten offered several possible definitions of "substantially all": it

might mean "anything important," "all," or "everything."  *See* 11/20/19 Tr. at

801:5-8.  The SOSA does not contain any of these definitions of "substantially

all"; nor does the SOSA explain what, if anything, JMG or the Ohadi Trust

considered to be "important."

310.  The SAA deletes the entire collateral clause (SOSA § 1.1(c)) from the SOSA,

including the phrase "substantially all."  *See* SAA P765 ¶ 2.

311.  The SAA replaces SOSA § 1.1(c) with a new definition of collateral.  *See* P765,

SAA  ¶ 2.  The new definition does not use the phrase "substantially all."  Instead,

it grants a lien in "all property of Grantor," a phrase that was never used in the

original SOSA.  *Id*.

312.  The SAA elaborates on the phrase "all property of Grantor" with a page of

additional explanatory text, none of which was in the original SOSA.  *See* SAA ¶

58

2.

313.   P1156 is a blackline comparing (i) the SAA's new definition of collateral with (ii) SOSA § 1.1(c) as originally written.

314.   As shown in P1156, the SAA purports to grant the Ohadi Trust – for the first time – a blanket, first priority lien over all of JMG's assets.  *See* P1156; SAA ¶ 2.

315.   In the SAA itself, JMG and the Ohadi Trust claim to "believe" that this blanket, first priority lien had existed "as of August 14, 2015," the date of the original SOSA.  *See* SAA ¶ D.  But the SAA – which created this lien – in fact was signed by JMG and the Ohadi Trust only *after* the entry of the Judgment, *after* this fraudulent transfer case was filed, and *one day after* Jet Midwest International had served a garnishment writ on JM Inc.  *Id*. at 1.

316.   In other words, the SAA not only purports to grant the Ohadi Trust a new lien, but to do so *retroactively* to August 14, 2015.  *See* SAA ¶ D.  By backdating the new lien to August 14, 2015, Defendants try to simultaneously (i) manufacture a new lien, while (ii) creating the misimpression that the lien is not new, but somehow had existed all along.  *Id*.

317.   There is no written record of JMG, prior to entry of the Judgment, ever suggesting to Jet Midwest International that the Ohadi Trust had a blanket, first priority lien over JMG's assets.  As the Court commented at trial: "I'm saying why would [Jet Midwest International] enter into an agreement knowing that that agreement couldn't be kept in terms of their security interest based upon their loan?  That makes no sense to me."  *See* 11/19/19 Tr. at 491:5-8.

59

318. JMG's own financial advisor, Scott Still, agreed that it would make no sense for a creditor to lend funds to JMG if there was reason to believe that, because of a blanket, first priority lien held by another party, the loan would not be repaid.  *See* 11/19/19 Tr. at 527:1-15.

319. Scott Still loaned funds to JMG and *was* repaid.  Mr. Still testified as follows about that loan:

> Q  Did anyone at JMG ever tell you that they couldn't pay you back the addition -- the loan because of the Ohadi lien?
>
> A  No.
>
> Q  Did anyone at JMG ever tell you that they couldn't pay you back the additional $200,000 payment because of the Ohadi lien?
>
> A  No, not that I recall.
>
> Q  Would you have loaned money to JMG if JMG had told you that your loan would not be repaid because all of its assets were subject to the Ohadi lien?
>
> A  Repeat that question one more time.
>
> Q  Sure. Would you have loaned money to JMG if JMG had told you that your loan would not be repaid because all of its assets were subject to the Ohadi lien?
>
> A  Probably not.

   *See* 11/19/19 Tr. at 527:1-15.

**The Ohadi Trust's Intervention in the Term Loan Action**

320. Following entry of the Judgment, not only did JMG and the Ohadi Trust enter into the SAA, but the Ohadi Trust also intervened in the Term Loan Action to oppose collection of the Judgment.  *See* Ohadi/Woolley Answer ¶ 36.  The practical effect of that intervention has been to temporarily stop further efforts to collect the

60

Judgment pending the resolution of the issues raised in this case, including the challenge to the validity of the SAA.

## DEFENDANTS' COURSE OF CONDUCT REGARDING USES OF CASH

### Summary

321.    Defendants, in their business dealings with each other, have never treated the Ohadi Note as though it were secured by a blanket, first priority lien over JMG's assets.

322.    Prior to entry of the Judgment (on October 26, 2017), 100% of JMG's repayments of principal on the Ohadi Note were made during a four-month period: from November 2015 to February 2016.  *See* P376 at 134; P377 at 122; P369 at 160.  During that four-month period, JMG repaid a total of $4,707,435.48 in principal on the Ohadi Note.  *Id*.

323.    Of the $4,707,435.48 that JMG paid on the Ohadi Note during this four-month period, a total of $3,504,164.95 (or 75%) of the funds were the Term Loan Aircraft sale proceeds that JMG gave the Ohadi Trust in November and December 2015.  *See* § VII(E), *supra*.

324.    From the Ohadi Note default (March 2016) through the entry of the Judgment in the Term Loan Action (October 2017), JMG made no payments of principal on the Ohadi Note.  *See* P377 at 122; P369 at 160.  But during that same period, JMG gave tens of millions of dollars to the Ohadi Trust, Ken Woolley and the Krauses for purposes entirely unrelated to satisfying the Ohadi Note. There is no

61

evidence of any Defendant objecting to such payments on the ground that the funds should have been used to repay the Ohadi Note.

325.   Had those funds instead been used to repay the Ohadi Note, the Ohadi Note would have been fully paid long before entry of the Judgment.  The latest reported balance due under the Ohadi Note is $5,270,000 – far less than the amounts Defendants accepted from JMG for purposes unrelated to the Ohadi Note.  *See* Term Loan Action, Docket No. 161 at 4.

326.   When asked why the Ohadi Trust did not try to foreclose on the Ohadi Note prior to entry of the Judgment, Paul Ohadi responded: "I'm still making 18 percent versus my bank giving me only 2 percent."  *See* 11/20/19 Tr. at 779:11-15.  That is, the Ohadi Trust benefitted by accepting interest payments, at an 18% rate, from JMG.  *Id.* at 779:16:17; 780:8-13.

327.   Paul Ohadi described this arrangement – under which JMG paid him monthly interest on the Ohadi Note, while *also* paying him and Ken Woolley millions of dollars for purposes *unrelated* to the Ohadi Note – as a "verbal agreement."  *See* 11/20/19 Tr. at 780:15.

328.   Asked why this alleged "verbal agreement" was not put in writing, Paul Ohadi testified: "I don't usually put too much in writing.  I'm not good writer.  Sorry.  Not good reader and good writer.  I rely on my attorney."  *See* 11/20/19 Tr. at 780:21-24.

329.   However, the Ohadi Trust's attorney, Brad Helsten, *also* did not put any such agreement into writing prior to entry of the Judgment.  *See* 11/20/19 Tr. at 779:18-25.

330. The first time that JMG and the Ohadi Trust entered into a written forbearance agreement was on January 31, 2018, over three months *after* entry of the Judgment. *See* P645.

331. That January 31, 2018 forbearance agreement – which was drafted by Brad Helsten, and signed by Paul Kraus (for JMG) and Ken Woolley (for the Ohadi Trust) – states that there are "No Oral Agreements" between JMG and the Ohadi Trust. *See* P645 ¶ 34.

**"Consulting Fee" Payments to the Krauses**

332. JMG's distributions of cash for purposes unrelated to the Ohadi Note included, but were not limited to: (i) the 12/7/15 Woolley Cash Transfer of $1 million; (ii) JMG's payment of $950,000 to Kraake on October 30, 2015, and (iii) JMG's repayment of Mr. Still's loan. There is no evidence that any Defendant objected to any of these three payments on the ground that the funds instead should have been used to pay the Ohadi Note.

333. But those three payments are just the tip of the iceberg. JMG's distributions of cash for purposes unrelated to the Ohadi Note also included, among other things, JMG's payment of millions of dollars in "consulting fees" to the Krauses. The McDonough Report admits that these "consulting fee" payments in fact were "discretionary owner payments to Paul & Karen Kraus and are not true consulting fees." *See* McDonough Report at 25-26.

334. The consulting fee payments included:

- A total of $900,864 paid to the Krauses in 2015. *See* McDonough Report at 25.

- A total of $660,493 paid to the Krauses in 2016. *Id*. at 25.

- A total of $982,869 paid to the Krauses in 2017. *Id*. at 26.

335.   There is no evidence that any Defendant objected to these "consulting fee" payments on the ground that the funds instead should have been used to satisfy the Ohadi Note.

**Payments to Ken Woolley**

**Summary**

336.   JMG also gave Ken Woolley tens of millions of dollars instead of paying the Ohadi Note.

337.   From December 7, 2015 through October 17, 2017, JMG paid a total of $27,201,222.80 to Ken Woolley. *See* P1149. *See also* 11/18/19 Tr. at 166:19167:8.

338.   One such payment is the previously noted 12/7/15 Woolley Cash Transfer of $1 million.

339.   The remaining $26,201,222.80 was distributed via a series of payments on other dates.

340.   There is no evidence that any Defendant objected to these payments to Ken Woolley on the ground that the funds instead should have been used to repay the Ohadi Note.

341.   Ken Woolley and his accountant, Ms. White, tracked these payments in a spreadsheet. *See* P862. *See also* White Dep. Tr. at 95:10-96:3. In the same spreadsheet, Ken Woolley and Ms. White would note that the Ohadi Note was

still unpaid, and also would record the fact that JMG was continuing to pay Ken Woolley tens of millions of dollars.  *See* P862.

342.    In fact, Ken Woolley expressly directed JMG to pay this money to him *instead of* repaying the Ohadi Note.  For example, in the email marked as P874, Mike Logan notifies Ken Woolley that JMG has sold three engines, and suggests that the funds be used to repay a portion of the Ohadi Note.  *Id*.  Ken Woolley responds by instructing Mr. Logan:

> Paul has already pledged that profit to me for the money I lent him regarding Dynamic Airways.  It is not funds which can be used to pay the obligations of Jet Midwest.

*Id*.  Neither Mike Logan nor Ken Woolley suggest, in this email, that the Ohadi Note was secured by a blanket, first priority lien, or any lien.  *Id*.; 11/20/19 Tr. at 634:1-636:17.

**Profit Sharing Distributions**

343.    Many of the payments made by JMG to Ken Woolley were made pursuant to a profit-sharing arrangement with JMG.  *See* Yormark Report, Exhibits 9A-20B.

344.    The profit-sharing arrangement began on May 13, 2016, which was the same month in which Ken Woolley was recognized as a member of JMG.  *See* P1028.

345.    The profit-sharing arrangement involved a series of specific profit-sharing transactions.  In general, each profit-sharing transaction was structured in the following way:

- Ken Woolley (through Alta or KMW) loaned funds to JMG for the purchase of one or more specific aircraft or engines.  *See* OW089; OW096; OW102; OW112; OW128; OW118; OW122; OW137; OW165; OW173; OW198.

65

- JMG signed a promissory note setting forth JMG's obligation to repay the principal and interest of the loan to Ken Woolley. *See* OW089; OW096; OW102; OW112; OW128; OW118; OW122; OW137; OW165; OW173; OW198.

- The Krauses personally guaranteed JMG's obligation to pay the promissory note. *See* P593; P989; P990; P991; P992; P993; P994; P995; P996.

- JMG signed a security agreement designating the acquired aircraft or engines as collateral to secure repayment of the promissory note. *See* OW088; OW097; OW103; OW113; OW129; OW119; P581; OW138; OW164; OW174; OW199.

- JMG also signed a side letter ("Profit-Sharing Agreement," or "PSA"). *See* OW090; OW098; OW104; OW114; OW130; OW120; OW123; OW139; OW167; OW168; OW210. The Profit-Sharing Agreement specified how JMG was to distribute any remaining surplus of cash, or "profits," after JMG had sold the aircraft or engine and repaid the promissory note. *Id*. Profits were distributed to Ken Woolley, Paul Kraus and others, with each Profit-Sharing Agreement containing a formula explaining how the profits were to be allocated. *Id*. In many cases, the formula required JMG to distribute profits to Ken Woolley for the express and sole purpose of paying Paul Kraus' personal debt to Ken Woolley. *See* P857.

- On February 8, 2017, one month after Jet Midwest International filed the Term Loan Action, Paul Kraus and Ken Woolley executed an Omnibus Amendment to the Loan Agreements and Side Letters which stated that notwithstanding anything to the contrary in the Loan Agreements and Side Letters, all proceeds payable to Paul Kraus would be paid to Ken Woolley until all advances and loans to Dynamic and Paul Kraus were retired in full. OW 333.

346.   There is no direct link between the Profit-Sharing Agreements and security agreements. Each security agreement specifies that its purpose is to secure "the obligations of the Secured Party *under the Promissory Note*." *See* OW088; OW097; OW103; OW113; OW129; OW119; P581; OW138; OW164; OW174; OW199 (emphasis added). None of the security agreements refer to securing

66

JMG's obligations under a Profit-Sharing Agreement, or otherwise refer directly to any Profit-Sharing Agreement. *See id.*

347. A review of the UCC financing statements filed against JMG (*see* P760) shows that:

   - KMW has never filed a UCC financing statement against JMG;

   - The first time Alta filed a UCC financing statement against JMG was on September 28, 2016 – months after the profit-sharing arrangement began. *See* P760 at 25.

348. Mr. Yormark analyzed the profit-sharing arrangement and found that, in substance, the true purpose of the arrangement was for Ken Woolley "to receive funds so that Mr. Kraus would have the opportunity to pay back his personal debt." *See* 11/18/19 Tr. at 177:1-14.

349. Mr. Yormark determined that, under the profit-sharing arrangement:

   - JMG suffered a net loss of $2,422,239. *See* Yormark Report, Exhibit 9C.

   - Despite suffering a net loss, JMG distributed $5,642,156.00 in "profits" to Ken Woolley and Paul Ohadi. *Id.*

   - Of the $5,642,156.00, a total of $1,597,503 was distributed for the express purpose of repaying Paul Kraus' personal debt to Ken Woolley. *Id.*

350. Exhibits 9A-20B of the Yormark Report review JMG's cash payments under this profit-sharing arrangement. JMG made the following cash payments directly to Ken Woolley:

| TABLE 1 | | |
|---|---|---|
| **Date** | **Total Amount of Wire Transfer** | **Purpose of Wire Transfer** |
| 7/29/16 (before Alta filed its first UCC) | $712,445 (the "7/29/16 Woolley Cash Transfer") | Repayment of principal. |
| 8/29/16 (before Alta filed its first UCC) | $210,509 (the "First 8/29/16 Woolley Cash Transfer") | Repayment of principal. |
| 8/29/16 (before Alta filed its first UCC) | $214,500(the "Second 8/29/16 Woolley Cash Transfer") | Repayment of principal. |
| 8/29/16 (before Alta filed its first UCC) | $214,500 (the "Third 8/29/16 Woolley Cash Transfer") | Repayment of principal. |
| 9/7/16 (before Alta filed its first UCC) | $280,000 (the "9/7/16 Woolley Cash Transfer") | Distribution of profits under Profit Sharing Agreement. |
| 10/4/16 | $872,500 (the "10/4/16 Woolley Cash Transfer") | Repayment of principal. |
| 4/21/17 | $5,038,000 (the "4/21/17 Woolley Cash Transfer") | Repayment of principal. |
| 5/31/17 | $3,716,536 (the "5/31/17 Woolley Cash Transfer") | Wire transfer had two purposes: 1. Distribution of $1,035,536 in profits under Profit-Sharing Agreement. 2. Repayment of $2,681,000 in principal. |

68

| TABLE 1 | | |
|---|---|---|
| **Date** | **Total Amout of Wire Transfer** | **Purpose of Wire Transfer** |
| 9/13/17 | $2,000,035 (the "9/13/17 Woolley Cash Transfer") | Wire transfer had two purposes:<br><br>1. Distribution of $700,035 in profits under Profit-Sharing Agreement.<br><br>2. Repayment of $1,300,000 in principal. |
| 9/15/17 | $199,975 (the "9/15/17 Woolley Cash Transfer") | Distribution of profits under Profit Sharing Agreement, for express purpose of satisfying Paul Kraus' personal debt to Ken Woolley. |
| 9/26/17 | $1,974,216 (the "First 9/26/17 Woolley Cash Transfer") | Wire transfer had two purposes:<br><br>1. Distribution of $1,048,075 in profits under Profit-Sharing Agreement.<br><br>2. Payment of $926,141 in principal and interest. |
| 9/26/17 | $161,652 (the "Second 9/26/17 Woolley Cash Transfer") | Distribution of profits under Profit Sharing Agreement, for express purpose of satisfying Paul Kraus' personal debt to Ken Woolley. |
| 10/17/17 | $1,709,007 (the "10/17/17 Woolley Cash Transfer") | Wire transfer had two purposes:<br><br>1. Distribution of $709,007 in profits under Profit-Sharing Agreement.<br><br>2. Repayment of $1 million in principal. |

69

351. The payments listed in Table 1, above, are in the total amount of $17,303,875.00.

352. None of the payments listed in Table 1 satisfied any portion of the Ohadi Note.

353. JMG also made two profit distributions that benefitted Ken Woolley indirectly. *See* Yormark Report, Exhibits 9A-20B. These two payments were in the combined amount of $1,235,867. *Id*. In both instances, JMG paid funds to Paul Kraus, who was then contractually obligated to use those funds to partially pay his personal debt to Ken Woolley. *Id*. Neither payment satisfied JMG's Ohadi Note obligation. *Id*. The payments were:

| TABLE 2 | | |
|---|---|---|
| <u>Date</u> | <u>Total Amount of Wire Transfer</u> | <u>Purpose of Wire Transfer</u> |
| 9/14/16 | $940,000 (the "9/14/16 Woolley Cash Transfer") | Distribution of profits under PSA, for express purpose of satisfying Paul Kraus' personal debt to Ken Woolley. |
| 6/2/17 | $295,867 (the "6/2/17 Woolley Cash Transfer") | Distribution of profits under PSA, for express purpose of satisfying Paul Kraus' personal debt to Ken Woolley. |

354. At trial, Ken Woolley testified that the 9/14/16 Woolley Cash Transfer of $940,000 was never paid to him. *See* 11/20/19 Tr. at 625:18-626:6. He claimed that Paul Kraus gave the $940,000 to Dynamic. *Id*. In fact, however, when the $940,000 payment was made, Ms. White recorded the payment as an amount "indirectly paid to Ken [Woolley] toward his portion of Dynamic investment," and Ms. White therefore treated that payment as a reduction of Paul Kraus' personal debt to Ken Woolley. *See* P865 at 9, Rows 38 and 40.

70

355. The payments listed in Tables 1 and 2, above, were in the combined amount of $18,539,742 ($17,303,875 + $1,235,867) – which was approximately four times the total amount of cash ($4,707,435.48) that JMG applied toward paying principal under the Ohadi Note during the same period. This course of conduct is not indicative of a genuine belief, on the part of Defendants, that the Ohadi Note in fact was secured by a blanket, first priority lien.

356. Paul Ohadi had actual knowledge of these payments because he was an investor in Alta and KMW, as shown in the spreadsheet maintained by Ms. White. *See* P862. In many instances, after receiving a payment from JMG, Ken Woolley would remit a portion of those funds to Paul Ohadi. *Id*. However, such remittances were not treated as reducing any obligation owed by JMG under the Ohadi Note. *Id*. *See also* 11/20/19 Tr. at 663:6-16.

357. At no time did JMG, Ken Woolley, or any other Defendant object to these payments on the ground that the funds should have been used to repay the Ohadi Note. Paul Kraus, Mike Logan and Ken Woolley routinely emailed each other about this profit-sharing arrangement without ever referring to any competing claim held by the Ohadi Trust. *See* P822; P719.

358. At certain points during trial, Defendants tried to rationalize this course of conduct by suggesting that these payments were made because of a purchase money security interest ("PMSI"), which, according to Defendants, would trump any blanket, first priority lien. *See* 11/20/19 Tr. at 659:16-21; 11/21/19 Tr. at 840:22-

71

841:9. That explanation is legally unsound, and there is no evidence, in Defendants' contemporaneous conduct, that Defendants tried to create PMSIs. *See* Conclusions of Law § VII(C), *infra*.

359. Moreover, this explanation was contradicted by Brad Helsten. Brad Helsten testified that, in his view, the *Term Loan* was secured by a PMSI. *See* Tr. at 805:16-806:4. But Brad Helsten also testified that, in his view, the Term Loan PMSI was superseded by the lien securing the Ohadi Note. *See id*. According to Brad Helsten, that is because the Ohadi lien came first, and the real rule of lien priority is "first in time, first in right." *See id*.

360. In sum, Defendants suggested that (i) the Ohadi Note was secured by a blanket, first priority lien; *but* (ii) despite that alleged lien, it was appropriate for JMG to give Defendants tens of millions of dollars for purposes *unrelated* to the Ohadi Note, *but* (iii) because of the *same* alleged lien, JMG is precluded from paying its debt to Jet Midwest International. What these positions add up to, in substance, is the notion that a lien can exist for the sole purpose of prejudicing the interests of a judgment creditor, while the debtor's insiders walk away with what is left of the debtor's assets. As discussed herein, there is no legal basis for this position.

**Additional Payments to Ken Woolley**

361. As reflected in P1149, JMG made several other payments to Ken Woolley prior to entry of the Judgment. These payments further demonstrate that, before entry of the Judgment, Defendants never treated the Ohadi Trust as being a blanket, first priority lienholder.

72

362. As previously mentioned, Alta (as consignor) and JM Inc. (as consignee) entered into a consignment agreement for the purpose of consigning, to JM Inc., certain assets that had been acquired from China Air.  *See* P774 (the "China Air Consignment Agreement").  JMG was not a party to the China Air Consignment Agreement.  *Id*.  There is no evidence of any security agreement securing JM Inc.'s payment obligations under that agreement.  *Id*.

363. JMG made three cash distributions to Ken Woolley, on behalf of JM Inc., under the China Air Consignment Agreement.  *See* 11/18/19 Tr. at 187:24-188:9.  They included:

- The payment of $855,000, by JMG to Ken Woolley on July 18, 2017 (the "7/18/17 Woolley Cash Transfer");

- The payment of $1,214,716, by JMG to Ken Woolley on August 18, 2017 (the "8/18/17 Woolley Cash Transfer"); and,

- The payment of $1,177,632, by JMG to Ken Woolley on September 12, 2017 (the "9/12/17 Woolley Cash Transfer")

*Id*.  *See also* P1149.

364. All three payments were made while the Term Loan Action was pending before this Court.

365. On March 23, 2018 (during the JMG Bankruptcy Case), Alta filed a UCC financing statement in Kansas, against JM Inc., with respect to the China Air aircraft and engines.  *See* P1143.  But this was months after the abovereferenced payments were made.  *Id*.

366. P1149 lists three other payments to Ken Woolley, each of which is similarly inconsistent with Defendants' position that the Ohadi Trust had a blanket, first priority lien over JMG's assets. First, on May 27, 2016, JMG made a $5,150,000.00 payment (the "5/27/16 Woolley Cash Transfer") to Ken Woolley to repay principal owed under a promissory note between JMG and Alta. *See* P598 (promissory note). At that time, Alta did not have a UCC financing statement on file, in Delaware, against JMG. *See* P760. But JMG still paid $5,150,000.00 to Ken Woolley instead of using those funds to pay the Ohadi Note. *Id.*

367. The second and third payments are: (i) the $250,000.00 payment made to Ken Woolley on January 19, 2016 (the "1/19/16 Woolley Cash Transfer") and (ii) the $250,000.00 payment made to Ken Woolley on June 14, 2016 (the "6/14/16 Woolley Cash Transfer"). *See* P1149. There is no evidence of any agreement between JMG and Ken Woolley, Alta or KMW regarding either payment. When these payments were made, no UCC financing statement had been recorded against JMG in Delaware by Ken Woolley, Alta or KMW. *See* P760.

368. At her deposition, Emily White testified that the 1/19/16 and 6/14/16 Woolley Cash Transfers were linked to the sale of two engines (ESNs 717032 and 717033) by an entity called Aero Cap Dyn, LLC ("Aero Cap"). Ken Woolley was an owner of Aero Cap. *See* P762. But when Emily White was asked, at her deposition, why *JMG* (as opposed to AeroCap) was the entity that paid Ken Woolley on account of the sale of those engines, Emily White had no information to offer. *See* White Dep. Tr. at 89:4-9; 89:12-22. Nor did any witness who

testified at trial, on Defendants' behalf, offer any logical explanation regarding this matter.

369. Again, there is no evidence that any Defendant objected to these payments to Ken Woolley on the ground that the funds instead should have been used to repay the Ohadi Note.

**Ken Woolley's Conduct with Respect to the Woolley Guaranty**

370. Pursuant to the Woolley Guaranty, the funds that Ken Woolley has received from JMG are to be held by Ken Woolley "only as a trustee" for the Ohadi Trust, and Ken Woolley must "promptly pay over" to the Ohadi Trust "all proceeds recovered for application to the obligations of Debtor [JMG] under the Loan Documents." *See* Woolley Guaranty ¶ 5.

371. As noted, the Ohadi Trust has represented that the present balance due under the Ohadi Note is $5,270,000. *See* Term Loan Action, Docket No. 161 at 4. As discussed above, Ken Woolley has received many times this amount from JMG. Accordingly, if the funds received by Ken Woolley were used to reduce the liability owed by JMG under the Ohadi Note – as required under the Woolley Guaranty – the Ohadi Note would be fully paid today.

372. Ken Woolley has not complied with his obligation, under the Woolley Guaranty, to give these funds to the Ohadi Trust – in fact, he has not made any such payments. *See* 11/20/19 at 612:22-613:8; 623:20-23. But while Ken Woolley keeps for himself the funds that should be used to satisfy the Ohadi Note,

Defendants (including Ken Woolley) oppose the enforcement of the Judgment. They do so on the ground that the Ohadi Note is still technically unpaid and, according to Defendants, is secured by a blanket, first priority lien.

**Cash Payments to the Ohadi Trust**

373.   Prior to the filing of the JMG Bankruptcy Case, JMG made an aggregate total of $14,925,859.87[3] in direct cash payments to the Ohadi Trust Account maintained by the Ohadi Trust at MB Bank.  *See* P1148.  An examination of these payments shows that, once again, the bulk of JMG's cash distributions were *not* treated as repaying the Ohadi Note.

374.   JMG's $14,925,859.87 in direct cash payments to the Ohadi Trust Account included:

- JMG's use of the Term Loan Aircraft sales proceeds to pay obligations owed under the Ohadi Note in November and December 2015.  Those three payments add up to $3,961,898.12, and therefore account for 27% of the $14,925,859.87.

- On September 7, 2016, JMG gave the Ohadi Trust $7,780,000.00 (the "9/7/16 Ohadi Cash Transfer").  *See* P1148.  As indicated by Mr. Yormark, this payment was comprised of: (i) a profit distribution of $250,000 under a PSA (the parties to which were JMG and Alta), and (ii) a repayment of $7,530,000 in principal, interest and late charges under a promissory note (the parties to which were JMG and Alta).  *See* Yormark Report, Exhibit 14B.  The 9/7/16 Ohadi Cash Transfer was 52% of the total amount of $14,925,859.87 paid to the Ohadi Trust.  On September 7, 2016, Alta did not have any UCC financing statement on file against JMG.  *See* P760.

- The remainder of the payments reflected on P1148 (the "Additional Ohadi Note Payments"),[4] totaling $3,183,961.75, were additional payments on

---

[3] P1148 reflects total transfers of $17,767,859.87.  However, $2,842,000.00 of that total amount represents the value of JMG's transfer of the AWN share certificates, which was not a cash payment.  *See* P1148.

[4] As shown on P1148, these payments were made on: August 3, 2015; August 31, 2015; September 3, 2015; September 30, 2015; March 16, 2016; March 30, 2016; April 29,

76

the Ohadi Note.  *See* P1148.  These payments were approximately 21% of the $14,925,859.87.  Of these payments, $2,933,961.75 was monthly interest, and $250,000 (after entry of the Judgment) was treated as a payment of principal.  *See* 11/18/19 Tr. at 186:1-6.

375.  In sum, of the cash that JMG paid directly to the Ohadi Trust Account, 52% was paid for purposes unrelated to the Ohadi Note.  But in opposing the enforcement of the Judgment, Defendants' position still is that the Ohadi Note is secured by a blanket, first priority lien.

## THE PROPOSED FORECLOSURES

### Structure of the Proposed Foreclosures

376.  On November 6, 2017 – approximately two weeks after entry of the Judgment – the Ohadi Trust served a default notice on JMG, citing as its basis JMG's March 2016 default on the Ohadi Note.  *See* P759 (the "Ohadi Default Notice").  This was the first time that the Ohadi Trust had served a default notice on JMG.  *See* 11/20/19 Tr. at 814:1-5.

377.  On November 13, 2017 – approximately one week after the Ohadi default notice – KMW served a default notice on JMG.  *See* P772 (the "KMW Default Notice").  This was the first time that KMW had served a default notice on JMG.  *See* 11/20/19 Tr. at 814:1-5.

---

2016; June 1, 2016; June 30, 2016; August 2, 2016; September 1, 2016; September 7, 2016; October 3, 2016; November 1, 2016; December 1, 2016; December 30, 2016; January 31, 2017; February 28, 2017; April 3, 2017; April 28, 2017; May 31, 2017; June 30, 2017; July 31, 2017; August 31, 2017; September 29, 2017; October 31, 2017; November 30, 2017; December 29, 2017; January 31, 2018, and February 23, 2018.

77

378. The KMW Default Notice indicated that, in May 2017, JMG had failed to pay the principal amount owed on a promissory note between JMG and KMW. *See* OW198 (the "KMW Promissory Note"). The KMW Promissory Note is dated January 17, 2017. *Id*.

379. KMW has represented that the present balance due under the KMW Promissory Note is $4,213,882.00. *See* Term Loan Action, Docket No. 160 at 3.

380. The KMW Default Notice states that the KMW Promissory Note is secured by an Aircraft Mortgage and Security Agreement dated January 17, 2017 (approximately a year and a half after the date of the Ohadi Note). *See* OW199 (the "KMW Security Agreement").

381. The KMW Security Agreement states that KMW's collateral consists of eight specific aircraft and the attached engines. *See* KMW Security Agreement, Schedule A.

382. As noted above, KMW has never filed a UCC financing statement against JMG in Delaware. *See* P760.

383. The evidentiary record in this case includes copies of the FAA records regarding the eight aircraft that are identified as KMW's collateral in the KMW Security Agreement. *See* P106 through P111. Those records indicate that KMW did not record the KMW Security Agreement with the FAA until December 4, 2017, which was six weeks after the entry of the Judgment and nearly a month after the KMW Default Notice was served. *Id*.

384. On November 29, 2018, the Ohadi Trust and KMW simultaneously announced their intent to foreclose (the "Proposed Foreclosures") on JMG's remaining inventory. *See* P1019 (the "Gjerdingen Written Testimony") ¶ 7. *See also* Gjerdingen Written Testimony Exhibit 2 (the "Ohadi Notice of Disposition") and Exhibit 3 (the "KMW Notice of Disposition").

385. The Ohadi Notice of Disposition stated that the following assets would be auctioned:

- Four engines (MSNs 709636, 709650, 709660, 709672), which are different from the engines listed in the KMW Security Agreement; and,

- JMG's inventory of parts for sale (the "Spare Parts Foreclosure Inventory").

*See* Ohadi Notice of Disposition at 3.

386. The Ohadi Notice of Disposition provided a link to a spreadsheet, hundreds of pages in length, itemizing each spare part contained in the Spare Parts Foreclosure Inventory. *See* Gjerdingen Written Testimony, Exhibit 1 (the "Spare Parts Foreclosure Spreadsheet"). That spreadsheet had been given to the Ohadi Trust by JMG (specifically, by Karen Kraus) for purposes of the Proposed Foreclosures. *See* Gjerdingen Written Testimony ¶ 6.

387. The Ohadi Notice of Disposition identified three security agreements as the purported legal bases for the Ohadi Trust foreclosing upon the above-referenced assets:

- The FOSA (the First Ohadi Security Agreement);

79

- The SOSA (the Second Ohadi Security Agreement); and,

- The SAA (the post-judgment lien in which Defendants amended the SOSA).

*See* Ohadi Notice of Disposition at 2.

388. The KMW Notice of Disposition listed six of the aircraft, and attached engines, referenced in the KMW Security Agreement. *See* KMW Notice of Disposition, Schedule A.

389. The KMW Notice of Disposition identified the KMW Security Agreement as the purported legal basis for KMW foreclosing upon those assets. *See* KMW Notice of Disposition at 2.

390. The Ohadi Default Notice, KMW Default Notice, Ohadi Notice of Disposition and KMW Notice of Disposition all had the same signatory: Brad Helsten.

391. The assets identified in the Ohadi and KMW Notices of Disposition were to be sold together, as one lot, on December 19, 2018 at the offices of the Spencer Fane law firm in Kansas City. *See* Ohadi Notice of Disposition at 1-2; KMW Notice of Disposition at 1-2. The Spencer Fane firm is trial counsel for the Ohadi/Woolley Defendants in this litigation.

392. The proposed auction date (December 19, 2018) was 20 calendar days (14 business days) after the date (November 29, 2018) on which the notices of disposition were served.

393. Responsibility for advertising the proposed auction was assigned by Defendants to a litigation associate at the GTG law firm; the GTG law firm also is the Ohadi/Woolley Defendants' counsel in this litigation. *See* Gjerdingen Written Testimony ¶ 3.

394. The litigation associate who was given this responsibility has no educational or professional background in the aviation field. *See* Gjerdingen Written Testimony ¶ 2.

395. The litigation associate did not begin advertising the proposed auction until December 1, 2018, which was 18 calendar days (13 business days) before the proposed auction date of December 19, 2018. *See* Gjerdingen Written Testimony ¶ 13.

396. Advertisements were placed in three publications: Barnstormers.com, USA Today, and the Kansas City Star. *See* Gjerdingen Written Testimony ¶¶ 13-18. As discussed below, these publications do not reach the relevant markets for the assets at issue.

397. There is no evidence that these advertisements successfully attracted any interested buyers prior to the proposed auction date. *See* Gjerdingen Written Testimony ¶ 9.

398. This Court entered a TRO and preliminary injunction to stop the Proposed Foreclosures pending a final decision on the merits in this case. *See* Docket Nos. 122 and 169.

399. Despite the fact that, in this litigation, Defendants assert that the Ohadi Trust has a blanket, first priority lien covering all of JMG's assets, the Ohadi Trust never objected to KMW's proposed foreclosure. *See* 11/20/19 Tr. at 628:23-24; 632:12-17; 788:19-789:11.

400. As previously noted, Paul Kraus' original, stated reason for seeking financing from the Ohadi Trust, in 2015, was to stop Amur from foreclosing. *See* P651.

401. However, Paul Kraus has not tried to stop the Proposed Foreclosures by the Ohadi Trust and KMW. *See* 11/19/19 Tr. at 380:14-381:8.

402. In his pre-trial deposition in this case, Paul Kraus testified that he did not want Ken Woolley or the Ohadi Trust to foreclose. *See* 11/19/19 Tr. at 381:12-17. But at trial, Paul Kraus testified that he is not concerned about the Proposed Foreclosures. *Id*. at 381:7-8.

403. Asked why he was not concerned about the Proposed Foreclosures, Paul Kraus did not cite any business reason. *See* 11/19/19 Tr. at 381:7-8. Instead, Paul Kraus's only explanation for his position was that, in his view, Ken Woolley and Paul Ohadi are "good people." *Id*.

**Mr. Tokoph's Analysis of the Proposed Foreclosures**

 • **Whether the Auction Was Designed to Maximize Value**

404. David Tokoph, an aviation industry expert retained by Jet Midwest International in this case, testified that the Proposed Foreclosures by the Ohadi/Woolley Defendants were not reasonably designed to maximize value. *See* 11/18/19 Tr. at 12:1-26:20.

> The single lot sale was not structured to maximize value of the very complex inventory. The advertising means, I don't believe, were sufficient for this type of inventory. The timeframe was not enough to allow for a wide subset of buyers. And I think it's indicated by Erick Gjerdingen, who said that there were no inspections requested. Any buyer of this size of inventory would have wanted an inspection of the inventory

*Id*. at 43:22-44:5.

405.   The market for trading spare parts, whole aircraft and engines is extremely complex.  *See* 11/18/19 Tr. at 14:5-16:5.  To design an orderly liquidation that maximizes value:

> [T]here needs to be an assessment of the assets for which are being sold. So an analysis of what type of asset it is, what is the market for that asset, and then apply and develop for the best way to market that asset. So who are the potential buyers in the space, what does supply look like for competition's sake, and what does demand look like.

*Id*. at 16:22-17:3.

406.   The assets identified in the KMW Notice of Disposition are corporate aircraft and business jets.  *See* 11/18/19 Tr. at 19:22-20:1.  Such aircraft normally would be marketed to "either a corporate flight department or a wealthy individual looking to transport company employees or themselves, or a charter operator who provides that type of service to individuals or corporations where, again, they're selling the aircraft for transport as opposed to individual seats within the aircraft." *Id*. at 20:11-17.

407.   The engines identified in the Ohadi Notice of Disposition are JT9D engines, which typically would be used by an airline in a large commercial aircraft.  *See* 11/18/19 Tr. at 21:16-17.  Such engines normally would be marketed to "an airline or a trader, engine trader, or an engine lessor supplying engines to that airline." *Id*. at 21:18-20.

408.   Mr. Tokoph explained that the Spare Parts Foreclosure Inventory contains over 84,000 individual spare parts "coming from a number of different aircraft types,"

including:

> new – or current generation in-service aircraft like the 737 engine A-320, which there are over 10,000 aircraft operating, to the DC9, which is an aircraft that's out of favor and has literally 5 percent of its original number of delivered aircraft still operating. So a wide range of aircraft types.

*See* 11/18/19 Tr. at 26:14-19.

409.  Mr. Tokoph provided the following description of the way in which the Ohadi/Woolley Defendants had planned to auction the above-referenced aircraft, engines and parts:

> I learned that the foreclosure auction was to be conducted in one lot, one lot sale, including, again, assets from all those different aircraft and aircraft types. It was advertised via Barnstormers, which is a general aviation trading platform. By general aviation, I mean, you know, small personal transport aircrafts, such as single engine or twin engine Cessnas, as opposed to a corporate aircraft or commercial aircraft trading platform. So that, to me, was a bit surprising, as it's not a very useful place to list this type of inventory, as the readers really don't – the readers of Barnstormers wouldn't really have an interest in corporate or commercial aviation. It was organized by a law firm who I understand has no experience in marketing these types of assets; and, again, conducted in one lot. . . . I understood the advertisement for the inventory sale first occurred in early December; so around December 4th. And the foreclosure auction was scheduled December 19th, I believe, so a very small or short time period to gain prospective buyers.

*See* 11/18/19 Tr. at 39:24-40:21. In sum, the auction was not properly organized, or advertised, to attract potential buyers. *Id*.

410.  In the aviation industry, it would be abnormal to group such a complex inventory of spare parts, engines and aircraft together and then try to sell it as one single lot. *See* 11/18/19 Tr. at 23:19-24:8. That is because such assets should be sold to "very distinct markets." *Id*. Mr. Tokoph has never seen, in the aviation

industry, an auction in which such a complex inventory was organized as one lot, as Defendants wish to do here. *Id.* at 24:21-25:4.

411.    Mr. Tokoph further explained:

> The reason is, again, the complexity of this inventory and the varied fleet of aircraft from which they are removed. Again, there was no airline who operates the entirety or every aircraft within this fleet; and there are few, if any, traders that participate in every single one of these markets. So it's too complex of an inventory for one sale.

*See* 11/18/19 Tr. at 28:11-16.

412.    Auctioning such assets as one lot does not maximize value, because "it's unlikely that one particular buyer would be interested or be able to ascribe value to all the different subsets of inventory within this one single lot." *See* 11/18/19 Tr. at 41:13-16.

> It's unlikely that you're going to find a buyer that has either an airline that operates all the aircraft in the inventory or a trader that services all the specific market segments in an inventory. So any potential buyer who has interest in one specific part of the inventory is unlikely to ascribe value to the part of the inventory which they do not engage in, so the effect would not be a maximization of value of the entire inventory.

*Id.* at 24:12-20.

413.    The inventory should be divided "based on the specific aircraft from which the parts were removed or the specific aircraft and engines themselves and targeted to either end users, airlines, operators, charter operators, who operate those fleets of aircraft, or traders who actively engage in trading parts for those types of aircraft." *See* 11/18/19 Tr. at 41:17-23.

414. The auction also needs to be advertised properly.  As Mr. Tokoph explained:

> For example, for selling commercial aviation spares, a trading platform such as ILS or Inventory Locator System would have been a preferable location, as that's where airlines and traders go to actually acquire commercial aircraft parts. And for corporate jets, I think a trader platform such as Controller or Trade-A-Plane would have been preferential, as that's where buyers of those type of assets go to buy parts.

*See* 11/18/19 Tr. at 41:3-11.

415. In addition, "the time for sale, you know, would likely -- should have been longer so that there is time to attract the appropriate interest in the inventory by these parties."  *See* 11/18/19 Tr. at 41:24-42:2.

416. Mr. Tokoph explained that, *if* an orderly liquidation of the Spare Parts Foreclosure Inventory had been commenced in December 2018, the liquidation potentially could have generated cash proceeds of $17,564,620, if the liquidator were given up to 12 months to complete the liquidation process.  *See* P1152 (the "Tokoph Report") at 18, Table 3.

417. Moreover, *if* an orderly liquidation of the aircraft and engines had been commenced in December 2018 (and assuming the aircraft are in Half-Time maintenance status and the engines are enrolled in a manufacturer's engine program), the liquidation potentially could have generated additional cash proceeds of $14,259,000, if the liquidator were given up to 12 months to complete the liquidation process.  *See* Tokoph Report at 23, Table 7.

418. As noted, these estimated orderly liquidation values assume a liquidation process commencing in December 2018.  *See* 11/18/19 Tr. at 44:9-12.  It would not be appropriate to apply those estimates to any earlier, or subsequent, points in time,

because of changes in market conditions and the contents of the inventory over time.  *Id.* at 44:13-23.

419.   In any event, the foreclosure auction that the Ohadi Trust and KMW wanted to conduct in December 2018 would not have been an orderly liquidation.  *See* 11/18/19 Tr. at 42:3-5.  In fact, Mr. Tokoph indicated, "it's really more of a fire sale than anything else."  *Id.* at 42:7-8.  As Mr. Tokoph indicated, there would be no reason to expect such a fire sale to attract competitive bidding or generate any cash proceeds.  *Id.* at 43:17-20; 44:6-8.

• **Further Analysis of Spare Parts Foreclosure Inventory**

  • **First Ohadi Security Agreement**

420.   Mr. Tokoph performed three additional analyses of the Spare Parts Foreclosure Inventory.

421.   First, he compared (i) the list of assets that were identified as the Ohadi Trust's collateral in the FOSA (*i.e.*, the First Ohadi Security Agreement) (*see* ¶ 306, *supra*), and (ii) the contents of the Spare Parts Foreclosure Inventory.  *See* 11/18/19 Tr. at 38:13-20.  Mr. Tokoph found no overlap between those two lists of inventories.  *Id.*

422.   Mr. Tokoph's finding regarding this point was unrebutted at trial.  The significance of this unrebutted finding is that it rules out the FOSA as a possible basis for the Ohadi Trust's claim that it is entitled to foreclose on the Spare Parts Foreclosure Inventory.

87

423. Thus, in arguing that it is entitled to conduct such a foreclosure, the Ohadi Trust must try to rely on the SAA, which amended the SOSA (the Second Ohadi Security Agreement).

424. There is no doubt the Spare Parts Foreclosure Inventory falls within the *scope* of the SAA; indeed, as noted above (*see* ¶ 304, *supra*) Defendants admit that the SAA was created for the purpose of shielding that inventory from Jet Midwest International's garnishment writ. But the SAA is not legally enforceable, because, as discussed herein, it is a fraudulent transfer.

• **Bankruptcy Inventory**

425. Second, Mr. Tokoph compared (i) the Spare Parts Foreclosure Inventory, published on November 29, 2018, and (ii) the inventory that JMG disclosed to the Bankruptcy Court on March 27, 2018. *See* 11/18/19 Tr. at 30:16-20; Tokoph Report at 14, Table 1.

426. The Spare Parts Foreclosure Spreadsheet is hundreds of pages in length and discloses over 84,000 individual parts. *See* Spare Parts Foreclosure Spreadsheet.

427. Mr. Tokoph explained that exporting such a spreadsheet from an inventory management database takes just "a minute or two." *See* 11/18/19 Tr. at 35:2536:5.

428. The inventory that JMG disclosed to the Bankruptcy Court on March 27, 2018 was one and a half pages in length, and was attached by JMG to Official Form 206Sum (Summary of Assets and Liabilities for Non-Individuals). *See* P212 ("Form 206") at 9-10.

88

429. Form 206 contains the following instructions:

> Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also, include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. . . . Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form.

*See* Form 206 at 2.

430. The inventory list (the "Bankruptcy Inventory") that JMG attached to Form 206 does not disclose *any* individual spare parts. *See* Form 206 at 9-10. It does identify certain assets: specifically, a total of 25 aircraft, 13 engines and one "flight simulator." *Id*. JMG described this inventory as its "Inventory for Sale/Lease." *Id*. JMG did not disclose any other aircraft, any other engines, or any other type of inventory to the Bankruptcy Court. *Id*.

431. The Spare Parts Foreclosure Spreadsheet identifies the specific aircraft from which each individual spare part was obtained. *See* 11/18/19 Tr. at 25:12-26:7. The Spare Parts Foreclosure Spreadsheet identifies 53 such aircraft. *See* Tokoph Report at 16.

432. Of the 53 aircraft identified in the Spare Parts Foreclosure Inventory, 42 of them (or 79%) were not disclosed by JMG to the Bankruptcy Court in the JMG Bankruptcy Inventory. *See* 11/18/19 Tr. at 30:16-20; Tokoph Report at 14, Table 1; P1069 (JMG's Responses to Jet Midwest International RFAs 1 through 50); November 8, 2019 Order (Docket No. 582) at 5.

89

433. All of those 42 aircraft were acquired by JMG months or years before the JMG Bankruptcy Case was filed, but JMG disclosed none of them to the Bankruptcy Court. *See* 11/18/19 Tr. at 32:11-33:17; Tokoph Report at 15, Table 2; P1069 (JMG's Responses to Jet Midwest International RFAs 1 through 50); November 8, 2019 Order (Docket No. 582) at 5.

434. Among the assets that JMG omitted from the Bankruptcy Inventory, but disclosed in the Spare Parts Foreclosure Spreadsheet, are spare parts from the Term Loan Aircraft. The Spare Parts Foreclosure Spreadsheet states that JMG still has, in its inventory, over 400 spare parts from that aircraft. *See* Tokoph Report at 24. *See also* 11/18/19 Tr. at 36:21-22. But in its Bankruptcy Inventory, JMG did not disclose any such spare parts. *Id*.

435. At trial, Mike Logan suggested two possible reasons why the Spare Parts Foreclosure Inventory and Bankruptcy Inventory differed. First, he suggested that JMG prepared the lists using different software systems. *See* 11/18/19 Tr. at 266:9-18. But he did not explain *why* JMG would use different methods in generating inventory lists for purposes of bankruptcy and foreclosure, especially given that the result of this was to give the Ohadi Trust enormous amounts of material information never shared with the Bankruptcy Court. Second, he suggested that, in the Bankruptcy Inventory, JMG omitted mention of any aircraft that JMG considered to have no book value. JMG omitted such aircraft even though Form 206 expressly tells the debtor (here, JMG) that it must disclose "assets and properties which have no book value." *See* 11/18/19 Tr. at 265:1019; Form 206 at 2.

436. At trial, Karen Kraus pointed out that she testified before the Bankruptcy Court on the final day of the JMG Bankruptcy Case. *See* 11/19/19 Tr. at 348:24-349:1. During such testimony before the Bankruptcy Court, Karen Kraus commented, in a general fashion, on the fact that JMG had aircraft inventory. *Id*. at 349:2-350:5. That much was already known. What Karen Kraus did *not* tell the Bankruptcy Court (or Jet Midwest International) was that JMG had disclosed only a small fraction of the volume and contents of such inventory. *Id*.

**• Post-Judgment Discovery**

437. During post-judgment discovery, *prior to* the filing of the JMG Bankruptcy Case, JMG similarly gave incomplete information about its remaining inventory to Jet Midwest International.

438. Jet Midwest International's post-judgment discovery demands required JMG to disclose (among other things) all of its assets. *See* P123; P126. When it responded to those demands on January 3, 2018, JMG failed to produce a complete list of its inventory. *See* P1069 (JMG's Responses to Jet Midwest International RFAs 51 through 57); Tokoph Report, Exhibit C.

439. Of the 53 aircraft identified in the Spare Parts Foreclosure Inventory, only six (or 11%) of those aircraft were disclosed by JMG in post-judgment discovery. *See* P1069 (JMG's Responses to Jet Midwest International RFAs 51 through 57); Tokoph Report, Exhibit C.

440. In a sworn interrogatory response produced to Jet Midwest International in postjudgment discovery on January 3, 2018, JMG also represented –

inaccurately – that it had no information regarding where any of the spare parts from the Term Loan Aircraft were.  *See* P103; P130.

441.  In sum, in post-judgment discovery, just as in the JMG Bankruptcy Case, JMG provided materially incomplete information about its inventory.  But once the Ohadi Trust indicated that it wished to foreclose, JMG gave a complete inventory list to the Ohadi Trust to facilitate that foreclosure.  There was no reason why that list could not have been given by JMG to Jet Midwest International or the Bankruptcy Court.

### • Mr. McDonough's Failure to Rebut Mr. Tokoph's Analysis

442.  Defendants' expert, Mr. McDonough, did not rebut Mr. Tokoph's report or testimony.

### • JMG's FINANCIAL CONDITION

#### • JMG's Internal Financial Records and Federal Tax Returns

443.  JMG's own general ledger data, as kept in the ordinary course of business by Mike Logan, states that JMG's debts continuously exceeded JMG's assets during the time period at issue in this case.[5]  This data is summarized in Table 7 of the DiSalvatore Report (P1154):

| (amounts in thousands of USD)<br>**For the Period Ended** | **Total Assets** | **Total Liabilities** | **Total Shareholders Equity** |
|---|---|---|---|
| **December 31, 2015** | $ 16,114 | $ 18,536 | $ (2,422) |
| **March 31, 2016** | $ 13,622 | $ 16,857 | $ (3,235) |

---

[5] JMG does not have audited financial records.  *See* DiSalvatore Report at 5.

| amounts in thousands of USD)<br>**For the Period Ended** | **Total Assets** | **Total Liabilities** | **Total Shareholders Equity** |
|---|---|---|---|
| **June 30, 2016** | $ 16,527 | $ 19,238 | $ (2,710) |
| **September 30, 2016** | $ 24,512 | $ 26,344 | $ (1,832) |
| **December 31, 2016** | $ 27,622 | $ 30,981 | $ (3,360) |
| **March 31, 2017** | $ 32,837 | $ 36,811 | $ (3,974) |
| **June 30, 2017** | $ 26,799 | $ 31,758 | $ (4,959) |
| **September 30, 2017** | $ 19,867 | $ 25,871 | $ (6,004) |
| **December 31, 2017** | $ 11,486 | $ 23,017 | $ (11,532) |
| **March 31, 2018** | $ 8,629 | $ 21,833 | $ (13,204) |
| **June 30, 2018** | $ 7,827 | $ 21,099 | $ (13,272) |
| **September 30, 2018** | $ 7,388 | $ 21,363 | $ (13,975) |
| **December 31, 2018** | $ 7,174 | $ 20,672 | $ (13,498) |
| **March 31, 2019** | $ 7,171 | $ 20,737 | $ (13,566) |
| **May 31, 2019** | $ 6,530 | $ 20,326 | $ (13,796) |

*See* DiSalvatore Report, Table 7.

444. JMG's own general ledger data also states that JMG had negative net income ("**NI**"), and that its gross revenues drastically declined year by year, as summarized in this table:

93

| (amounts in thousands of USD) **Twelve Months Ended** | **Revenue** | **EBIT** | **NI** |
|---|---|---|---|
| **December 31, 2015** | $ 26,468 | $ (1,051) | $ (400) |
| **March 31, 2016** | $ 24,403 | $ (3,826) | $ (3,222) |
| **June 30, 2016** | $ 23,104 | $ (2,989) | $ (2,485) |
| **September 30, 2016** | $ 34,541 | $ (2,855) | $ (5,622) |
| **December 31, 2016** | $ 27,215 | $ 1,258 | $ (937) |
| **March 31, 2017** | $ 25,970 | $ 1,432 | $ (739) |
| **June 30, 2017** | $ 27,129 | $ (76) | $ (2,248) |
| **September 30, 2017** | $ 24,144 | $ (1,830) | $ (4,172) |
| **December 31, 2017** | $ 23,644 | $ (5,920) | $ (8,172) |
| **March 31, 2018** | $ 23,923 | $ (7,125) | $ (9,230) |
| **June 30, 2018** | $ 15,476 | $ (6,631) | $ (8,314) |
| **September 30, 2018** | $ 6,643 | $ (6,778) | $ (7,971) |
| **December 31, 2018** | $ 4,938 | $ (1,239) | $ (1,966) |
| **March 31, 2019** | $ 4,628 | $ 2 | $ (362) |
| **May 31, 2019** | $ 3,558 | $ (411) | $ (774) |

See DiSalvatore Report, Tables 2 and 3.

445.     In its federal tax returns for 2015-17, JMG similarly reported that it had negative

net equity as of the end of each year, and negative net income for each year.

See P413 at 5 (Schedule M-2, Analysis of Partners' Capital Accounts); P-415 at

94

8  (Schedule M-2, Analysis of Partners' Capital Accounts); P364 at 6 (Schedule
M-2, Analysis of Partners' Capital Accounts).

446.  As noted by Mr. DiSalvatore, this data shows, on its face, that "[e]quity was
consistently negative and the negative balance increased by approximately 470%
from the reported balance as of December 31, 2015 to the reported balance as of
May 31, 2019." *See* DiSalvatore Report at 11.  It also shows "a deterioration in
financial performance," and "constant financial distress." *Id*. at 7-
8  Mr. McDonough did not rebut any of these points.

**Mr. DiSalvatore's Solvency Analysis**

447.  Mr. DiSalvatore also conducted a deeper analysis of JMG's financial condition.
He analyzed JMG's finances at quarterly intervals, or "Assessment Dates," from
December 31, 2015 through May 31, 2019 (the "Assessment Period").  *See*
11/18/19 Tr. at 72:2-6.

448.  The purpose of Mr. DiSalvatore's analysis was to determine whether JMG was
solvent at each Assessment Date.  *See* 11/18/19 Tr. at 72:2-6.  Mr. DiSalvatore
explained that, by definition, a solvency analysis examines a business "on a
going concern basis." *See* 11/18/19 Tr. at 71:12-13.  The purpose of the analysis
is to determine whether a business, as a going concern, has the "ability to pay
their debts as they come due." *Id*. at 69:16-20.

449.  Mr. DiSalvatore's analysis confirmed what JMG's own financials, and tax returns,
state on their face: that the company was continuously insolvent.  As Mr.

95

DiSalvatore explained:

> JMG was insolvent at each assessment date throughout the assessment period regardless of the test that was employed, which would include the balance sheet test, the cash flow test, and the capital adequacy test. So at every point in time, they were insolvent.

*See* 11/18/19 Tr. at 75:24-76:3.

450. As noted immediately above, Mr. DiSalvatore applied three tests. Specifically:

> The three tests include[] a balance sheet test, essentially whether or not the fair market value of the assets are greater than the value of the liabilities that are on the balance sheet, including any contingent liabilities that may not meet with the definition of GAAP.
>
> There's a cash flow test. The cash flow test essentially deals with management's ability to pay its obligations when they come due in the ordinary course of business.
>
> And then there's a capital adequacy test. In short, capital adequacy really deals with the – whether or not there's an equity cushion, if you will, and whether or not the business has an ability to attract capital from other potential investors.

*See* 11/18/19 Tr. at 70:3-16.

451. If a company ultimately fails any of the three solvency tests, the company should be considered to be insolvent. *See* 11/18/19 Tr. at 71:1-6.

**• Relationship to Tokoph Report**

452. As previously discussed, Mr. Tokoph analyzed, among other things, the cash proceeds that might be obtained if JMG's inventory were to be liquidated in an orderly fashion by a receiver. *See* 11/18/19 Tr. at 16:6-17:10. One form of relief sought by Jet Midwest International in this litigation is the appointment of a receiver to conduct an orderly liquidation. However, all of the Defendants (including JMG) have opposed such relief. *See* Docket No. 536.

96

453. In analyzing whether JMG is solvent, Mr. DiSalvatore did not use the numbers that Mr. Tokoph generated in his liquidation analysis. *See* 11/18/19 Tr. at 73:2574:6. As noted above, a solvency analysis does not examine the debtor on a liquidation basis, but rather on a going concern basis. *Id*. at 69:13-20. Moreover, the purpose of a solvency analysis is to determine whether the debtor, as a going concern, was capable of timely paying its debts. *Id*. at 69:16-20. Because JMG on its own will not conduct an orderly liquidation, and because JMG will not consent to a receiver conducting an orderly liquidation (*see* Docket No. 536), JMG's debts could not have been timely paid in that manner. JMG has also, in fact, failed to pay its debts, and failed to pay them for many years in a row.

454. Thus, instead of applying liquidation values, Mr. DiSalvatore looked to the prices for which JMG, as a going concern, typically sells its inventory. *See* 11/18/19 Tr. at 90:21-25. Mr. DiSalvatore explained: "[W]hat I did is I took the book value of JMG's inventory at each of those assessment dates, and I stepped it up to its selling price." *Id*. at 90:21-25.

455. To determine the selling prices of JMG's inventory, as compared to the book value of JMG's inventory, Mr. DiSalvatore relied on JMG's own budget, as prepared by Mr. Logan. *See* DiSalvatore Report at 31. Mr. DiSalvatore did so because that budget sets forth JMG's expectations regarding gross margins and operating margins in selling inventory. *Id*.

**• Balance Sheet Test**

456.  Mr. DiSalvatore employed two approaches in conducting the balance sheet test:

(i) the sum of assets approach, and (ii) the income approach.  *See* 11/18/19 Tr.

at 94:16-95:13.

457.  The sum of assets approach "focuses on the balance sheet of a business

enterprise and considers the value of the underlying assets and liabilities as a

means of determining the value of the equity."  *See* DiSalvatore Report at 27.

458.  The result of the sum of assets approach was:

As of each Assessment Date, JMG's Total Shareholders' Equity balance remained negative.  Therefore, under this approach, JMG's balance sheet remained in a negative state as of each Assessment Date and JMG was insolvent from a Balance Sheet Test perspective, because the fair market value of its assets are less than the fair market value of its liabilities.

*See* DiSalvatore Report at 32-33.

459.  The detailed results of the sum of assets approach are set forth in Exhibit 11.0 to the DiSalvatore Report.  In sum, the results are:

| Assessment Date | Net Shareholders' Equity |
|---|---|
| 12/31/15 | $ (2,255,520) |
| 3/31/16 | $ (3,088,472) |
| 6/30/16 | $ (2,475,117) |
| 9/30/16 | $ (1,425,728) |
| 12/31/16 | $ (2,847,402) |
| 3/31/17 | $ (3,263,805) |
| 6/30/17 | $ (4,397,017) |
| 9/30/17 | $ (5,628,320) |
| 12/31/17 | $ (11,257,809) |
| 3/31/18 | $ (12,982,667) |
| 6/30/18 | $ (13,066,001) |
| 9/30/18 | $ (13,783,245) |
| 12/31/18 | $ (13,310,550) |
| 3/31/19 | $ (13,386,662) |

98

| 5/31/19 | $ (13,624,842) |
| --- | --- |

460. The income approach focuses on "estimating annual future cash flows and individually discounting them back to present value." *See* DiSalvatore Report at 27.

461. In applying the income approach, Mr. DiSalvatore used a technique known as the Direct Capitalization Method. *See* DiSalvatore Report at 31-32.

462. "The Direct Capitalization Method assumes a valuation metric (earnings, cash flow, etc.) grows at a constant rate into perpetuity. The valuation metric is capitalized into perpetuity based on a capitalization rate that is deemed appropriate based on available facts and circumstances." *See* DiSalvatore Report at 27.

463. Mr. DiSalvatore determined that, in this case, it was appropriate to apply a capitalization rate within the range of 20% to 35%. *See* DiSalvatore Report at 31.

464. Mr. DiSalvatore explains that he selected this range of capitalization rates because, "[b]ased on the consistently poor financial performance of JMG over the time period reviewed, it is my opinion that this enterprise had a level of risk consistent with a venture capital investment that typically requires a higher rate of return than a more stable and profitable business." *See* DiSalvatore Report at 31. Mr. DiSalvatore applied "venture capital rates of return that are based on various historical studies." *Id*.

99

465. The Direct Capitalization Method, as applied to JMG's financial data, "indicated a negative Total Shareholders' Equity for JMG." *See* DiSalvatore Report at 33. Therefore, once again, "JMG was insolvent, from a Balance Sheet Test perspective." *Id*.

466. The detailed results of the Direct Capitalization Method are set forth in Exhibit 11.2 to the DiSalvatore Report. In sum, the results are:

| Assessment Date | Adjusted Net Worth at 20% Capitalization Rate | Adjusted Net Worth at 35% Capitalization Rate |
|---|---|---|
| 12/31/15 | $ (7,638,935) | $ (11,070,420) |
| 3/31/16 | $ (9,033,134) | $ (11,525,727) |
| 6/30/16 | $ (12,399,104) | $ (14,523,756) |
| 9/30/16 | $ (17,084,593) | $ (19,553,347) |
| 12/31/16 | $ (17,501,343) | $ (21,933,482) |
| 3/31/17 | $ (24,551,523) | $ (28,587,321) |
| 6/30/17 | $ (16,759,650) | $ (20,729,427) |
| 9/30/17 | $ (11,296,232) | $ (15,042,947) |
| 12/31/17 | $ (10,735,111) | $ (14,418,092) |
| 3/31/18 | $ (10,073,346) | $ (13,336,373) |
| 6/30/18 | $ (10,587,660) | $ (13,513,919) |
| 9/30/18 | $ (9,417,585) | $ (12,812,199) |
| 12/31/18 | $ (10,189,057) | $ (13,238,988) |
| 3/31/19 | $ (8,247,538) | $ (11,836,455) |
| 5/31/19 | $ (9,243,803) | $ (12,333,563) |

467. Mr. DiSalvatore notes that there exists another possible approach to conducting a balance sheet test, known as the Market Approach. *See* DiSalvatore Report at 30. The Market Approach can be conducted only when it is possible to benchmark the debtor's business at issue against comparable, publicly traded companies. *Id*. Mr. DiSalvatore explained:

100

> The companies returned in my search appeared to be engaged in diversified business operations that were not comparable to JMG's business operations or were otherwise not comparable. Accordingly, I believe that the market approach should not be applied in these circumstances.

*Id.*

468. Thus, Mr. DiSalvatore did not apply the Market Approach. *See* DiSalvatore Report at 30.

**• Cash Flow Test**

469. In applying the cash flow test, Mr. DiSalvatore found that, at each Assessment Date, JMG's total available gross cash flow was less than the debt obligations and guaranties that were owed by JMG at that time. *See* 11/18/19 Tr. at 98:9-16. In other words, JMG "never had enough cash to meet their obligations as they come due." *Id.* at 98:19-20.

470. In fact, throughout the Assessment Period, JMG's interest expense alone was greater than JMG's total available cash flow. *See* 11/18/19 Tr. at 100:8-9. That is:

> [JMG] couldn't even pay their interest expense based on that financial analysis, let alone their debt. And those negative numbers never changed throughout the analysis. So this is all factual data. This is just me taking the data off their income statement and running these ratios and drawing some conclusion from the data, either by the assessment date or for the entire period. And what's coming across loud and clear is that this is a very risky, highlyleveraged, poorly-performing business. That's what that data is telling me.

*Id.* at 100:9-18.

471. As shown in Exhibit 12.0 to the DiSalvatore Report, JMG's residual gross cash flow – *i.e.*, its available cash after payment of liabilities – is negative at each Assessment Date.

| Assessment Date | Residual Gross Cash Flow |
|---|---|
| 12/31/15 | $ (1,083,801) |
| 3/31/16 | $ (3,899,560) |
| 6/30/16 | $ (2,736,268) |
| 9/30/16 | $ (11,353,860) |
| 12/31/16 | $ (11,516,884) |
| 3/31/17 | $ (11,360,658) |
| 6/30/17 | $ (17,059,260) |
| 9/30/17 | $ (18,802,113) |
| 12/31/17 | $ (23,499,491) |
| 3/31/18 | $ (23,816,366) |
| 6/30/18 | $ (23,439,082) |
| 9/30/18 | $ (23,508,328) |
| 12/31/18 | $ (17,441,609) |
| 3/31/19 | $ (16,012,082) |
| 5/31/19 | $ (16,256,609) |

472. Mr. DiSalvatore's analysis of the cash flow test is corroborated by the fact that JMG defaulted on numerous debts, including: the Amur debt (January 2015); the Term Loan (October 2015); the Ohadi Note (March 2016); the MercFuel guarantee (October 2016); the AEG guarantee (March 2017); the KMW note (May 2017); the World Fuel guarantee (October 2017), and the Judgment (October 2017). *See* 11/18/19 Tr. at 102:10-105:10.

473. As another perspective on this issue, Mr. DiSalvatore computed JMG's coverage ratios. A coverage ratio "addresses how much coverage does a business have regarding the book value of its assets over its debt." *See* 11/18/19 Tr. at 99:8-10. Mr. DiSalvatore explained:

> And so in its simplest form, again, by way of example, if you look at the coverage ratio at December 31, 2015, of customer deposits and notes payable to inventory, what this is saying is that the debt obligations of the business at that point in time were three times greater than the book value of the inventory. That's a bad situation for anyone in any business. So that's a quick indication that the business is severely overleveraged.

*Id*. at 99:11-19.

474. JMG's coverage ratios are set forth in detail in Exhibit 12.1 to the DiSalvatore Report. In sum, below is the ratio of (i) JMG's customer deposits and notes payable to (ii) the book value of JMG's inventory at each Assessment Date. For example, for 12/31/15, the coverage ratio of 2.91x means the combined value of JMG's customer deposits and notes payable was nearly three times greater than the total book value of JMG's inventory.

| Assessment Date | Coverage Ratio (Customer Deposits and Notes Payable to Inventory) |
|---|---|
| 12/31/15 | 2.91 |
| 3/31/16 | 2.98 |
| 6/30/16 | 2.15 |
| 9/30/16 | 1.70 |
| 12/31/16 | 1.58 |
| 3/31/17 | 1.39 |
| 6/30/17 | 1.34 |
| 9/30/17 | 1.55 |
| 12/31/17 | 2.05 |
| 3/31/18 | 2.39 |
| 6/30/18 | 2.46 |
| 9/30/18 | 2.60 |
| 12/31/18 | 2.61 |
| 3/31/19 | 2.53 |
| 5/31/19 | 2.52 |

**• Capital Adequacy Test**

475.	Mr. DiSalvatore found that JMG fails the capital adequacy test at each

Assessment Date.

> [E]very test that I did for the balance sheet for JMG, there was never
> a positive equity balance. Never. It was always negative. So there's
> no – there's no equity cushion here whatsoever.

*See* 11/18/19 Tr. at 106:5-8.  Therefore, "in every instance, whether I'm looking at

each of the assessment dates or across the assessment period itself, they failed

the capital adequacy test and were insolvent."  *Id*. at 108:15-17.

476.	The capital adequacy test also considers whether a company is willing or able to

raise capital from shareholders, or others, to pay debts.  *See* 11/18/19 Tr. at

106:9-10.  JMG fails this aspect of the test as well.  *Id*. at 107:1-2.  JMG never

made a capital call on its members, and its members never voluntarily injected

long-term equity into the company.  *Id*. at 107:3-15.

477.	Moreover, Mr. DiSalvatore notes that JMG was unable to obtain debt capital from

banks or other institutional lenders because JMG had no positive net equity in its

assets and had no track record of sustaining profitable operations.  *See*

DiSalvatore Report at 36-37.  These are, in essence, the reasons why MB Bank

declined to offer financing to JMG.  *Id*.

478.	In sum, as explained by Mr. DiSalvatore:

> Based on performing the Reasonable Capital Test, it is my opinion
> that JMG did not have a sufficient "equity cushion" based on the
> results of the Balance Sheet Test and was, therefore, insolvent as of
> each Assessment Date.  Also, JMG did not generate sufficient cash
> flow to meet its obligations as they came due in the ordinary course
> of business as of each Assessment Date. Nor did JMG present a
> sufficient financial performance that might allow it to attract capital

104

other than those secured lenders who lent to JMG throughout the Analysis Period, several of which JMG defaulted on. As such, JMG was insolvent based on the Reasonable Capital Test at each of the Assessment Dates.

*See* DiSalvatore Report at 38.

• **McDonough Rebuttal to DiSalvatore Analysis**

    • **Overview**

479. Mr. McDonough offered no opinion regarding JMG's solvency during the time frame of 1/1/19 through 5/31/19 (the latest period for which data was produced before trial).

480. Mr. McDonough testified that he believes that JMG was solvent at earlier times during the Assessment Period. *See* 11/20/19 Tr. at 700:20-701:3.

481. However, Mr. McDonough offered no opinion on why JMG defaulted on the Term Loan and has failed to pay the Judgment. *See* 11/20/19 Tr. at 703:20-705:1.

482. Mr. McDonough also offered no opinion on why JMG has defaulted on debts to the Ohadi Trust, KMW and fuel companies. *See* 11/20/19 Tr. at 723:2-16.

483. Mr. McDonough did not try to reconcile (i) his position that JMG was solvent, with (ii) the fact that JMG failed to pay these debts. *See* 11/20/19 Tr. at 703:20-705:1; 723:2-16.

    • **Balance Sheet Test**

484. Mr. McDonough criticized Mr. DiSalvatore's application of the sum of assets approach. *See* 11/20/19 Tr. at 685:13-687:12; 690:17-698:14. Mr. McDonough's opinion was that, instead of focusing on the prices at which JMG actually sells its

inventory in the ordinary course of business, it is more appropriate to use numbers from the Tokoph Report. *See id*. at 685:13-687:12; 690:17-698:14. Mr. McDonough testified that, when those numbers are used, the value of JMG's assets exceeds the total value of its debts. *Id*.

485. Mr. Tokoph is not a solvency expert and did not conduct a solvency analysis. *See* 11/18/19 Tr. at 45:6-7. Mr. Tokoph estimated the proceeds that might be generated if this Court were to appoint a receiver to organize an orderly liquidation of JMG's inventory. *Id*.

486. Mr. McDonough maintained that the Tokoph Report should be injected into a solvency analysis despite the fact that the focus of the Tokoph Report is the inventory of spare parts that JMG fraudulently concealed and transferred. These are the spare parts that JMG (i) failed to disclose in response to Jet Midwest International's post-judgment discovery demands; (ii) failed to disclose in its bankruptcy schedules; (iii) shielded behind a fraudulent lien, the SAA, one day after Jet Midwest International served its garnishment writ, and (iv) finally revealed only as part of the announcement of the Proposed Foreclosures by the Ohadi Trust and KMW. Even after those foreclosures were announced, Defendants' intent was not to conduct an orderly liquidation, but rather a fire sale, despite there being no evidence that such a fire sale would generate any competitive bidding or cash proceeds. *See* 11/20/19 Tr. at 685:13-687:12; 690:17-698:14. It is Jet Midwest International that is seeking the appointment of a receiver in this case, while Defendants (including JMG) oppose such relief. Notwithstanding how JMG has gone to such great lengths to exclude these

106

assets from its estate, Mr. McDonough looks to these assets as the cornerstone of his rebuttal opinion.

487. Mr. McDonough did not try to independently determine what the orderly liquidation value of JMG's inventory was as of any point in time. He relied solely on Mr. Tokoph's numbers and then pushed those numbers into a solvency analysis at various Assessment Dates. *See* 11/20/19 Tr. at 685:13-687:12; 690:17-698:14. He did so despite the fact that, as Mr. Tokoph explained, that estimate was applicable only to the market conditions and inventory list that existed as of December 2018, and was only an estimate of the potential proceeds if an orderly liquidation had been conducted at that time. *See* 11/18/19 Tr. at 44:13-23.

488. As explained by Mr. DiSalvatore, Mr. McDonough's critique conflates two distinct issues: (i) estimating the proceeds that might be obtained if this Court were to appoint a receiver to liquidate JMG's assets in an appropriate fashion, and (ii) determining the viability of JMG as a going concern. *See* 11/18/19 Tr. at 128-129. Conflating these two issues is "inconsistent with the basic concepts of how you would do a valuation for a business on a going concern basis." Tr. 128:15-17. Mr. DiSalvatore noted that, in his 35 years of experience in the business valuation field, he has never seen these concepts conflated in this way. Tr. 138:2-5.

489. In opining that JMG passed the balance sheet test from 12/31/15 through 12/31/18 (the only period Mr. McDonough analyzed), Mr. McDonough also relies

on the income and market approaches. In using those approaches, Mr. McDonough deemed JMG to be comparable to the publicly traded companies identified in an industry guide prepared by Duff & Phelps for SIC Code 372 (the "SIC Code 372 Companies"). *See* P102, McDonough Report at 23. In testifying at trial, Mr. McDonough omitted any mention of the SIC Code 372 Companies. However, those companies are the basis of his written analysis. *Id*.

490. Mr. McDonough then proceeded to apply the Direct Capitalization Method by using a capitalization rate appropriate for the SIC Code 372 Companies (as opposed to Mr. DiSalvatore's approach of using a capitalization rate appropriate for a high-risk venture capital investment). *See* McDonough Report at 23. Having equated JMG with the SIC Code 372 Companies, Mr. McDonough also applied the Market Approach. *Id*. As previously noted, Mr. DiSalvatore deemed the Market Approach to be inapplicable because in fact there are no publicly traded companies that are sufficiently comparable to JMG.

491. As noted by Mr. DiSalvatore, the SIC Code 372 Companies include:

> about five or six publicly-traded companies who are in the business of either manufacturing aircraft, manufacturing original equipment that would go into the construction of the aircraft itself, or there were other businesses.
>
> Every one of those businesses – and, for example, the companies that are included in that grouping, it's Boeing, it's Aeroviro, CPI, Triumph. There could be two or three other companies in that grouping.
>
> Boeing is a $100 billion company. It has over 100,000 employees. Its stock is publicly traded on the New York Stock Exchange. It's very profitable. It can raise capital whenever it wants. And all of those other companies that are in that study, they're not quite as large as Boeing, but they're big.

108

> I don't know how you can compare a Boeing to JMG, which is seven employees, 25 million in revenue in any given period. It's not manufacturing anything. They trade aircraft and parts. Not the same thing. It's wrong.

*See* 11/18/19 Tr. at 110:8-111:1.

492. Mr. DiSalvatore further explained that the SIC Code 372 Companies are "all quality investments. They're all very healthy companies. They're all profitable for most years. They have better profit margins than JMG. They can raise capital whenever they want and from public sources." *See* 11/18/19 at 111:9-12. Thus, he explained, comparing JMG to the SIC Code 372 Companies "makes no sense. It's just illogical." *See id*. at 111:19-20.

493. Based on Mr. McDonough's comparison of JMG to the SIC Code 372 Companies, Mr. McDonough uses a capitalization rate ranging from 8.9-9.4% (as opposed to Mr. DiSalvatore's application of rates within the range of 20-35%). *See* P102, McDonough Report, Exhibit D2. By applying a capitalization rate between 8.9% and 9.4%, Mr. McDonough in effect is suggesting that a hypothetical investor would be willing to inject new equity into JMG in exchange for those rates of return, as opposed to a 20-35% rate of return. *Id*.

494. In fact, however, JMG's *lenders* charge interest rates within the range of 14% to 20%. *See* 11/18/19 Tr. at 112:18-113:5. Thus, what Mr. McDonough in effect is suggesting is that an equity holder would accept a lower rate of return than a lender. *See* 11/18/19 Tr. at 113:3-4. Mr. DiSalvatore noted that such a suggestion cannot withstand scrutiny because, as a basic principle, "the cost of

debt is less than what you think the cost of equity might be." *Id*. at 112:22-23.  In

other words, as Mr. DiSalvatore put it: "Why, as an equity holder – you're taking

all the risk in the business – why would you take a lower rate of return on your

investment than a debt?  It makes no sense.  It's just illogical." *Id*. at 111:17-20.

495.    The second key difference between the experts' applications of the income

approach is that Mr. McDonough made a number of changes, which he describes

as "normalization adjustments," to JMG's financial statements.  *See* P102,

McDonough Report at 24-27.  Among the expenses that Mr. McDonough

eliminates are the write-off of the uncollectible Dynamic debt; the "consulting

fees" that JMG paid to the Krauses, and the profit-sharing distributions made by

JMG to Paul Kraus, Ken Woolley and the Ohadi Trust.  *See id*.

496.    Mr. DiSalvatore did not make those normalization adjustments.  That is because

JMG's financial statements are unaudited, and therefore do not contain footnotes

that (in an audited financial statement) would indicate whether a particular

expense was in some way abnormal for that business.  *See* 11/18/19 Tr. at

132:19-24.  Moreover, "given the poor performance of this business," there is no

prospect of any new ownership group acquiring JMG and managing it in such a

way as to eliminate such expenses.  *Id*. at 134:2-7.

497.    In his report, Mr. McDonough does not identify any year, outside the Assessment

Period, in which JMG's expenses differed from its expenses in the Assessment

Period.

498.    Both Ken Woolley and Paul Kraus testified that it was normal for JMG to make

profit sharing distributions.  *See* 11/19/19 Tr. at 484:21-485:5; 578:6-13.

110

499. When Paul Kraus was asked about the "consulting fees" he received from JMG, he did not claim that such payments were an anomaly. *See* 11/19/19 Tr. at 390:17-391:2. He claimed to have no knowledge of the timing or amounts of such payments. *Id*.

500. Dynamic's inability to pay its debts is not a problem that suddenly arose during the Assessment Period. Ken Woolley testified that Dynamic was in financial distress from the moment he and Paul Kraus first acquired Dynamic in 2013. *See* 11/19/19 Tr. at 555:4-5.

**• Cash Flow and Capital Adequacy Tests**

501. Mr. McDonough's application of the cash flow test (or what he calls the "payment of debts test") takes up less than one page in his report. *See* P 102, McDonough Report at 31-32.

502. In this portion of his report, Mr. McDonough purports to apply the cash flow test, but his application of that test is not responsive to Mr. DiSalvatore's analysis. *See* McDonough Report at 31-32. First, as noted above, Mr. McDonough does not try to explain the fact that JMG in fact did default on a number of debts throughout the Assessment Period.

503. Second, and critically, Mr. McDonough only considers JMG's ability to satisfy what Mr. McDonough describes as JMG's "operating expenses: Utilities, payroll, rent, insurance, things along those lines." *See* 11/20/19 Tr. at 700:11-14. Mr.

McDonough does not consider JMG's ability to satisfy other liabilities (such as the Term Loan, the Ohadi Note, or the fuel company debts), even if such debts were currently due to be paid. *Id*.

504. Third, as noted above, Mr. DiSalvatore focuses on the relevant issue of whether JMG had sufficient *cash flow* to pay its debts when due. That is not what Mr. McDonough does.

505. Mr. McDonough compares (i) a small fraction of JMG's current debts, to (ii) what he defines as JMG's "current assets." *See* P 102, McDonough Report at 31-32 and Exhibit D5. "Current assets," defined by Mr. McDonough, includes not only cash that could be used to pay such debts, but also inventory, accounts receivable and prepaid expenses. *Id*.

506. In sum, in applying the cash flow test, Mr. McDonough looks to assets that were not cash, and that JMG had no proven ability to convert into cash to pay debts when due. Mr. McDonough then considers whether the "value" of that broad category of assets (as determined by Mr. McDonough) exceeded a small sub-set of JMG's current obligations.

507. In his report, Mr. McDonough's analysis of the capital adequacy test takes up less than a quarter of a page, and, in substance, is simply a replication of his flawed balance sheet test. *See* P 102, McDonough Report at 32. At trial, Mr. McDonough conceded that he did not truly conduct a capital adequacy test, because he (incorrectly) did not consider it to be legally relevant. *See* 11/20/19 Tr. at 678:15 ("I don't believe we're looking at the capital adequacy.").

## CONCLUSIONS OF LAW

## I. OVERVIEW OF FRAUDULENT TRANSFER ACT

### A.    Purpose of the Statute

1.    "The Missouri Uniform Fraudulent Transfer Act (hereinafter referred to as simply 'MoUFTA') is patterned after the Uniform Fraudulent Transfer Act first approved by the National Conference of Commissioners on Uniform Laws in 1984." Fleming Cos., Inc. v. Rich, 978 F. Supp. 1281, 1294 (E.D. Mo. 1997). The MoUFTA specifies two types of fraudulent transfers. The first is "actual fraud" and the second is "constructive fraud."

2.    The MoUFTA "provides relief for 'creditors' who are victims of fraudulent transfers." See Enter. Fin. Grp., Inc. v. Podhorn, 930 F.3d 946, 949 (8th Cir. 2019).

3.    "The burden of proof is on the creditor [here, Jet Midwest international], and fraud is never presumed when the transaction may be fairly reconciled with honesty." Higgins v. Ferrari, 474 S.W.3d 630, 636 (Mo.App. 2015). " A party seeking to have a transaction declared void as fraudulent must prove his case by clear and convincing evidence." Bueneman v. Zykan, 52 S.W.3d 49, 54 (Mo.App. 2001); Taylor v. Clark, 140 S.W.3d 242, 251 (Mo.App. 2004).

### B.    Actual Intent

4.   Under the MoUFTA, one way to show that a transfer was fraudulent is to show that "the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor." *See* Mo. Stat. Ann. § 428.024.1.(1).

5.   A "creditor" is "a person who has a claim." *See* Mo. Stat. Ann. § 428.009(4). A claim is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id*. § 428.009(3). Thus, Jet Midwest International has been a creditor of JMG since the Term Loan Agreement was signed in September 2015.

6.   "The words 'hinder,' 'delay' and 'defraud' are connected by the word 'or' in the statute, and it is sufficient if either result is accomplished by the conveyance." Citizens' Bank of Hayti v. McElvain, 280 Mo. 505, 511 (1920).

7.   The focus of the inquiry is "on the intent of the debtor," as opposed to the transferee's intent. See Ritchie Cap. Mgm't, LLC v. Stoebner, 779 F.3d 857, 862 (8th Cir. 2015).

8.   Under Missouri law, "[p]erhaps one of the strongest statements concerning intent is found in Citizens National Bank v. Cook, 857 S.W.2d 502 (Mo.App. 1993) citing Citizens Bank of Hayti v. McElvain, 280 Mo. 505, 219 S.W. 75 (1920)." In re Americana Servs., 175 B.R. 1018, 1022 (Bankr. W.D. Mo. 1994). In Cook, the Missouri Court of Appeals held:

> If the necessary consequence of a conceded transaction was defrauding another, then, as a party must be presumed to have foreseen and intended the necessary consequences of his own act, the transaction

114

> itself is conclusive evidence of a fraudulent intent; for a party cannot be permitted to say that he did not intend the necessary consequence of his own voluntary act.

Americana, 175 B.R. at 1022 (quoting Cook, 857 S.W.2d at 506).

9.   JMG received a $6.5 million loan from Jet Midwest International, and never repaid it. Through the Proposed Foreclosures – which were organized at the request of *JMG's* own CEO, Paul Kraus – JMG seeks to transfer all of its remaining property to corporate insiders. Much of that property was concealed from the Bankruptcy Court, and from Jet Midwest International, before the Proposed Foreclosures were announced.  Since this is the effect of Defendants' conduct, it can reasonably be inferred that this was Defendants' intent.

10.   The statute lists eleven badges of fraud that a court may consider in determining whether a debtor acted with actual intent to hinder, delay or defraud.  See Mo. Stat. Ann. § 428.024.2.

11.   Specifically, a court may consider whether:

- The transfer or obligation was to an insider;

- The debtor retained possession or control of the property transferred after the transfer;

- The transfer or obligation was disclosed or concealed;

- Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

- The transfer was of substantially all the debtor's assets;

- The debtor absconded;

115

- The debtor removed or concealed assets;

- The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

- The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

- The transfer occurred shortly before or shortly after a substantial debt was incurred; and

- The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

See Mo. Stat. Ann. § 428.024.2.

12. The badges of fraud are "a list of circumstantial factors that a court may use to infer fraudulent intent." In re Sholdan, 217 F.3d 1006, 1009 (8th Cir. 2000).

13. "Although none of the badges standing alone will establish fraud, the existence of several of them will raise a presumption of fraud." Fleming, 978 F. Supp. at 1297-98.

14. In other words, "a strong inference of fraud arises from a concurrence of several badges of fraud." Allison v. Mildred, 307 S.W.2d 447, 454 (Mo. 1957). "The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent; however, 'the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." In re Sherman, 67 F.3d 1348, 1354 (8th Cir. 1995) quoting (Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254-55 (1st Cir.1991)).

116

15. The presence of "any one" of the eleven badges of fraud "can be a sufficient basis on which to find the requisite intent," and the presence of "more than one" of the eleven badges of fraud "strongly indicates that the debtor did, in fact, possess the requisite intent" to defraud." In re Rademacher, 549 B.R. 889, 894 (Bankr. E.D. Mo. 2016) (citing In re Schroff, 156 B.R. 250, 255 (Bankr. W.D. Mo. 1993)).

16. As discussed herein, the transfers at issue here display virtually *all* the badges of fraud.

C.  **Constructive Fraud**

17. "Although a finding of fraudulent intent is required to show actual fraud, under the Uniform Fraudulent Transfers Act a debtor's intent in transferring assets is immaterial to a claim of constructive fraudulent transfer." Larson Mfg. Co. of S.D. v. Conn. Greenstar, 929 F. Supp. 2d 924, 935 (S.D. 2013).

18. Under the MoUFTA, there are three separate and independent ways to prove that a transfer was constructively fraudulent.

19. First, a transfer is constructively fraudulent if it "was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent." See Mo. Stat. Ann. § 428.029.2.

20. Second, a transfer is constructively fraudulent if "the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in

117

exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." See Mo. Stat. Ann. § 428.029.1.

21.  Third, a transfer is constructively fraudulent if the debtor did not receive reasonably equivalent value in exchange for the transfer or obligation, *and either*:

- The debtor "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction"; *or*,

- The debtor "[i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

See Mo. Stat. Ann. § 428.024.1(2).

22.  The MoUFTA does not define "reasonably equivalent value." In the Eighth Circuit, "[t]here is no bright line rule used to determine when reasonably equivalent value is given." In re Lindell, 334 B.R. 249, 255 (Bankr. D. Minn. 2005). "The important elements to consider are (1) fair market value and (2) whether there was an arm's length transaction." Id.

23.  "A determination of reasonably equivalent value is 'fundamentally one of common sense, measured against market reality.'" Lindell, 334 B.R. at 256 (transfer of notes worth $130,000.00 in exchange for $50,000.00 cash was not reasonably equivalent value).

24.  "Transfers made by a debtor for the benefit of a third party, by themselves, do not provide any reasonable equivalent benefit for the debtor." In re Southern Health Care of Arkansas, Inc., 309 B.R. 314, 319 (8th Cir. B.A.P. 2004). An example would be "a payment to satisfy a third party's debt." In re Petters Co., 603 B.R.

118

601, 606 (Bankr. D. Minn. 2019) ("*Petters II*").

25.    In this case, transfers made by JMG for the sole purpose of benefitting JMG's insiders – for example, transfers made by JMG to pay off Paul Kraus' personal debt to Ken Woolley – do not qualify as providing reasonably equivalent value to JMG itself.

26.    If a court deems a purported obligation to be fraudulent, "transfers made by the debtor on account of that obligation are not made for reasonably equivalent value, and may be set aside as actually or constructively fraudulent if the other requirements for actual or constructive fraud are met."  See 5 Collier on Bankruptcy ¶ 548.03[4][a].  For example, the fact that JMG entered into ProfitSharing Agreements, in which JMG agreed to pay Paul Kraus' personal debts, does not shield such payments from being deemed constructively fraudulent.  Such payments (totaling $1,597,503) were constructively fraudulent, in part because there was no business justification for JMG assuming such debts in the first place.

27.    For this and other reasons, each transfer at issue in this case was constructively fraudulent.

**D.    Definition of "Good Faith"**

28.    In response to an actual fraud claim under Mo. Stat. Ann. § 428.024.1(1), the transferee may attempt to assert, as an affirmative defense, that the transferee "took in good faith and for a reasonably equivalent value."  See Mo. Stat. Ann. § 428.044.1. This affirmative defense is inapplicable to a constructive fraud claim.

119

Id.

29. To successfully assert this affirmative defense, the transferee must prove *both* good faith *and* reasonably equivalent value. In re Spatz, 222 B.R. 157, 168-69 (N.D. Ill. 1998).

30. In the Eighth Circuit, "[t]he question of good faith consists of two parts: (1) whether the transferee was on inquiry notice of the transferor's fraud or insolvency; and, if so, (2) whether the transferee conducted a diligent investigation." See Zayed v. Buysee, No. 11-cv-1042 (SRN/FLN), 2012 WL 12893882, at *22 (D. Minn. Sept. 27, 2012).

> [A] transferee is on inquiry notice when he has sufficient facts to question whether the transfer was made for a fraudulent purpose or whether the transferor was insolvent. . . . Courts look to whether any facts, or 'red flags,' exist, sufficient to cause a reasonable person to inquire further. . . . The presence of such signs requires the transferee to diligently investigate. A failure to inquire 'in the face of unusual circumstances also is sufficient to preclude a good faith defense.' Thus willful ignorance does not support a finding of good faith.

Id.

31. In this case, Defendants not only had *reason* to know, but *actually knew*, that JMG was in financial distress. In January 2015, Ken Woolley reviewed JMG's financial records and decided not to loan his own funds to JMG. In August 2015, MB Bank conducted a deeper analysis and confirmed that JMG was not creditworthy for a loan in any amount. Both of those events took place *before* the Assessment Period at issue in this case even began.

32. Subsequent events repeatedly validated MB Bank's analysis. JMG defaulted on the Ohadi Note in March 2016. Paul Ohadi was aware of the fact that JMG was

120

"hurting" and having a "financial problem." <u>See</u> 11/20/19 Tr. at 780:12-13. Afterwards, JMG's finances only further worsened, culminating in JMG's bankruptcy and failure to pay the Judgment. <u>See</u> Conclusions of Law ("CL") § V (discussing these red flags in detail).

33. Therefore, the affirmative defense of good faith and reasonably equivalent value is inapplicable to any of the fraudulent transfers at issue in this case. Defendants cannot prove reasonably equivalent value, and Defendants cannot establish the elements of good faith.

**E.** **Definition of "Transfer**

34. In the MoUFTA, the term "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." <u>See</u> Mo. Stat. Ann. § 428.009(12).

35. The definition expressly refers to the "creation of a lien or other encumbrance" as a type of transfer. *See* Mo. Stat. Ann. § 428.009(12).

36. A debtor's "technical compliance with the underlying legal requirements for a grant of lien under Article 9 of the Uniform Commercial Code does not insulate him from a fraudulent transfer attack." <u>See</u> <u>Derma Pen, LLC v. 4EverYoung Ltd.</u>, No. 2:13CV-00729-DN-EJF, 2015 WL 641618, at *5 (D. Utah Feb. 16, 2015). In other words, if a lien is fraudulent, it is "voidable just as any other transfer under the UFTA." *Id.* at *6. <u>Accord</u> <u>Phillips v. Phillips</u>, No. A13-0699, 2014 WL 902683, at

121

*3 (Minn. Ct. App. Mar. 10, 2014) ("the formality of a UCC filing" is not a safe harbor).

37.     It also is "self-evident that a collusive foreclosure sale may be set aside as involving a fraudulent transfer." Mussetter v. Lyke, 10 F. Supp.2d 944, 959 (N.D. Ill. 1998), aff'd, 202 F.3d 274 (7th Cir. 1999).

38.     Every transfer at issue in this case meets the MoUFTA's definition of "transfer." The transfers at issue in this case include transfers of cash and other liquid assets; the creation of a fraudulent lien (the SAA), and the attempt to conduct a fraudulent foreclosure sale.

## II.     THE OHADI/WOOLLEY DEFENDANTS ARE INSIDERS OF JMG

### A.     Definition of "Insider"

39.     The MoUFTA lists a number of scenarios in which a person or entity qualifies as an insider of the debtor. See Mo. Stat. Ann. § 428.009(7).

40.     The list is a "non-exclusive" list of examples of non-arm's-length relationships that afford "an opportunity to self-deal or [to] exert more control over the debtor's affairs than is available to other creditors." See In re Petters Co., 499 B.R. 342, 365 (Bankr. D. Minn. 2013) ("Petters I") (citations omitted).

41.     When one of the specific scenarios set forth in Mo. Stat. Ann. § 428.009(7) is applicable, the transferee is referred to as a statutory insider. Petters I, 499 B.R. at 365. When those scenarios do not apply, but the transferee still has a nonarm's-length relationship with the debtor, the transferee is referred to as a nonstatutory insider. Id.

42.     An "affiliate" of the debtor is a statutory insider. See Mo. Stat. Ann. § 428.009(7)(d).

43.   There are several ways to be an "affiliate," two of which are particularly relevant here.

44.   First, an affiliate is "[a] person who directly or indirectly owns, controls, or holds with power to vote, twenty percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities, (i) [a]s a fiduciary or agent without sole discretionary power to vote the securities; or (ii) [s]olely to secure a debt, if the person has not exercised the power to vote." See Mo. Stat. Ann. § 428.009(1)(a).

45.   Second, an "affiliate" is:
> A corporation twenty percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor or a person who directly or indirectly owns, controls, or holds, with power to vote, twenty percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities, (i) [a]s fiduciary or agent without sole power to vote the securities; or (ii) [s]olely to secure a debt, if the person has not in fact exercised the power to vote.

See Mo. Stat. Ann. § 428.009(1)(b).

46.   Not only is an affiliate of the debtor a statutory insider of the debtor, but an insider of an affiliate *also* is a statutory insider of the debtor. See Mo. Stat. Ann. § 428.009(7)(d).

47.   If a person is "in control" of the debtor, that person is a statutory insider of the debtor. See Mo. Stat. Ann. §§ 428.009(7)(b).c and 428.009(7)(c).e.

48.   If a debtor is a partnership, all of the debtor's general partners are statutory insiders. See Mo. Stat. Ann. § 428.009(7)(c).a.

49.   If a debtor is a corporation, all of the debtor's directors and officers are statutory

123

insiders.  See Mo. Stat. Ann. § 428.009(7)(b).a, b.

50.     If a debtor is a general partner in a partnership, all of the other general partners

of that partnership are statutory insiders of the debtor.  See Mo. Stat. Ann. §

428.009(7)(a).c.

51.     A "managing agent" of the debtor is a statutory insider.  See Mo. Stat. Ann. §

428.009(7)(e).

52.     A non-statutory insider is:

> an entity with a sufficiently close relationship to the debtor that its
> conduct is made subject to closer scrutiny than those dealing at
> arm's length with [the] debtor. . . . A creditor not dealing at arm's
> length with [the] debtor, and whose special relationship with debtor
> enables it to compel payment of its claim, has sufficient control over
> debtor to be deemed an insider.

In re RiversideWorld Inc., 366 B.R. 34, 43 (Bankr. N.D. Iowa 2007).

### B.     The Ohadi Trust and Ken Woolley Are Statutory Insiders of JMG

53.     The Ohadi Trust's position that it is not a member of JMG is not factually based,

but rather was triggered by the Ohadi Trust's desire to obtain a priority position in

the JMG Bankruptcy Case.  See P869.  More specifically, as Paul Kraus

acknowledged, the idea of denying the Ohadi Trust's ownership of JMG

originated in a conversation between Paul Kraus and litigation counsel Pete

Smith, when this Court was about to enter the Judgment and JMG began

planning for bankruptcy.  See 11/19/19 Tr. at 383:13-15; 384:3-4; 384:17-385:18.

### 1. The Ohadi Trust Is a JMG Insider Because It Is an Affiliate of JMG

54.     First, the Ohadi Trust is a statutory insider of JMG because it is an affiliate of

JMG.

55.     In August 2015, the Ohadi Trust acquired 20% of JMG.  See FF 52.

124

56. From that point forward, because the Ohadi Trust owned and controlled 20% of JMG's voting shares, the Ohadi Trust was an affiliate of JMG (*see* Mo. Stat. Ann. § 428.009(1)(a)), and therefore a statutory insider of JMG (*see* Mo. Stat. Ann. § 428.009(7)(d)).

57. There is no evidence that Defendants ever took any formal steps to reduce the Ohadi Trust's ownership percentage below 20%. To date, JMG's Operating Agreement (as amended) still identifies the Ohadi Trust as owning a full 20% of JMG. *See* P403; P404; P407.

**2. The Ohadi Trust Is a JMG Insider Because It Is a Member of JMG**

58. The second reason why the Ohadi Trust is a statutory insider of JMG is the simple fact that, as set forth in JMG's Operating Agreement, the Ohadi Trust is a member of JMG.

59. As noted above, the MoUFTA expressly states that the term "insider" includes a general partner of a partnership, as well as a director or officer of a corporation. See Mo. Stat. Ann. §§ 428.009(7)(b).a, b; 428.009(7)(c).a. As also noted above, the specific examples of insiders set forth in the MoUFTA are a non-exclusive list. Petters I, 499 B.R. at 365.

60. A member of an LLC is a statutory insider because the role of an LLC member is analogous to that of a general partner or director. See In re Longview Aluminum, LLC, 657 F.3d 507, 510 (7th Cir. 2011) (member of Delaware LLC is insider because "[b]y default, under Delaware law, authority is vested in the members of an LLC.").

125

61. Thus, members of JMG (including the Ohadi Trust) are necessarily insiders of JMG. But the Ohadi Trust is more than just a member– it is a *managing* member. This takes it a step beyond the cases cited above, in which being a member of an LLC or partnership was already sufficient to be deemed an insider. JMG's Operating Agreement defines JMG as:

> A Delaware Limited Liability Company
>
> *Managed By Its Members*

See P407 at 1 (emphasis added). Thus, by definition, each member of JMG (including the Ohadi Trust) is not just a member, but also a *managing* member of the company.

62. In fact, the Ohadi Trust has greater voting rights in JMG than JMG's founder and CEO, Paul Kraus, who indisputably is an insider. Paul Kraus controls 0.8% of the voting shares of JMG, whereas the Ohadi Trust controls 20% of the voting shares of JMG. Thus, as a matter of pure voting power, the Ohadi Trust has 25 times the voting power of Paul Kraus. If Paul Kraus is an insider (which he clearly is), the Ohadi Trust is an insider.

**3. The Ohadi Trust Is a JMG Insider Because It Controls JMG**

63. The Ohadi Trust also is a statutory insider of JMG because it controls JMG.

64. The Ohadi Trust controls JMG to such an extent that:

- JMG readily gave the Ohadi Trust critically important data, regarding JMG's inventory of spare parts, that JMG failed to disclose to the U.S. Bankruptcy Court for the District of Delaware (during the JMG Bankruptcy Case) and Jet Midwest International (during the JMG Bankruptcy Case and postjudgment discovery).

- JMG supports the Ohadi Trust foreclosing on those spare parts even though Defendants have offered no business justification for their

126

proposed method of auctioning the spare parts. *See* FF 403. In fact, Paul Kraus suggested that the Ohadi Trust foreclose. *See* P834. Paul Kraus has no business justification for supporting the Proposed Foreclosures; his sole, stated reason for supporting the Proposed Foreclosures is that he considers Paul Ohadi and Ken Woolley to be "good people." <u>See</u> 11/19/19 Tr. at 381:7-8.

- When Brad Helsten told JMG to send him the AWN share certificates – instead of turning them over to the U.S. Marshal's Service or this Court – JMG complied, even though JMG was directly flouting the TRO application pending before this Court and the enforcement of a writ of execution by the U.S. Marshals Service.

- When the Ohadi Trust instructed JMG to sign the SAA, JMG again complied.

- When the Ohadi Trust opposed the continuation of the JMG Bankruptcy Case, JMG promptly asked the Bankruptcy Court to dismiss the JMG Bankruptcy Case.

- JMG has supported every position taken by the Ohadi Trust throughout this litigation, despite the fact that the Ohadi Trust is a creditor seeking to foreclose.

65. The Ohadi Trust holds greater voting rights than any other member of JMG, with the exception of Karen Kraus. Also, there is no evidence that JM Inc., or any planned successor entity to JMG (*see* P871), would be able to obtain financing in the future from anyone other than the Ohadi Trust or Ken Woolley. Given the financial leverage that the Ohadi Trust and Ken Woolley have over the Krauses, the Krauses do not have the ability to exercise independent business judgment to protect the interests of JMG and its estate. <u>See</u> <u>Petters I</u>, 499 B.R. at 366 ("major creditor to a deeply-indebted debtor-borrower" is insider).

**4. The Ohadi Trust Is a JMG Insider Via JM Inc.**

66.     The Ohadi Trust also is a statutory insider of JMG because the Ohadi Trust is an insider of JM Inc., which is an affiliate of JMG.  JMG has admitted that JM Inc. is its affiliate.  See P213 ¶ 8. The reason JMG and JM Inc. are affiliates of each other is that Karen Kraus owns a majority of the voting shares of both entities.  See Mo. Stat. Ann. § 428.009(1)(b).

67.     Pursuant to the Ohadi Note, the Ohadi Trust received a share certificate granting it a 20% ownership interest in JM Inc.  See  § VI(A), supra.  Paul Kraus and Ken Woolley both recognized that the Ohadi Trust therefore owned 20% of JM Inc.  Id. ¶¶ 206-207.

68.     As the recognized owner of 20% of JM Inc., the Ohadi Trust is an affiliate – and thus an insider – of JM Inc.  See Mo. Stat. Ann. §§ 428.009(1)(a); 428.009(7)(d).  As an insider of JM Inc., which is a JMG affiliate, the Ohadi Trust is a statutory insider of JMG.  Id.

**5. The Ohadi Trust Is a JMG Insider Because of Its Role at Dynamic**

69.     Just as the Ohadi Trust is a JMG insider via JM Inc., it is a JMG insider via Dynamic.

70.     As previously noted, the Dynamic Bankruptcy Case effectively came to an end on March 8, 2018, and Dynamic then was rebranded as Eastern Air Lines.  See FF ¶ 99 n.1.

71.     Every transfer at issue in this case took place prior to the completion of the Dynamic Bankruptcy Case. JMG and the Ohadi/Woolley Defendants began secretly planning the Proposed Foreclosures in October 2017, before the

128

Dynamic Bankruptcy Case ended.  See P834.  The Proposed Foreclosures cite, as one of their purported bases, the SAA – which was signed on February 23 and 28, 2018, before the Dynamic Bankruptcy Case ended.

72.  Paul Kraus has admitted that JMG was an affiliate of Dynamic.  *See* FF ¶ 102.

73.  JMG and Dynamic also were affiliates because 20% or more of the outstanding voting securities of both entities were "directly or indirectly owned, controlled, or held with power to vote" by the same person: Karen Kraus.  See Mo. Stat. Ann. § 428.009(1)(b).

74.  As noted, Karen Kraus owns a majority of the voting securities of JMG. Also, 37.5% of Dynamic's voting securities were owned by CASH, the members of which are the Krauses.  As a member of CASH, Karen Kraus can "direct, manage and control the business" of CASH.  See P634 ¶ 3.1.  Therefore, she had "control" over 37.5% of Dynamic's shares.  Id.

75.  The connections between JMG and Dynamic went well beyond the fact that Karen Kraus controlled more than 20% of the voting securities of both entities. Specifically:

- Paul Kraus described Dynamic as JMG's "Sister Company."  *See* P384.

- While serving as COO of JMG, Karen Kraus simultaneously served as COO and CFO of Dynamic, where, in Ken Woolley's words, "she took on nearly completely operational *control* of the business."  See P682 (emphasis added).

- Paul Kraus simultaneously served as CEO of JMG and CEO of Dynamic.

129

- JMG and Dynamic were closely entangled financially. Their relationship included: (i) the multi-million-dollar receivable owed by Dynamic to JMG (which Dynamic never paid); (ii) JMG's guarantee (with no benefit to JMG) of Dynamic's debts to fuel suppliers (never fully paid by either JMG or Dynamic); (iii) Dynamic's guarantee of JMG's Term Loan debt (never paid by either JMG or Dynamic), and (iv) the PSAs, pursuant to which JMG's revenues were used to pay a portion of Paul Kraus' personal debt to Ken Woolley (from their partnership at Dynamic).

76. Because JMG and Dynamic were affiliates, every Dynamic insider was a statutory insider of JMG. See Mo. Stat. Ann. § 428.009(7)(d).

77. Paul Kraus has admitted that the Ohadi Trust was a Dynamic insider. See FF ¶ 102.

78. The Ohadi Trust was a Dynamic insider because the Ohadi Trust was a member of Dynamic. See In re Longview Aluminum, 657 F.3d at 510 (LLC member is insider).

79. The Ohadi Trust not only was a member of Dynamic, but exercised control over Dynamic. The Ohadi Trust signed: (i) the resolution approving the Dynamic Guarantee, through which Dynamic guaranteed JMG's repayment of the Term Loan (see P1116 at 4), and (ii) the resolution approving the filing of the Dynamic Bankruptcy Case (see P223).

80. As an insider of Dynamic, the Ohadi Trust was a statutory insider of JMG (Dynamic's affiliate) when the transfers at issue in this case were made. After March 23, 2018, Dynamic was rebranded as Eastern Airlines, but the Ohadi Trust continued to be a JMG insider for all the other reasons discussed herein (see CL §§ II(B)(1)-(4), and II(C)).

### 6. Ken Woolley Is a JMG Insider Via the Ohadi Trust

81.    Like the Ohadi Trust, Ken Woolley is a statutory insider of JMG for several reasons.

82.    First, Ken Woolley is an insider of the Ohadi Trust, which, as discussed, is a JMG affiliate.  As an insider of a JMG affiliate (the Ohadi Trust), Ken Woolley is an insider of JMG.

83.    Ken Woolley is an insider of the Ohadi Trust because Ken Woolley and Paul Ohadi have partnered with each other in various business ventures for a number of years, including but not limited to JMG and Dynamic.  See 11/19/19 Tr. at 561:1-2; 11/20/19 Tr. at 755:17-20.  See also Mo. Stat. Ann. § 428.009(7)(a).c (when a person is a general partner in a business, every other general partner of that business is deemed that person's insider).

84.    The business relationship between Ken Wooley and Paul Ohadi is so close that, from the beginning of the Assessment Period to date, they have been jointly represented by the same business counsel, Brad Helsten (and also are jointly represented by the same litigation counsel in this case).  See 11/20/19 Tr. at 756:7-14.  In addition, the Woolley Guaranty was the only reason the Ohadi Trust loaned funds to JMG.  Id. at 596:10-11; 772:19-22.

85.    Ken Woolley also is an insider of the Ohadi Trust because he functions as a managing agent of the Ohadi Trust, as evidenced by the fact that the SAA was signed on behalf of the Ohadi Trust by Ken Woolley. See Mo. Stat. Ann. § 428.009(7)(e) (managing agent is insider).

131

86.     Under the Woolley Guaranty, Ken Woolley is more than just a managing agent of
        the Ohadi Trust – he is "a trustee for" the Ohadi Trust.  See P931, Woolley
        Guaranty ¶ 5.  Ken Woolley has received tens of millions of dollars from JMG.
        Under the Woolley Guaranty, he received these funds for the Ohadi Trust and is
        contractually required to pay the Ohadi Note.  Id.

87.     But Ken Woolley has made no such payments.  He manages these funds but
        never pays the Ohadi Note as required. By preventing the Ohadi Note from being
        satisfied, he perpetuates the existence of the SAA – the supposed lien that is
        being used to shield JMG's remaining assets from the Judgment.  As the
        manager of tens of millions of dollars in which the Ohadi Trust has a beneficial
        interest, Ken Woolley is the Ohadi Trust's managing agent.  See Crimm v. Mo.
        P.R. Co., 750 F.2d 703, 708 (8th Cir. 1994) ("Whether an individual has the
        status of managing agent depends on several factors, including whether the
        interests of the individual 'are identified with those of his principal and on the
        nature of his functions, responsibilities and authority . . . .'").

        **7.      Ken Woolley Is a JMG Insider Because He Is a Member of JMG**

88.     As previously noted, one reason why the Ohadi Trust is a statutory insider of JMG
        is that the Ohadi Trust is member of JMG.  An LLC member is a statutory insider.
        See In re Longview Aluminum, 657 F.3d at 510. The same reasoning is equally
        applicable to Ken Woolley, who asked to be and was recognized as a member of
        JMG (specifically, as an owner of 10.1% of JMG's shares) so that he could help
        the Ohadi Trust avoid KYC disclosure requirements.  Therefore, just as the
        Ohadi Trust is a statutory insider of JMG, so is Ken Woolley.

132

**8. Ken Woolley Is a JMG Insider Because He Controls JMG**

89.    Ken Woolley also exercises control over JMG.  Because Ken Woolley, like the

Ohadi Trust, came to be recognized as a member of JMG, he also by definition

became a *managing* member.  See P407 at 1.  Ken Woolley has far greater

voting rights in JMG than Paul Kraus, who indisputably is a JMG insider.  Once

Ken Woolley was recognized as a 10.1% member of JMG, he had well over 10

times the voting rights of Paul Kraus (a 0.8% member).

90.    Ken Woolley controls JMG to such an extent that: • Ken Woolley was part of the
"Team" that, after entry of the Judgment, worked on a detailed plan to "scrap"
JMG and replace it with a new entity.  See P871.

- Ken Woolley is the individual whom Paul Kraus approached to propose
  the "idea" of the Ohadi Trust foreclosing on JMG and thereby "taking" its
  assets.  See P834.

- JMG has stated no objection to Ken Woolley's company, KMW,
  foreclosing on aircraft and engines owned by JMG, despite there being no
  business justification for KMW's proposed auction method.  *See* FF § 403.
  As noted, Paul Kraus' sole, stated reason for supporting the Proposed
  Foreclosures is that he considers Paul Ohadi and Ken Woolley to be
  "good people."  See 11/19/19 Tr. at 381:7-8.

- Ken Woolley has funded or brokered virtually all of the financing that has
  been provided to JMG from August 2015 (the Ohadi Note) through the
  present.  As noted above, there is no evidence that anyone other than the
  Ohadi Trust and Ken Woolley would consider loaning funds, in the future,
  to the Krauses' aviation ventures.

- Paul Kraus, JMG's CEO, owes a personal debt of over $20 million to Ken
  Woolley.

- Through this financial leverage over Paul Kraus, Ken Woolley controls
  JMG.  Paul Kraus is the only JMG officer who approved the PSAs
  between JMG and Ken Woolley's companies, Alta and KMW.  By means

133

of those agreements, JMG's scarce revenues are diverted to Ken Woolley to satisfy part of Paul Kraus' debt.

- It is Ken Woolley who gives instructions to Mike Logan (JMG's CFO) regarding whether JMG should use its available cash to pay the Ohadi Note, debts to KMW and Alta, or Paul Kraus' personal debt.  See P874; 11/20/19 Tr. at 634:1-636:17.

- When Ken Woolley receives payments from JMG, he is required to do so as a trustee, so long as the Ohadi Note remains in default.  See P931,Woolley Guaranty ¶ 5.  By the time JMG filed for bankruptcy, JMG had no cash left in any of its bank accounts, while Ken Woolley had received $27,201,222.80 from JMG.  See P1149; 11/18/19 Tr. at 167:6-8; 27 ¶ 337.  As trustee of these funds, Ken Woolley controls virtually everything that is left of JMG.  He could have used JMG's revenues to pay the Ohadi Note, and, under the Woolley Guaranty, this is what he was expected to do. Instead, he has structured tens of millions of dollars in payments to himself and to the Ohadi Trust while leaving the Ohadi Note unpaid.  By doing so, he maintains the SAA that Defendants use to obstruct enforcement of the Judgment.

- JMG has supported every position taken by Ken Woolley, KMW and Alta throughout this case, despite the fact that KMW is a creditor seeking to foreclose.

91. Because of his control over JMG, Ken Woolley is a statutory insider of JMG.  See Petters I, 499 B.R. at 366 ("major creditor to a deeply-indebted debtor-borrower" is an insider).

**9. Ken Woolley Is a JMG Insider Via Dynamic**

92. As discussed above (*see* CL § III(B)(5), *supra*), when Dynamic still existed, the Ohadi Trust's status as an insider of Dynamic was an additional reason why the Ohadi Trust was a statutory insider of Dynamic's affiliate, JMG.  See Mo. Stat. Ann. § 428.009(7)(d); 428.009(7)(b).c; 428.009(7)(c).e.  The same reasoning applies to Ken Woolley.

93. Paul Kraus has admitted that Ken Woolley was a Dynamic insider.  See FF ¶

102.

94.     Ken Woolley was a Dynamic insider because he owned (through NVLV) more than 50% of Dynamic.  *See* P314 at 60-64.

95.     Ken Woolley also contributed capital to Dynamic; participated in managing Dynamic's business affairs, and signed corporate resolutions of Dynamic, including (i) the resolution authorizing Dynamic to enter into the Dynamic Guarantee (*see* P312 at 10-11), and (ii) the resolution authorizing Dynamic to commence the Dynamic Bankruptcy Case (*see* P223).

C.      **Alternatively, the Ohadi Trust and Ken Woolley Are Non-Statutory Insiders**

96.     Even if they are not statutory insiders, the Ohadi Trust and Ken Woolley are nonstatutory insiders.  They do not deal with JMG at arm's-length.  They have a "special relationship" with JMG that enables them, when they wish, to "compel payment" of claims, such that their dealings with JMG should be given close scrutiny.  RiversideWorld, 366 B.R. at 43.

97.     All of the facts that make the Ohadi Trust and Ken Woolley statutory insiders of JMG (*see* CL § III(B), *supra*) also make them non-statutory insiders.  They are JMG's largest shareholders, apart from Karen Kraus.  They have significant roles at JMG's affiliates.  They have control over JMG's decision-making, including with respect to the transfers at issue in this case.

98.     As noted, following entry of the Judgment, Ken Woolley was part of the JMG management "Team" that worked on a plan to "scrap" JMG.  See P871 at 1.  An

135

arm's-length creditor would not help to "scrap" the debtor that allegedly owed him millions of dollars.

99. One of the forms of relief sought in this case is the appointment of a receiver to conduct an orderly liquidation. Mr. Tokoph demonstrated that such a liquidation would add significant value. His opinion is unrebutted. But JMG still stands with the Ohadi/Woolley Defendants in opposing such relief, and in advocating, instead, for a foreclosure for which Defendants offer no business justification. This can only be because Defendants' relationship is collusive, and because Defendants' intent is to transfer JMG's assets to the Ohadi/Woolley Defendants at a below-market price, and thereby shield those assets from the Judgment.

**D.    Because Woolley Is a JMG Insider, So Are Alta and KMW**

100. Alta and KMW are Ken Woolley's wholly owned entities. Therefore, because Ken Woolley was a JMG insider, Alta and KMW were JMG insiders as well.

**E.    The Ohadi/Woolley Defendants' Rebuttal Arguments Are Unpersuasive**

101. In this litigation, to rebut the argument that they are insiders of JMG, the Ohadi/Woolley Defendants have stated that the Ohadi Trust did not sign JMG's Operating Agreement. On that basis, they have claimed that the Ohadi Trust was never a member of JMG, and that Ken Woolley thus could not have received any membership rights from the Ohadi Trust.

102. This argument is unavailing. The ultimate issue is not whether the Ohadi Trust and Ken Woolley were *members*, but whether they were *insiders*. As shown above, they were insiders for many reasons, only one of which is that they were members. In fact, if JMG recognized them as members even though they were

136

not, that would only be further proof that they are insiders. Only an insider would be recognized as a member of an LLC without going through corporate formalities that normally would be required of a new member.

103. Turning to the technical issue of whether the Ohadi Trust became a member of JMG, there is no evidence that signing JMG's Operating Agreement had any significance to the Ohadi Trust before this case was filed. There is no prelitigation document in which the Ohadi Trust denied being a member of JMG, let alone on the ground that it had not signed JMG's Operating Agreement. There is no evidence that any Defendant gave any thought to this matter before the Judgment was about to be entered in the Term Loan Action, at which point Paul Kraus and litigation counsel Pete Smith began to discuss a potential bankruptcy filing by JMG.

104. The transaction through which the Ohadi Trust became a member of JMG was negotiated by counsel (Brad Helsten and David Kulowiec) over a period of one month. Those negotiations included amendments to JMG's Operating Agreement, designating the Ohadi Trust as a member with a 20% interest in the company. In those amendments, the signature page did not include a signature block for the Ohadi Trust. See P404. The only signature blocks that were included were for the Krauses, and the Krauses duly signed. See id. Accordingly, it is clear that counsel did not see any need for the Ohadi Trust's signature.

137

105.   In May 2016, the *same counsel* agreed to represent that the Ohadi Trust's ownership of 20% of JMG was now divided between the Ohadi Trust and Ken Woolley.  This claim was made in order to help the Ohadi Trust avoid Know-Your-Customer ("KYC") banking disclosure requirements.  Such a division of JMG's membership shares could not even have been contemplated unless Defendants and their counsel agreed that the Ohadi Trust already owned a 20% stake in JMG.  Likewise, unless the Ohadi Trust already owned part of JMG, these KYC disclosure requirements would have been of no concern to the Ohadi Trust.

106.   David Kulowiec and Brad Helsten were correct in their understanding that there was no need for the Ohadi Trust to sign JMG's Operating Agreement.  Under Delaware law, the default rule is that a person becomes a member of an LLC not upon signing the operating agreement, but "upon the consent of all members and when the person's admission is reflected in the records of the limited liability company."  See 6 Del. Stat. § 18-301(b)(1).  There is no doubt that all of JMG's members consented, and JMG's records (including the Operating Agreement itself) reflect the admission of the Ohadi Trust as a JMG member.

107.   In JMG's Operating Agreement, there is no provision requiring a new member to sign the Operating Agreement.  A new member only must have "agreed in writing to become a Member and to be bound by the terms of this Agreement."  See P407 ¶ 5.3.  Paul Ohadi, in his own words, in writing, stated that such was his "agreement" with Paul Kraus.  See FF ¶ 45.  Counsel formalized that agreement by creating an amendment (Amendment No. 2) to JMG's Operating Agreement,

138

and by having Paul Kraus sign an Issuance of Membership Shares.  See FF ¶ 50. Defendants ratified this agreement over and over again, in emails and sworn testimony.  See ¶ FF 54-57.  Defendants' stated understanding of this agreement never changed until after JMG conferred with its litigation counsel, Pete Smith, regarding the anticipated entry of the Judgment by this Court in the Term Loan Action. See FF ¶ 58-62.

108.   In Delaware, the reason why the LLC statute was created was in order to "afford the maximum amount of freedom of contract, private ordering and flexibility to the parties involved.  Substance is supposed to be paramount over form." In re Grupo Dos Chiles, LLC, No. CIV.A. 1447-N, 2006 WL 668443, at *2 (Del. Ch. Mar. 10, 2016).

109.   The Ohadi Trust and Ken Woolley agreed to become members of JMG; understood themselves to be members of JMG, and were recognized as members by JMG.  That is enough to qualify as a member under Delaware law. Grupo, 2006 WL 668443. These facts not only meet but far exceed the definition of "insider" in the MoUFTA.  Mo. Stat. Ann. § 428.009(7).

110.   **IV.  JMG FAILS EACH FINANCIAL CONDITION TEST**

   **A. JMG WAS INSOLVENT AT EACH ASSESSMENT DATE**

   **1. Definition of Insolvency**

110.   The UFTA contains two approaches to determining whether a debtor is insolvent:

   An insolvent person means someone who 'cannot pay his or her debts as they become due.' Neb. Rev. Stat. § 1-201(23) (Uniform Commercial Code); see also Neb. Rev. Stat. § 36-703(b) (Uniform

139

Fraudulent Transfer Act) ('A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent.'); Black's Law Dictionary 716 (5th ed. 1979) ('[Insolvency is] … the condition of a person who is unable to pay his debts as they fall due, or in the usual course of trade and business.'). Insolvency also means a 'financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation.' 11 U.S.C. § 101(32)(A) (Bankruptcy Code); see also Neb. Rev. Stat. § 36-703(a) ('A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.').

United States v. Whitehead, 176 F.3d 1030, 1040 (8th Cir. 1999).

111. In the MoUFTA, the first of these two approaches to analyzing insolvency is codified at Mo. Stat. Ann. § 428.014.2, which states: "A debtor who is generally not paying his debts as they become due is presumed to be insolvent." See Mo. Stat. Ann. § 428.014.2.

112. The second of these two approaches to analyzing insolvency is codified at Mo. Stat. Ann. § 428.014.1, which states: "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." See Mo. Stat. Ann. § 428.014.1.

113. Under either of these two tests, JMG was insolvent throughout the Assessment Period.

**2. JMG Is Insolvent Under Mo. Stat. Ann. § 428.014.2**

114. Throughout the Assessment Period, JMG was generally not paying its debts as they became due. As a result, JMG is presumed to be insolvent under Mo. Stat. Ann. § 428.014.2.

115. JMG failed to pay the following debts:

140

| Timing of Default | Nature of Default |
|---|---|
| January 2015 | Amur default; Amur planning to foreclose |
| October-December 2015 | JMG breaches Term Loan Agreement by using Term Loan Aircraft sale proceeds to pay Ohadi Trust and Ken Woolley |
| March 2016 | Default on Ohadi Note |
| September 2016 | JMG misses final, one-year deadline to repay $6.5 million principal of Term Loan |
| October 2016 | Default on MercFuel guarantee |
| March 2017 | Default on AEG guarantee |
| May 2017 | Default on KMW Promissory Note |
| October 2017 | Default on World Fuel guarantee |
| October 26, 2017 | Judgment entered in Term Loan Action; JMG fails to pay |

116. These defaults show a general pattern, by JMG, of failing to pay debts when due.

117. There is no evidence that, when these defaults occurred, there was any genuine dispute regarding the validity of the underlying debts. JMG recognized the validity of its debts to the Ohadi Trust, Ken Woolley and the fuel companies. The evidentiary record in this case includes JMG's internal emails regarding the Term Loan debt; none of those emails dispute the validity of that debt. See FF ¶ 196-203. Later on, JMG did nominally oppose Jet Midwest International's claim

141

in the Term Loan Action, but this Court found JMG's defenses to be based on "wishful thinking" and "zero evidence." <u>See</u> October 25, 2017 Order at 5.

118. Mr. DiSalvatore's analysis confirmed that these defaults were a symptom of financial distress that persisted throughout the Assessment Period. Mr. McDonough's analysis was nonresponsive to this issue. Mr. McDonough acknowledged that JMG had failed to pay the above-referenced debts, but did not try to determine why JMG defaulted on them.

119. Because JMG is generally not paying its debts as they come due, JMG is presumptively insolvent pursuant to Mo. Stat. Ann. § 428.014.2. JMG has not rebutted this presumption.

**3. JMG Is Insolvent Under Mo. Stat. Ann. § 428.014.1**

120. JMG also is insolvent under Mo. Stat. Ann. § 428.014.1, which states that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." <u>See</u> Mo. Stat. Ann. § 428.014.1. As determined by Mr. DiSalvatore, the value of JMG's debts was greater than the value of JMG's assets at each Assessment Date.

121. The MoUFTA does not fully define "fair valuation."

122. The MoUFTA does provide one example of what a "fair valuation" is *not*. Specifically, no value should be attributed to "property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable" under the MoUFTA. <u>See</u> Mo. Stat. Ann. § 428.014.4.

142

123. This concept is important here because, in attempting to rebut Mr. DiSalvatore's analysis, Mr. McDonough uses numbers from the Tokoph Report. That report deals with the orderly liquidation value of the spare parts inventory that JMG (i) failed to disclose in post-judgment discovery and bankruptcy, and (ii) fraudulently transferred to the Ohadi Trust by means of the SAA and Proposed Foreclosures. That is, Mr. McDonough relies on values that, under Mo. Stat. Ann. § 428.014.4, must be excluded from any solvency analysis.

124. But otherwise, the MoUFTA defers to courts to define "fair valuation." In the Eighth Circuit:

> [U]nder the 'balance sheet test' . . . 'insolvency' results when the aggregate of a debtor's property is not sufficient at a fair valuation to pay his debts, which means a fair market price *that can be made available for payment of debts within a reasonable period of time*, and 'fair market value' implies a willing seller and a willing buyer.

See *In re Bellanca Aircraft Corp.*, 56 B.R. 339, 385 (Bankr. D. Minn. 1985) (quoting

American Nat'l Bank & Trust of Chicago, Illinois v. Bone, 333 F.2d 984, 987 (8th

Cir. 1964)) (emphasis added). See also Uniform Voidable Transactions Act,

Official Commentary at 14-15 (in solvency test, purpose of fair valuation is to

"assess the risk that the debtor will not be able to satisfy its liabilities.")

125. As a result, "it is clear that liquidation value, or a distressed or forced sale price is generally not the proper standard" of valuation. See *Bellanca*, 56 B.R. at 385. In fact, "there is *overwhelming authority* to the effect that normally . . . . [the

valuation of a business enterprise] must be made from the vantage of a going concern." See id. at 386 (quoting 2 Collier on Bankruptcy ¶ 101.29, at 101-64 (15th ed. 1985)) (emphasis added).[6]

126. Mr. DiSalvatore appropriately focuses on whether JMG, as a going concern, had assets that could be monetized to pay JMG's debts in a reasonable time. Mr. DiSalvatore analyzes this issue from multiple perspectives, including: (i) the balance sheet test, using both the sum of assets approach and income approach; (ii) the cash flow test, and (iii) the capitalization test. All of the tests lead to the same answer: that JMG is insolvent.

127. Mr. DiSalvatore's results explain the fact that JMG has failed to pay any of the Judgment and has defaulted on debts to numerous other creditors. Mr. DiSalvatore's results also explain why JMG filed for bankruptcy and, in bankruptcy, ultimately admitted that it was unable to reorganize. Mr. DiSalvatore's results also are consistent with JMG's own internal financial reports and federal tax returns, which, throughout the Assessment Period, consistently stated that JMG had negative net equity as well as negative net income.

128. Mr. McDonough's rebuttal is flawed as a matter of law and common sense. Specifically:

- Mr. McDonough states that JMG is solvent, but never considers whether JMG, as a going concern, had the ability to pay its debts within a reasonable time.

- As noted above, if a debtor fails to pay its debts when due, the debtor is presumed insolvent. See Whitehead, 176 F.3d at 1040; Mo. Stat. Ann. § 428.014.2. Mr. McDonough states that JMG is solvent, but

---

[6] In the current, 16th edition of Collier on Bankruptcy, the cited language appears at ¶ 101.32.

never tries to reconcile this opinion with the fact that JMG has not paid the Judgment or its other debts.

- Mr. McDonough critiques Mr. DiSalvatore's application of the sum of assets approach by arguing that Mr. DiSalvatore should have used numbers from Mr. Tokoph's orderly liquidation analysis. However, as discussed, Mr. Tokoph's orderly liquidation analysis focuses on the spare parts inventory that JMG concealed and fraudulently transferred after entry of the Judgment. Specifically, this is the same inventory of spare parts that JMG (i) failed to disclose during post-judgment discovery; (ii) failed to disclose during the JMG Bankruptcy Case; (iii) created the SAA in order to shield from garnishment, and (iv) tried to have the Ohadi Trust take via foreclosure. Where, as here, assets are concealed and/or fraudulently transferred, a valuation of such assets has no place in a solvency analysis. See Mo. Stat. Ann. § 428.014.4. A debtor cannot conceal or fraudulently transfer assets to avoid paying debts, and then argue that those very same assets somehow made the debtor solvent. See id.

- Mr. McDonough's critique also conflates (i) a liquidation analysis with (ii) the legally relevant question of whether JMG, as a going concern, can pay its debts within a reasonable time. Conflating these concepts contradicts "overwhelming authority." See Bellanca, 56 B.R. at 386. If a debtor, as a going concern, cannot pay its debts within a reasonable time, the debtor is deemed insolvent. See id.

- Relatedly, Mr. McDonough ignores the fact that JMG has not conducted or proposed an orderly liquidation as recommended by Mr. Tokoph and has not agreed to the appointment of a receiver. Instead, Defendants' plan is to auction JMG's inventory using a fire sale method for which no business justification has been offered. Defendants cannot have it both ways. They cannot simultaneously (i) insist on selling JMG's assets in a manner that does not qualify as an orderly liquidation, while (ii) stating that JMG is solvent because it theoretically could have conducted an orderly liquidation (even though it refused to do so).

- In using the income and market approaches, Mr. McDonough makes the same error of conjuring up a hypothetical business instead of focusing on whether *JMG*, as a going concern, could pay its debts

145

within a reasonable time. He compares JMG to the SIC Code 372 Companies (such as Boeing), which have nothing in common with JMG. His "normalization" adjustments have no evidentiary basis, and such adjustments cannot make JMG into Boeing.

- Mr. McDonough's application of the cash flow test is similarly flawed. Mr. McDonough purports to apply that test, but never analyzes the critical issue of whether JMG had the cash to pay all of its debts when due. Instead, Mr. McDonough compares his valuation of all of JMG's assets to his valuation of a small sub-set of JMG's debts. And as far as the capitalization test is concerned, Mr. McDonough conceded at trial that he did not really apply that test at all.

129. Thus, at each Assessment Date, JMG was insolvent under Mo. Stat. Ann. § 428.014.1.

## B. JMG KNEW OR SHOULD HAVE KNOWN THAT IT WAS INCURRING DEBTS BEYOND ITS ABILITY TO PAY WHEN DUE

130. In the MoUFTA, whether a debtor can pay its debts when due is relevant to a solvency analysis. See CL § IV(A), *supra*. But it also is important for a separate reason.

131. Specifically, whether or not a debtor is insolvent, a transfer may be deemed constructively fraudulent if the debtor did not receive reasonably equivalent value, and if the debtor "[i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." See Mo. Stat. Ann. § 428.024.1(2)(b).

132. JMG incurred debts far beyond its ability to pay when due. See CL ¶ 114-119, *supra*. For purposes of Mo. Stat. Ann. § 428.024.1(2)(b), the only remaining question is whether JMG intended to do so, or believed or reasonably should have believed it was doing so.

133. That question should be answered in the affirmative, for three reasons.

146

134. First, JMG's own internal financial reports, and tax returns, continuously stated that JMG had negative net equity and negative net income. Thus, the fact that JMG was incurring debts beyond its ability to pay when due is not a revelation that JMG heard for the first time from Mr. DiSalvatore. It is what JMG's own reporting stated at all relevant times.

135. Second, both Ken Woolley (in January 2015) and MB Bank (in September 2015) reviewed JMG's financial records and told JMG that there were serious questions regarding JMG's creditworthiness and financial viability. Thus, from the beginning of the Assessment Period, JMG knew very well it was running headlong into significant financial problems.

136. Third, JMG's own personnel repeatedly discussed the fact that JMG had insufficient cash to make full and timely payments both on the Ohadi Note and the Term Loan. *See* FF, ¶ 197-204 supra. Such emails are the very definition of a debtor (here, JMG) knowingly incurring debts that it could not pay as they came due. See P385 (JMG only had "118k saved toward the interest payment due Oct. 1st nothing towards the Nov. 1st principle [sic] payment."); P387 ("There are obviously more needs than free cash."); P926 ("We need to somehow extend the maturity with Ohadi or there wont [sic] be any excess cash"; Ohadi Note payments are "currently more than the usable cash we are collecting on a monthly basis."); P917 ("we are now forecast 2M negative by month end still needing one of the 737 transactions to close to cover Ohadi payment."); P383

(Term Loan Aircraft sale proceeds needed to "immediately pay paul ohadi");
P391 (using Term Loan Aircraft sale proceeds to pay Ohadi Trust will lead to "a
massive balloon sometime soon"); P916 ("We are still forecasting a negative
2.1M at the end of the month after the Ohadi debt payment.").

### C. JMG WAS UNDERCAPITALIZED

137.    Whether a debtor was undercapitalized is an important issue in a solvency
analysis. But this issue also is important for a separate reason under Mo. Stat.
Ann. § 428.024.1(2)(a).

138.    Under Mo. Stat. Ann. § 428.024.1(2)(a), regardless of whether a debtor is
insolvent, a transfer may be deemed to be constructively fraudulent if the debtor
did not receive reasonably equivalent value, and if the debtor "[w]as engaged or
was about to engage in a business or transaction for which the remaining assets
of the debtor were unreasonably small in relation to the business or transaction."
See Mo. Stat. Ann. § 428.024.1(2)(a).

139.    Mr. DiSalvatore found that JMG was undercapitalized throughout the
Assessment Period, and Mr. McDonough did not rebut this point. See FF ¶ 475,
supra. Thus, in applying Mo. Stat. Ann. § 428.024.1(2)(a), the Court should find
that JMG was undercapitalized.

## V.    THERE WAS REASONABLE CAUSE TO BELIEVE JMG WAS INSOLVENT

### A. Definition of "Reasonable Cause"

140.    The MoUFTA does not define what it means to have "reasonable cause to
believe the debtor was insolvent." See Mo. Stat. Ann. § 428.029.2.

141.    The Eighth Circuit has stated:

148

The act requires neither actual knowledge of nor belief in the debtor's insolvency. All that is necessary is a reasonable cause to believe the debtor is insolvent. A creditor's mere apprehension or suspicion that the debtor is suffering financial reverses or may be insolvent is insufficient. . . . It is clear, however, that a creditor may not ignore a debtor's precarious state of affairs. When circumstances exist that would incite a prudent business person to inquire into the debtor's affairs, a creditor who refuses or neglects to do so will be charged with notice of all facts a reasonably diligent inquiry would have disclosed.

Green v. A. G. Edwards & Sons, Inc., 582 F.2d 439, 443 (8th Cir. 1978).

**B. The Ohadi/Woolley Defendants Were on Inquiry Notice of JMG's Insolvency**

142. Under the standard set forth above, the Ohadi/Woolley Defendants had reasonable cause to believe JMG was insolvent, as shown in the following chronology:

| Date or Time Frame | Event |
|---|---|
| **January 2015** | **JMG defaults on Amur debt, faces imminent foreclosure, and discusses this issue with Ken Woolley and Paul Ohadi.** |
| **January 2015** | **Ken Woolley reviews JMG's financials and detects significant issues. Ken Woolley decides that, in light of those issues, he will not personally loan funds to JMG.** |
| **August 2015** | **Ken Woolley helps broker the Ohadi Note, despite there being no resolution of the issues Ken Woolley detected when he reviewed JMG's financial records in January 2015.** |
| **August 2015** | **Ken Woolley personally guarantees repayment of Ohadi Note, despite the fact that he lacks sufficient cash to fulfill his obligations under that guarantee.** |

149

| Date or Time Frame | Event |
|---|---|
| August 2015 | The Ohadi Trust is recognized as a managing member of JMG. |
| September 2015 | MB Bank rejects JMG's loan application and provides a detailed analysis of JMG's poor financial condition. This analysis is shared directly with Paul Ohadi and Ken Woolley. The issues raised by MB Bank are never resolved. |
| September 2015-present | Dynamic (owned principally by Ken Woolley) owes over $3 million to JMG, but never repays this debt. |
| September 2015 | Ken Woolley agrees to have Dynamic act as guarantor of JMG's obligation to repay the Term Loan. Ken Woolley does so despite the fact that Dynamic already is failing, and already is unable to pay its existing debt of over $3 million to JMG. |
| March 2016 | JMG defaults on the Ohadi Note. |
| March 2016 | Ken Woolley is personally aware of the Ohadi Note default "from the time it first happened." *See* 11/20/19 Tr. at 611:13-612:6; 612:22-613:8. |
| March 2016-present | In light of JMG's default on the Ohadi Note, Paul Ohadi knows that JMG is "hurting" and having a "financial problem." *See* 11/20/19 Tr. at 780:1213. |
| March 2016-present | JMG's default on the Ohadi Note triggers Ken Woolley's obligation, under the Woolley Guaranty, to pay the Ohadi Note for JMG. Ken Woolley does not comply with this obligation. As a result, JMG's default on the Ohadi Note continues in perpetuity. |
| May 2016 | Ken Woolley is recognized as a managing member of JMG. |

150

| Date or Time Frame | Event |
|---|---|
| May 2016 | Ken Woolley and Paul Kraus begin entering into the PSAs, through which JMG's scarce revenues will be used to pay Paul Kraus' personal debt to Ken Woolley. |
| September 2016 | Jet Midwest International sends default notices to Dynamic (owned principally by Ken Woolley) and JMG regarding the Dynamic Guarantee default and the Term Loan default. |
| October 2016 | Dynamic and JMG default on MercFuel debt. |
| January 2017 | Jet Midwest International sues Dynamic for the Dynamic Guarantee default. |
| January 2017 | Jet Midwest International sues JMG for the Term Loan default. Ken Woolley's company, Alta, reacts by restructuring the China Air transaction so that JMG no longer holds title to the China Air assets. |
| March 2017 | Dynamic and JMG default on AEG debt. |
| July 2017 | Dynamic files the Dynamic Bankruptcy Case, thus eliminating, as a practical matter, any remaining possibility of Dynamic (i) paying its $3 million debt to JMG, or (ii) paying the Term Loan debt in Dynamic's capacity as guarantor of that debt. |
| September-October, 2017 | By Ken Woolley's admission, Ken Woolley had actual knowledge of the Term Loan Action by this time. |

| Date or Time Frame | Event |
|---|---|
| October 3, 2017 | Ken Woolley, Brad Helsten and Paul Kraus exchange an email to discuss the Term Loan Action, the Ohadi Note default, and the possibility of the Ohadi Trust "taking" JMG's remaining assets via foreclosure. |
| October 2017 | Dynamic and JMG default on World Fuel debt. |
| October 26, 2017 | The Judgment is entered in the Term Loan Action. |
| January 19-31, 2018 | At some point during this period of time (Defendants have provided conflicting information regarding the exact timing), Brad Helsten instructs JMG to send the AWN share certificates to him in order to prevent levy by the U.S. Marshals Service. |
| February 2018 | According to Paul Kraus' testimony, prior to JMG's actual bankruptcy filing, Paul Kraus and Ken Woolley discuss JMG's intent to file for bankruptcy. |
| February 16, 2018 | Jet Midwest International files this fraudulent transfer case. |
| February 19, 2018 | Ken Woolley is part of the JMG management "Team" discussing a plan to "scrap" JMG. |
| February 23, 2018 | The SAA is signed by JMG. The SAA expressly refers to the Judgment entered in the Term Loan Action. |
| February 26, 2018 | JMG files for bankruptcy. |
| February 28, 2018 | Ken Woolley signs the SAA in his capacity as attorney-in-fact for the Ohadi Trust. |

Case 5:18-cv-06019-FJG   Document 634   Filed 05/26/20   Page 152 of 210

| Date or Time Frame | Event |
|---|---|
| March 1, 2018 | **The Ohadi Trust, Alta and KMW file their notices of appearance in the JMG Bankruptcy Case.** |
| June 1, 2018 | **The JMG Bankruptcy Case is dismissed based on JMG's representation that it lacks the necessary assets or income to commence a reorganization.** |
| June 1, 2018-present | **JMG continues to fail to pay any of the Judgment.** |

143.    As shown above, the Ohadi/Woolley Defendants were on reasonable notice,

throughout the Assessment Period, that JMG was insolvent.  At the latest, they

were on notice of JMG's insolvency in March 2016, when JMG defaulted on the

Ohadi Note. By the time the Judgment was entered in the Term Loan Action on

October 26, 2017, the Ohadi Note default had multiplied into six defaults (the

Ohadi Note, AEG, MercFuel, World Fuel, KMW, and the Term Loan default).

See Sherman, 67 F.3d at 1355 (reasonable cause to believe debtor insolvent

because transferee aware of debtor's debts, default and impending lawsuit).

144.    The Ohadi/Woolley Defendants knew JMG "could not meet [its] obligations as

they matured in the ordinary course of business." Merchants' Nat'l Bank of

Cincinnati v. Cook, 95 U.S. 342, 346, 5 Otto 342,1877 WL 18623 (1877). All

information "was negative or adverse to the financial stability" of JMG.

153

Employer's Mut. Cas. Co. v. Hinshaw, 309 F.2d 806, 809 (8th Cir. 1962). Here JMG defaulted on its debts, and the Ohadi/Woolley Defendants were aware of those defaults.

145.   JMG's need for additional funding from Ken Woolley and Paul Ohadi "should have revealed" that JMG "needed the money immediately to meet [its] payroll and to continue in business," and thus was insolvent.  Kenneally v. First Nat. Bank of Anoka, 400 F.2d 838, 844-45 (8th Cir. 1968).

## VI.      THE TRANSFER OF THE AWN SHARE CERTIFICATES WAS FRAUDULENT

### A. The Transfer of the AWN Share Certificates was Intentionally Fraudulent

146.   When JMG transferred the AWN share certificates to the Ohadi Trust in January 2018, JMG did so with actual intent to hinder, delay and defraud JM International. This transfer therefore was fraudulent under Mo. Stat. Ann. § 428.024.1(1).

147.   JMG transferred the share certificates after entry of the Judgment in order to prevent this Court from entering a TRO freezing the certificates, and in order to prevent the U.S. Marshals Service from seizing the certificates.  Defendants have offered no legitimate explanation for this transfer.  Brad Helsten testified that he instructed JMG to transfer the certificates only after he learned, from Karen Kraus, that the certificates were to be seized by the U.S. Marshals Service.

148.   The sole effect of this transfer was to hinder, delay and defraud Jet Midwest International by preventing Jet Midwest International from satisfying a portion of the Judgment.  *Also, the transfer did not reduce JMG's liability under the Ohadi Note or give JMG any other benefit.*

154

149. The Ohadi Trust did not have, or believe that it had, a perfected lien in the share certificates when this transfer was made. The SAA was not created until after this transfer was made, and there is no evidence of any other security agreement that, at the time, was applicable to the certificates. Also, Brad Helsten testified at trial that a creditor cannot have a perfected lien over share certificates without first possessing them. See 11/20/19 Tr. at 810:5-12.

150. Defendants also did not offer into evidence any contemporaneous email, or other contemporaneous document, in which any legitimate reason for this transfer was discussed. In the Irrevocable Stock Powers signed by Karen Kraus, JMG agreed to "sell, assign and transfer" the certificates to the Ohadi Trust for no consideration. See P638 at 3; P639 at 3. There is no reference in either of those Irrevocable Stock Powers to any existing security interest, an intent to create a new security interest, or any other reason for this transfer.

151. Because the sole effect of this transfer was to hinder, delay and defraud JM International, Defendants' intent was fraudulent. As noted above, the presence of just *one* badge of fraud would be sufficient to show fraudulent intent, and the confluence of *more than one* badge of fraud *strongly indicates* fraudulent intent. The transfer of the certificates displays *10* of the badges of fraud. In particular:

| Badge of Fraud | Applicability |
|---|---|
| Was transfer to an insider? | Yes – the transferee was the Ohadi Trust. |

155

| | |
|---|---|
| **Did debtor retain possession or control of the property?** | **Yes – the transfer was made to the Ohadi Trust, which is a managing member of JMG.** |
| **Was transfer or obligation concealed?** | **Yes – the transfer was concealed when it was made. When JMG subsequently disclosed the transfer, JMG told this Court that the certificates already had been sent to Brad Helsten in Utah, and that Jet Midwest International's TRO application therefore should be denied as moot.** |
| **Was the debtor being sued or threatened with suit?** | **Yes – this transfer occurred after entry of the Judgment, in response to Jet Midwest International's efforts to enforce the Judgment.** |
| **Was the transfer of substantially all the debtor's assets?** | **Yes – in the sense that the share certificates were JMG's last remaining liquid asset. JMG had no cash remaining in any of its bank accounts.** |
| **Did the debtor abscond?** | **N/A.** |
| **Did the debtor remove or conceal assets?** | **Yes – JMG moved these assets out of the jurisdiction (California) in which JMG's office was located, and in which the U.S. Marshals Service was trying to levy.** |
| **Did the debtor fail to receive reasonably equivalent value?** | **Yes – JMG received no value in exchange for transferring the certificates to the Ohadi Trust.** |
| **Was the debtor insolvent, or did it become insolvent shortly after the transfer was made?** | **Yes – JMG was insolvent when the transfer was made.** |
| **Badge of Fraud** | **Applicability** |

| Did the transfer occur shortly before or shortly after a substantial debt was incurred? | Yes – the transfer occurred shortly after entry of the Judgment in the Term Loan Action. |
|---|---|
| Did the debtor transfer the essential assets of the business to a lienor who transferred the assets to an insider? | Yes – the Ohadi Trust is a JMG insider, and also purports to be a lienor. |

152. Accordingly, it was Defendants' burden to identify a legitimate, alternative explanation for this transfer, if there is any. Defendants did not do so. Defendants' witnesses were unable or unwilling to even provide a concrete, coherent timeline of when exactly the transfer occurred, in relation to the U.S. Marshals Service coming to JMG's Los Angeles office.

153. Subsequent to this transfer being made, the value of the certificates collapsed, and, as this Court is aware, the certificates were deposited with this Court. But under the MoUFTA, the measure of harm is "the value of the *asset* at the time of the transfer, subject to adjustment as the equities may require." See Mo. Stat. Ann. § 428.044.3. Therefore, what matters is the fact that JMG fraudulently transferred the certificates to the Ohadi Trust when the certificates had value, which also was when Jet Midwest International was trying to levy on them.

154. The affirmative defense of good faith and reasonably equivalent value is inapplicable here. In order to successfully assert this affirmative defense, the

Ohadi Trust would have to prove both (i) good faith and (ii) reasonably equivalent value. Mo. Stat. Ann. § 428.044.1.

155. As described above, the Ohadi Trust did not give reasonably equivalent value (or any value at all) in exchange for the share certificates.

156. The Ohadi Trust also cannot show that it acted in good faith. To do so, the Ohadi Trust would have to prove that it was not on inquiry notice of (i) the fraudulent nature of the transfer, or (ii) JMG's insolvency.

157. The fact that the Ohadi Trust knew about the fraudulent nature of this transfer is indisputable. The Ohadi Trust engineered the transfer of the AWN share certificates, and did so in order to thwart the U.S. Marshals Service from seizing the share certificates.

158. The Ohadi Trust did so despite knowing there was an unpaid judgment against JMG, not to mention the fact that the Ohadi Note had been in default for over 18 months. Those were just a few of the red flags of JMG's insolvency that the Ohadi Trust was aware of at the time. Thus, the Ohadi Trust was on notice of JMG's insolvency.

**B. The Transfer of the AWN Share Certificates was Constructively Fraudulent**

159. The transfer of the AWN share certificates also was constructively fraudulent.

160. As discussed above, JMG did not receive reasonably equivalent value in exchange for transferring the share certificates. This means that:

- Because JMG was undercapitalized the transfer was fraudulent under Mo. Stat. Ann. § 428.024.1(2)(a).

- Because JMG knowingly had incurred debts that it could not timely pay the transfer was fraudulent under Mo. Stat. Ann. § 428.024.1(2)(b)).

158

- Because JMG was insolvent, the transfer was fraudulent under Mo. Stat. Ann. § 428.029.1.

161. None of the Defendants decreased the amount of debt owed by JMG to the Ohadi Trust, or Ken Woolley, as a result of this transfer. But even if this transfer were to be construed as a transfer "for an antecedent debt," it would be constructively fraudulent under Mo. Stat. Ann. § 428.029.2. Under Mo. Stat. Ann. § 428.029.2, a transfer is fraudulent if (i) the debtor is insolvent; (ii) the transferee is an insider, and (iii) the transferee has reasonable cause to believe the debtor was insolvent. When JMG transferred the certificates, JMG was insolvent; the transferee (the Ohadi Trust) was an insider, and, as noted, the Ohadi Trust had reasonable cause to believe JMG was insolvent.

## VII. THE SAA WAS FRAUDULENT

### A. The SAA Was Intentionally Fraudulent

162. When JMG and the Ohadi Trust entered into the SAA on February 23, 2018 (the date of JMG's signature) and February 28, 2018 (the date of Ken Woolley's signature on behalf of the Ohadi Trust), they did so with actual intent to hinder, delay and defraud JM International. Thus, the SAA was fraudulent under Mo. Stat. Ann. § 428.024.1(1).

163. In many cases, courts have found fraudulent intent when a debtor pledged collateral to an insider for the purpose of frustrating collection efforts by arm's length creditors.

159

164. JMG signed the SAA *one day* after Jet Midwest International served its garnishment writ on JM Inc. The SAA itself specifically references the Judgment that had been entered against JMG on October 26, 2017. The Ohadi/Woolley Defendants admit that the SAA was created "in view of JM Int'l's attempt to take possession of [JMG's] Spare Parts Inventory by service of its garnishment on JM Inc." See Ohadi/Woolley Defendants' Suggestions in Opposition to Plaintiff Jet Midwest International Co., Ltd.'s Motion for Summary Judgment (Docket No. 534) at 12 n. 2. This admission is, in effect, an admission that the SAA was created in order to prevent Jet Midwest International from enforcing the Judgment.

165. In addition, because the actual effect of the SAA was to hinder and delay the enforcement of the Judgment, this must have been intentional. For the past two years, by leveraging the SAA, JMG and the Ohadi Trust have stalled the enforcement of the garnishment writ and also have stalled Jet Midwest International's other efforts to garnish and levy JMG's assets.

166. The Ohadi Trust cited the SAA as a purported basis for a foreclosure to strip JMG of its remaining inventory of spare parts. There is no evidence that the Ohadi Trust's foreclosure auction would generate any proceeds, let alone in an amount sufficient to pay the Judgment. The foreclosure was organized by litigation counsel, with no guidance from a broker, a decision for which no business justification has been offered.

167. The fraudulent intent of the SAA was further revealed when KMW simultaneously announced its intent to foreclose on aircraft and engines owned by JMG. Despite

160

the fact that the SAA purports to grant the Ohadi Trust a blanket, first priority lien over all of JMG's assets, the Ohadi Trust stated no objection to – and in fact supported – KMW's proposed foreclosure.  But Defendants continue to use the purported lien granted by the SAA to obstruct collection of the Judgment. What this shows is that the purpose of the SAA is not to ensure payment of the Ohadi Note, but to shield JMG's assets from Jet Midwest International.

168.　　The SAA is particularly egregious because it was signed by Ken Woolley not only after entry of the Judgment and after service of Jet Midwest International's garnishment writ, but also:

- After this fraudulent transfer case was filed;

- After JMG had filed for bankruptcy;

- After Ken Woolley, Paul Kraus and Brad Helsten exchanged their October 3, 2017 email to discuss the Term Loan Action, the Ohadi Trust potentially "taking" JMG's assets, and to discuss the Ohadi Trust's 20% ownership of JMG;

- After Ken Woolley and other members of JMG's management discussed their plan – set forth in a PowerPoint presentation – to "scrap" JMG; and,

- After the Ohadi Trust had intentionally obstructed the U.S. Marshals Service from seizing the AWN share certificates from JMG's Los Angeles office.

169.　　As noted above, just *one* badge of fraud is sufficient to show fraudulent intent, and more than one *strongly* indicates fraudulent intent.  The SAA displays *10* of the badges of fraud set forth in the MoUFTA.  Specifically:

| Badge of Fraud | Applicability |
|---|---|
| **Was transfer to an insider?** | **Yes – the transferee was the Ohadi Trust.** |
| **Did debtor retain possession or control of the property?** | **Yes – JMG signed the SAA, but the property continued to be legally owned by JMG and physically maintained by JMG's affiliate, JM Inc.** |
| **Was transfer or obligation concealed?** | **Yes – it was concealed. The principal asset at issue was JMG's inventory of spare parts. JMG concealed that inventory during post-judgment discovery and during the JMG Bankruptcy Case.** |
| **Was the debtor being sued or threatened with suit?** | **Yes – this transfer occurred after entry of the Judgment, to obstruct enforcement of the Judgment. The SAA was signed *one day* after JM International's service of a garnishment writ on JM Inc.** |
| **Was the transfer of substantially all the debtor's assets?** | **Yes – JMG's inventory of spare parts is JMG's last remaining asset that, if liquidated in an orderly fashion, potentially could be used to pay much of the Judgment.** |
| **Did the debtor abscond?** | **N/A.** |
| **Did the debtor remove or conceal assets?** | **Yes – in addition to creating the SAA to shield its inventory of spare parts, JMG concealed that inventory during post-judgment discovery and during the JMG Bankruptcy Case.** |
| **Did the debtor fail to receive reasonably equivalent value?** | **Yes – JMG failed to receive any value in exchange for the SAA. The SAA has been used to destroy value by laying the groundwork for a foreclosure, by the Ohadi Trust, that is not designed as an orderly liquidation.** |
| **Was the debtor insolvent, or did it become insolvent shortly after the transfer was made?** | **Yes – JMG was insolvent when the transfer was made.** |

162

| Badge of Fraud | Applicability |
|---|---|
| **Did the transfer occur shortly before or shortly after a substantial debt was incurred?** | **Yes – the transfer occurred shortly after entry of the Judgment in the Term Loan Action, and one day after service of the garnishment writ.** |
| **Did the debtor transfer the essential assets of the business to a lienor who transferred the assets to an insider?** | **Yes – the Ohadi Trust is a JMG insider, and also purports to be a lienor.** |

170. Defendants failed to identify any legitimate explanation for the creation of the SAA.

171. The affirmative defense of good faith and reasonably equivalent value is inapplicable here. The Ohadi Trust did not give reasonably equivalent value (or any value) in exchange for JMG entering into the SAA. The Ohadi Trust cannot show that it acted in good faith, as the Ohadi Trust was aware of the fraudulent nature of this transfer and also was aware that JMG was insolvent when this transfer was made.

172. Like the transfer of the AWN share certificates, this transfer was engineered by the Ohadi Trust. When the Ohadi Trust engineered this transfer, the Ohadi Trust knew about the outstanding Judgment, JMG's default on the Ohadi Note, and numerous other indications of JMG's insolvency. Thus, the Ohadi Trust cannot prove that it lacked reasonable notice of JMG's insolvency.

163

## B. **The SAA Was Constructively Fraudulent**

173. Under facts like these, courts also have concluded that liens were constructively fraudulent.

174. As a transfer for an antecedent debt, the SAA is constructively fraudulent under Mo. Stat. Ann. § 428.029.2. The elements of that test are met because (i) JMG was insolvent; (ii) the transferee (the Ohadi Trust) was a JMG insider, and (iii) the Ohadi Trust had reasonable cause to believe JMG was insolvent. See id.

175. The SAA also was constructively fraudulent under Mo. Stat. Ann. §§ 428.024.1(2)(a) and (b), and 428.029.1, because JMG did not receive reasonably equivalent value.

176. JMG received no cash, debt forgiveness or other consideration for entering into the SAA. As noted above, the Ohadi/Woolley Defendants have admitted that the SAA was created "in view of JM Int'l's attempt to take possession of [JMG's] Spare Parts Inventory by service of its garnishment on JM Inc." (Doc. # 534) at 12 n. 2. No other reason for the SAA has been offered.

177. Obstructing the enforcement of the Judgment is of no value to JMG. It is of value only to JMG's insiders, who want to take JMG's remaining assets before the Judgment is paid.

178. In addition, when JMG entered into the SAA, JMG was undercapitalized, had knowingly incurred debts beyond its ability to pay as they became due and was insolvent. As a result, all of the elements of Mo. Stat. Ann. §§ 428.024.1(2)(a), 428.024.1 and 428.029.1 are satisfied.

## C. Defendants' Rebuttal Arguments Are Unpersuasive

179. The SAA engages in backdating by simultaneously granting the Ohadi Trust a blanket, first priority lien, while also suggesting, without evidence, that such a lien somehow had existed since August 2015. See P765, SAA ¶ D. The SAA's backdating clause has become Defendants' defense of the SAA in this litigation. Defendants contend that the SAA is immaterial because the SAA – according to the SAA itself – merely reaffirmed a preexisting lien.

180. Defendants created the SAA *after this litigation was filed*. Defendants' circular logic – in which Defendants defend the SAA during this litigation by relying on the self-serving statements that Defendants themselves included in the SAA – is baseless. The Ohadi Trust did not have a blanket, first priority lien at any point before the SAA was signed.

181. Defendants know this to be true because, after entry of the Judgment, Brad Helsten was unsure whether the Ohadi Trust had "a first priority position." See 11/20/19 Tr. at 801:23-802:3. That is why the Defendants suddenly created the SAA after Jet Midwest International served its garnishment writ. The SAA deleted the collateral clause from the SOSA (the Second Ohadi Security Agreement) and replaced it with a blanket, first priority lien. See P1156 (blackline showing how the SAA changed the language of the SOSA).

182. The SOSA, as originally written, did not grant such a lien, which is why Brad Helsten was concerned. A lien attaches to collateral when it becomes

165

enforceable against the debtor.  See UCC § 9-203(a).[7]  A lien is enforceable

against the debtor when "the debtor has authenticated a security agreement that

provides a description of the collateral."

183.  In a security agreement, a description of collateral is sufficient if it "reasonably

identifies what is described."  UCC § 9-108(a).  A description reasonably

identifies the collateral if it enables "a third party to distinguish between the

collateral and other, similar goods that the debtor owns."  See In re Keene Corp.,

188 B.R. 881, 893 (Bankr. S.D.N.Y. 1995).

184.  "The security agreement and financing statement have different functions under

the UCC."  Thorp Commercial Corp. v. Northgate Indus., Inc., 654 F.2d 1245,

1248 (8th Cir. 1981).

> The security agreement defines what the collateral is so that, if
> necessary, the creditor can identify and claim it, and the debtor or
> other interested parties can limit the creditor's rights in the collateral
> given as security.  The security agreement must therefore describe
> the collateral. . . . The financing statement, on the other hand, serves
> the purpose of putting subsequent creditors on notice that the
> debtor's property is encumbered.

Id.  Centerre Bank Nat'l Ass'n v. Missouri Farmers Ass'n, 716 S.W.2d 336, 341

(Mo. Ct. App. 1986) ("when a financing statement describes a greater quantity of

property than that described in the corresponding security agreement, the

security interest is defined by the narrower description contained in the security

agreement.") (internal citations and quotation marks omitted).

185.  The SOSA, as written in August 2015, did not contain language granting the

---

[7] The UCC is codified in Missouri at Mo. Stat. Ann. § 400.1-101, *et seq.*, and in New York at NY UCC § 1-101, *et seq*.  The SAA and other security agreements at issue here are governed by New York law.

166

Ohadi Trust a blanket lien over all of JMG's assets. Instead, it used the phrase "substantially all" to describe the scope of the lien that was granted to the Ohadi Trust at that point in time.

186.    The phrase "substantially all" is undefined in the UCC, and the UCC does not authorize the use of that phrase in a security agreement. Defendants have cited no case approving the use of that phrase in a security agreement, let alone a case equating that phrase to the concept of a blanket lien.

187.    At trial, when asked by his own counsel what "substantially all" meant, Brad Helsten did not have a clear, consistent answer. See 11/20/19 Tr. at 801:5-8. He suggested that it might mean (i) "anything important"; (ii) "all" or (iii) "everything." Id. None of these definitions were in the SOSA as originally signed in 2015. "Anything important" (a highly subjective standard) and "all" / "everything" are very different concepts, and the fact that these mutually inconsistent concepts were proposed at trial underscores the inherent confusion in the agreement itself and Defendants' position. Even if the phrase "anything important" were in the SOSA, the use of that vague language would not have added any clarity.

188.    Nothing in the SOSA clarifies the meaning of "substantially all." The SOSA does use the word "inventory," but "inventory" is modified by "substantially all." See SOSA § 1.1(c). Thus, no third party could have known whether or to what extent

167

it was JMG's intent to grant a lien over JMG's inventory of spare parts, or other categories of JMG's assets.

189.   This case is not a dispute between the parties to these security agreements. This case is about an attempt *by* the parties to these agreements (JMG and the Ohadi Trust) to wield the agreements against a third-party judgment creditor, Jet Midwest International.  But there is no written record of any Defendant suggesting to Jet Midwest International, prior to the closing of the Term Loan transaction, that the Ohadi Trust had a blanket lien, or any lien, over JMG's assets.  It would have defied common sense for Jet Midwest International to loan $6.5 million to JMG knowing that those funds would be subjected to a superior lien held by insider.

190.   JMG made a covenant, in the Term Loan Agreement, not to create or allow any competing liens over the Term Loan Aircraft.  <u>See</u> P112, Term Loan Agreement § 6.1.  That covenant was a material part of the inducement for Jet Midwest International to fund the loan.  <u>Id</u>.  By arguing that the Ohadi Trust had a blanket, first priority lien, Defendants in effect are suggesting that this covenant was already broken when made.  It would be an extreme act of bad faith for JMG to (i) induce a $6.5 million loan by promising not to allow competing liens;  (ii) default on the loan, and then (iii) obstruct enforcement of the Judgment by arguing that there was a competing lien.  The UCC prohibits bad faith conduct. <u>See</u> UCC § 1-304 ("Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement.").  <u>See also</u> <u>Thompson v. U.S.</u>, 408 F.2d 1075, 1084 (8th Cir. 1969) (holding that the

168

UCC "permits the consideration of the lack of good faith . . . to alter priorities which would otherwise be determined under Article 9.")

191.  Defendants should not be heard to argue that the Ohadi Trust had a blanket, first priority lien over JMG's assets in August 2015.  That argument, if accepted, necessarily would mean that Term Loan Agreement § 6.1 was fraudulent.

192.  Defendants' argument also contradicts Defendants' course of dealing with each other.  This is further evidence of bad faith, because it indicates that the alleged "lien" that Defendants purport to possess is nothing more than Defendants' desire to avoid paying the Judgment.

193.  "Ordinarily, evidence of the 'course of actual performance by the parties is considered the best indication of what they intended the writing to mean.'"  See David Frisch, Anderson on the Uniform Commercial Code (3d ed.) § 1-205:68.  Here, JMG made tens of millions of dollars in cash distributions to the Krauses, Ken Woolley and Paul Ohadi for purposes unrelated to the Ohadi Note.  See FF ¶ 321-331.  If the Ohadi Note was secured by a blanket, first priority lien, that cash would necessarily be used, first and foremost, to pay the Ohadi Note.  As a result, long before the entry of the Judgment, the Ohadi Note necessarily would have been extinguished, along with any liens purportedly securing it.

194.  At trial, Defendants sought to justify the distributions they received from JMG by contending that some or all of those distributions may have been made in accordance with PMSIs.  There is no contemporaneous evidence that, when

169

these distributions were being made, Defendants had tried to create PMSIs. The concept of PMSIs is inapplicable here.

195. A PMSI is a lien that secures repayment of all or part of the purchase price of inventory or other collateral. See UCC § 9-103(a), (b). *A PMSI cannot secure repayment of amounts in excess of the original price for which the collateral was purchased.* In re Win-Vent, Inc., 217 B.R. 803, 811 (Bankr. W.D. Mo. 1997) ("A purchase money security interest cannot exceed the price of what is purchased in the transaction giving rise to the security interest.").

196. In addition, when the collateral is inventory, a PMSI cannot have priority over a prior, blanket security interest unless four more conditions are satisfied:

> (1) the purchase-money security interest is perfected when the debtor receives possession of the inventory;
>
> (2) the purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest;
>
> (3) the holder of the conflicting security interest receives the notification within five years before the debtor receives possession of the inventory; and
>
> (4) the notification states that the person sending the notification has or expects to acquire a purchase-money security interest in inventory of the debtor and describes the inventory.

See UCC § 9-324(b).

197. The distributions at issue here were not made in accordance with PMSIs.

198. The nature of the profit-sharing arrangement between JMG, Ken Woolley and the Ohadi Trust was to distribute amounts in excess of the original purchase price of each aircraft or engine. These were the so-called "profits" to be distributed under

170

each Profit-Sharing Agreement. <u>See</u> FF ¶ 343-360, <u>supra</u>. As a matter of law, a PMSI cannot secure repayment of amounts in excess of an asset's purchase price. UCC § 9-103(a), (b). Thus, in referring to the concept of a PMSI, Defendants are trying to fit a square peg into a round hole – they are invoking a legal concept that is inapplicable to their course of conduct.

199. There also is no evidence that the four conditions listed in UCC § 9-324(b) were met for any of the distributions (profit sharing or otherwise) at issue. Defendants did not argue, and would have no basis for arguing, that the second, third or fourth conditions set forth in UCC § 9-324(b) were met for any such distributions.

200. Defendants also cannot show that the first condition was met. <u>See</u> UCC § 9324(b)(1). There was no security agreement underpinning *any* of the Profit Sharing Agreements. Relatedly, there was no security agreement underpinning JMG's purported obligation, set forth in those Profit-Sharing Agreements, to pay Paul Kraus' personal debt to Ken Woolley. <u>Id</u>. There also was no security agreement underpinning: (i) the "consulting fee" payments to the Krauses; (ii) the $950,000 payment to Kraake; or (iii) the 12/7/15, 1/19/16, 6/14/16, 7/18/17, 8/18/17, or 9/12/17 Woolley Cash Transfers.

201. As to the *perfection* of a lien, KMW has never filed a UCC financing statement against JMG. Alta did not file a UCC financing statement against JMG until September 28, 2016, which was long after JMG began making profit distributions. <u>See</u> <u>id</u>.

202. In sum, there is no evidence here that Defendants had PMSIs, or even attempted to create PMSIs. Defendants have offered no alternative explanation for their course of conduct.

## VII. THE PROPOSED FORECLOSURES ARE FRAUDULENT

### A. The Proposed Foreclosures Are Intentionally Fraudulent

203. The Proposed Foreclosures – like the SAA on which the Proposed Foreclosures purport to be based – are designed to hinder, delay and defraud Jet Midwest International.

204. Accordingly, they are intentionally fraudulent under Mo. Stat. Ann. § 428.024.1(1).

205. Defendants served two foreclosure notices: one by KMW, and the other by the Ohadi Trust. However, the stated intent of KMW and the Ohadi Trust is to auction all of JMG's inventory as one single lot. Thus, for purposes of the MoUFTA, it is appropriate to treat the Proposed Foreclosures as one transfer.

206. As previously discussed, foreclosures and other uses of purported security interests are transfers that can be deemed fraudulent. Uniform Voidable Transactions Act, Official Commentary at 13.

207. In Jackson v. Star Sprinkler Corp., 575 F.2d 1223 (8th Cir. 1978), the debtors' insiders created a new corporation in anticipation of the debtors filing for bankruptcy. Jackson, 575 F.2d at 1227. The insiders then assigned, to that new corporation, their security interests in the debtors' assets. Id. The new corporation then took possession of the debtors' assets on the ground that such assets purportedly were its collateral. Id.

172

208. The Eighth Circuit deemed the transfer of possession to be fraudulent. <u>Jackson</u>, 575 F.2d at 1234. It was the final step in "a scheme to strip the bankruptcy corporations of all assets," and "to place those assets in a new corporation which would appropriate the going-concern value of the old corporations sans the claims of 1,000 general creditors." <u>Id</u>. Such creditors then "would be left with empty corporate shells in the bankruptcy court." <u>Id</u>.

209. The Proposed Foreclosures at issue here are collusive and characterized by numerous badges of fraud. Paul Kraus is the person who "suggested" the "idea" of the Ohadi Trust "foreclosing and taking the assets of JMG." <u>See</u> P834. He did so in October 2017, while Jet Midwest International's motion for summary judgment in the Term Loan Action was pending before this Court. <u>Id</u>. The text of that October 3, 2017 email (P834) confirms the fraudulent intent of the Proposed Foreclosures. Defendants' intent is not to auction assets <i>at</i> a foreclosure, but to stage a foreclosure for the purpose of the Ohadi Trust "taking" JMG's assets. <u>See</u> P834. The assets would "then be sold." <u>Id</u>.

210. In other words, the "foreclosure" is a sham mechanism to insulate the assets from the Judgment by moving the assets to the Ohadi/Woolley Defendants. Then, after "scrapping" JMG and forming a new company in its place, the Krauses and the Ohadi/Woolley Defendants would sell the assets and keep all of the profits, leaving the Judgment unpaid.

211. The timing of the Proposed Foreclosures confirms their collusive nature. The

Ohadi and KMW loan defaults occurred well before entry of the Judgment (in March 2016 and May 2017). Neither the Ohadi Trust nor KMW tried to foreclose then. It was only after Jet Midwest International moved for summary judgment that Defendants began discussing the Ohadi Trust "taking" JMG's assets. See P834. It was only after the Judgment was entered that: (i) JMG and the Ohadi Trust entered into the SAA; (ii) KMW filed paperwork with the FAA to perfect its purported liens (see FF ¶ 383); (iii) the Ohadi Trust and KMW issued default notices to JMG (see FF ¶¶ 376, 377), and (iv) the Ohadi Trust and KMW announced their intent to foreclose, citing these newly minted liens as the basis to proceed.

212. The way in which the Proposed Foreclosures were organized is further evidence that their purpose is improper. Defendants appointed a litigation associate, with no background in the aviation industry, to organize an auction of millions of dollars of aircraft, engines and spare parts. Mr. Tokoph explained that the way the auction was organized was inconsistent with industry standards and had no business justification. Defendants made no attempt to break up the inventory into lots; to appropriately advertise the auction; to appraise the assets for purposes of the auction, or to obtain any guidance from a professional broker.

213. Even after the Tokoph Report was served, Defendants continued to insist on going forward with the Proposed Foreclosures – but had no response to anything in the Tokoph Report.

214. Worse, the purported security interest at the heart of the Proposed Foreclosures – the SAA – is itself fraudulent. See CL § VII, supra. In substance, what the

174

Proposed Foreclosures are principally about is JMG's inventory of spare parts, and the SAA is the only security agreement whose scope extends to those spare parts. But the SAA is a fraudulent lien.

215. Thus, through the Proposed Foreclosures, Defendants not only are seeking to auction JMG's remaining assets in a fraudulent manner, but are trying to do so based on a fraudulent instrument. There is no value for JMG or its estate in what is happening here. See 5 Collier on Bankruptcy ¶ 548.03[4][a] (when obligation is fraudulent, "transfers made by the debtor on account of that obligation are not made for reasonably equivalent value.").

216. Defendants are also seeking to auction assets that JMG failed to fully disclose in post-judgment discovery and bankruptcy. In post-judgment discovery, and in bankruptcy, JMG provided a materially incomplete description of the nature and scope of its inventory. But after JMG was dismissed from bankruptcy, JMG gave the Ohadi Trust a spreadsheet, hundreds of pages in length, itemizing its inventory in detail – and disclosing, for the first time, that JMG still had parts from the Term Loan Aircraft. No such spreadsheet was previously given by JMG to Jet Midwest International or the Bankruptcy Court. JMG in effect had attempted to "get rid of its creditors 'on the cheap,' and start over with a 'bundle of rights.'" Stallings v. Hussmann Corp., 447 F.3d 1041, 1048 (8th Cir. 2006).

217. The Proposed Foreclosures not only are fraudulent on their face, but display 10 distinct badges of fraud, any one of which alone would create an inference of fraudulent intent:

| Badge of Fraud | Applicability |
|---|---|
| **Was transfer to an insider?** | **Yes – the entities that wish to foreclose are the Ohadi Trust and KMW.** |
| **Did debtor retain possession or control of the property?** | **Yes – the Proposed Foreclosures are designed to transfer JMG's inventory to a successor entity, not to an arm's-length bidder.** |
| **Was transfer or obligation concealed?** | **Yes – the vast majority of the foreclosure assets were concealed both during post-judgment discovery and in the JMG Bankruptcy Case.** |
| **Was the debtor being sued or threatened with suit?** | **Yes – the Proposed Foreclosures were announced after entry of the Judgment, during this collection case.** |
| **Was the transfer of substantially all the debtor's assets?** | **Yes – the Ohadi Trust and KMW wish to foreclose on all of JMG's remaining inventory.** |
| **Did the debtor abscond?** | **N/A.** |
| **Did the debtor remove or conceal assets?** | **Yes – the vast majority of the foreclosure assets were concealed both during post-judgment discovery and in the JMG Bankruptcy Case.** |
| **Did the debtor fail to receive reasonably equivalent value?** | **Yes – the Proposed Foreclosures are not designed in a way that would give JMG reasonably equivalent value, and are based on a fraudulent instrument (the SAA).** |
| **Was the debtor insolvent, or did it become insolvent shortly after the transfer was made?** | **Yes – JMG was insolvent when the auctions were announced, and, if the auctions were to occur, JMG's existence would effectively be at an end.** |
| **Did the transfer occur shortly before or shortly after a substantial debt was incurred?** | **Yes – the transfer occurred after the Judgment was entered in the Term Loan Action.** |

| Badge of Fraud | Applicability |
|---|---|
| Did the debtor transfer the essential assets of the business to a lienor who transferred the assets to an insider? | **Yes – the Ohadi Trust and KMW are insiders of JMG, and are the entities that wish to foreclose.** |

218. The presence of so many badges of fraud is more than enough to prove fraudulent intent. <u>Allison</u>, 307 S.W.2d at 454; <u>In re: Graven</u>, 936 F.2d 378, 383 (8th Cir. 1991); <u>Sherman</u>, 67 F.3d at 1354; <u>Rademacher</u>, 549 B.R. at 894; <u>Matter of Craig</u>, 92 B.R. 394, 400 (Bank. D. Neb. 1988)  JMG failed to identify any other, legitimate reason for the Proposed Foreclosures.  Paul Kraus offered no business justification whatsoever for JMG's decision to consent to the Proposed Foreclosures (or to secretly propose them to the Ohadi Trust and Ken Woolley).  Paul Kraus' statement that Paul Ohadi and Ken Woolley are "good people" does not suffice as a justification.  <u>See</u> 11/19/19 Tr. at 381:7-8.  Thus, the Proposed Foreclosures are intentionally fraudulent.

219. The affirmative defense of good faith and reasonably equivalent value (<u>see</u> Mo. Stat. Ann. § 428.044.1) also is inapplicable here.  As discussed above, JMG would not receive reasonably equivalent value (or any value whatsoever) through the Proposed Foreclosures.  The Proposed Foreclosures are designed to benefit JMG's insiders and successor entity.

220. In addition, the Ohadi Trust and KMW cannot show that they acted in good faith in relation to the Proposed Foreclosures.  That is because the Ohadi Trust and

177

KMW were aware of the fraudulent nature of the Proposed Foreclosures and were on notice of the fact that JMG was insolvent. The Ohadi Trust and KMW plainly were aware of the fraudulent nature of the Proposed Foreclosures, since the Ohadi Trust and KMW were the foreclosing entities.

221. The Ohadi Trust and KMW indisputably were on notice of the fact that JMG was insolvent. The Ohadi Trust and KMW announced the Proposed Foreclosures (i) after the entry of the Judgment; (ii) after the JMG Bankruptcy Case had been dismissed due to JMG's inability to reorganize in bankruptcy, and (iii) *during the litigation of this fraudulent transfer case*.

**B. The Proposed Foreclosures Are Constructively Fraudulent**

**1. Mo. Stat. Ann. § 428.044.5(2) Does Not Shield Defendants' Conduct**

222. Under Mo. Stat. Ann. § 428.044.5(2), a foreclosure cannot be deemed constructively fraudulent if it represents "[e]nforcement of a security interest in compliance with" the UCC. See Mo. Stat. Ann. § 428.044.5(2). Mo. Stat. Ann. § 428.044.5(2) is not a legally cognizable defense to an intentional fraud claim. See id. It is a defense that may be raised only in response to a claim that a proposed foreclosure is constructively fraudulent. Id.

223. For two separate and distinct reasons, Mo. Stat. Ann. § 428.044.5(2) cannot be invoked to shield the Proposed Foreclosures from the constructive fraud claims that are at issue here.

224. First, Mo. Stat. Ann. § 428.044.5(2) is inapplicable to "a circumstance in which the transfer at issue is the granting of a security interest in the first instance." See Phillips, 2014 WL 902683, at *3. Here, the Proposed Foreclosures are

expressly based on the SAA – which itself is a fraudulent transfer. Therefore, Mo. Stat. Ann. § 428.044.5(2) is inapplicable.

225. Second, even if the Proposed Foreclosures were not based on the legally invalid SAA, Mo. Stat. Ann. § 428.044.5(2) still would be inapplicable because the Proposed Foreclosures do not meet the UCC's standards of good faith and commercial reasonableness. Because the Proposed Foreclosures do not meet those standards, the Proposed Foreclosures do not qualify as "[e]nforcement of a security interest in compliance with" the UCC. See Mo. Stat. Ann. § 428.044.5(2).

226. As previously mentioned, "[e]very contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement." See UCC § 1-304. The definition of "good faith," as that phrase is used in the UCC, is "honesty in fact and the observance of reasonable commercial standards of fair dealing." Id. § 1-201(20). Pursuant to the UCC, "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Id. § 9-610(b).

227. The burden of proof is on the alleged secured party to prove commercial reasonableness. Consumer Fin. Corp. v. Reams, 158 S.W.3d 792, 797–98 (Mo. Ct. App. 2005); Commercial Credit Equip. Corp. v. Parsons, 820 S.W.2d 315, 322 (Mo. Ct. App. 1991).

228. In this case, Defendants (the alleged secured parties) offered no evidence that the Proposed Foreclosures were commercially reasonable. The *only* analysis of

179

the Proposed Foreclosures came from *Jet Midwest International's* expert, Mr. Tokoph, who explained how the Proposed Foreclosures were *not* organized in an appropriate fashion.  See FF § XIII(B)(1).

229.    Under the UCC, a foreclosure is commercially reasonable if made:

> (1) in the usual manner on any recognized market;

> (2) at the price current in any recognized market at the time of the disposition; or

> (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

See UCC § 9-627(b).

230.    Mr. Tokoph's report and testimony demonstrate that the Proposed Foreclosures meet none of these criteria.  As shown by Mr. Tokoph, it is far from usual – in fact, it is unheard of – for anyone in the aviation industry to sell aircraft, engines or spare parts in the manner that Defendants are proposing.  There is no reason to believe that Defendants' proposed auction would lead to the payment of any price by any bidder, let alone a price current in the market.  No dealer, using normal commercial practices, would sell the assets at issue in this way.

231.    Specifically, Mr. Tokoph demonstrated that:

> • The entire auction process was organized by a litigation associate who had appeared as Defendants' counsel in this action.  It is not standard or advisable for an auction of aircraft, engines and spare parts – particularly an inventory of this complexity – to be handled by someone who lacks industry expertise.

> • It is not standard or advisable for an inventory of this complexity to be auctioned as a single lot.  That is because the inventory in fact contains assets that, to maximize value, should be marketed to different types of buyers.

180

- The way in which the auction was advertised was not appropriately designed to reach any of the relevant markets for any of the inventory to be auctioned, both because the choice of advertising venues was not reasonably calculated to reach the relevant audience, and because the advertising period was so short.

- Any prospective buyer would have asked to inspect the inventory before the auction date. In fact, nobody requested such an inspection. This is dispositive proof that Defendants in fact failed to attract any serious interest in the sale.

- Mr. Tokoph has never seen an inventory of this complexity auctioned in this manner in the aviation industry. Far from conforming to industry standards, Defendants' conduct is extremely abnormal from an industry perspective.

See FF § XIII(B)(1). Mr. Tokoph's analysis regarding these points was unrebutted.

232. Just last year, the Missouri Court of Appeals found that a foreclosure was commercially unreasonable because it "was structured to allow [the secured party] to acquire [debtor's assets] both at a reduced price and without the danger of outside competition." See Robb v. Bond Purchase, LLC, 580 S.W.3d 70, 83 (Mo. Ct. App. 2019). That is precisely what is happening here, as indicated by Mr. Tokoph, and by Defendants' own October 3, 2017 email. See P834 (purpose of the foreclosure is the Ohadi Trust "taking" JMG's assets).

## IX. THE TRANSFER OF THE TERM LOAN AIRCRAFT SALE PROCEEDS TO JMG CORPORATE INSIDERS WAS FRAUDULENT

### A. The 12/7/15 Woolley Cash Transfer Was Fraudulent

**1. The 12/7/15 Woolley Cash Transfer Was Intentionally Fraudulent**

233.  The Term Loan Agreement allowed JMG to sell the Term Loan Aircraft, and JMG in fact did sell the Term Loan Aircraft.  There was nothing improper about that sale unto itself.

234.  But the Term Loan Agreement also required JMG to use the sale proceeds to repay the $6.5 million principal of the Term Loan.  See P112, Term Loan Agreement § 2.10.  As revealed by post-judgment discovery in the Term Loan Action, and by the forensic accounting analysis of Mr. Yormark, JMG instead used the proceeds to pay millions of dollars to JMG's corporate insiders.  Those payments were more than just a breach of contract.  They were an intentional enrichment of JMG's insiders at the direct expense of Jet Midwest International.

235.  By making these payments, JMG hindered, delayed and defrauded JM International.  Therefore, pursuant to Mo. Stat. Ann. § 428.024.1(1), these payments were fraudulent.

236.  JMG knew what it was doing in using the Term Loan Aircraft sale proceeds to benefit corporate insiders.  In the Kraake Note, P204, JMG expressly pledged $950,000 of the Term Loan proceeds to Kraake, after having pledged the same proceeds to Jet Midwest International in the Term Loan Agreement.  See Kraake Note at 2.  What the Kraake Note proves is that JMG intended, from the beginning of this entire series of events, to defraud Jet Midwest International.

237.  Throughout September, October and December 2015, JMG's internal emails specifically discuss the fact that JMG had insufficient cash and therefore would not remit the Term Loan Aircraft sale proceeds to Jet Midwest International, but

instead would use the money for other purposes that were not authorized in the Term Loan Agreement. As a JMG employee expressly stated in these emails: "I think if we notify them [Jet Midwest International] we have sold it all and haven't sent them anything it will cause issues." See P391. That is, JMG knew that what it was doing was wrong, but JMG did it anyway.

238. JMG gave away the proceeds by means of several payments.

239. One such payment was the 12/7/15 Woolley Cash Transfer, in which JMG gave $1 million of Term Loan Aircraft sale proceeds to Ken Woolley. Defendants offered no evidence of any written loan agreement, security agreement, or other written agreement between Ken Woolley and JMG, explaining why JMG made the 12/7/15 Woolley Cash Transfer. Nor had Ken Woolley filed a UCC financing statement against JMG in Delaware at this time.

240. In fact, Ken Woolley's testimony was that, at this time, he "wasn't willing to lend money" to JMG, because of the issues he had detected upon reviewing JMG's financial records in January 2015. See 11/20/19 Tr. at 592:19-593:4. If that testimony was accurate, this payment necessarily was not a loan repayment, thus begging the question of what it was.

241. In examining whether this payment was intentionally fraudulent, the key, threshold issue is "the intent of the debtor," as the Eighth Circuit has held. Stoebner, 779 F.3d at 862. If the debtor's intent was fraudulent, the burden shifts to the transferee to prove the affirmative defense of good faith and reasonably equivalent value. See Mo. Stat. Ann. § 428.044.1.

242. The best evidence of a debtor's intent is the effect of the debtor's conduct. Americana, 175 B.R. at 1022 (quoting Cook, 857 S.W.2d at 506). That is, "[i]f the necessary consequence of a conceded transaction was defrauding another, then . . . the transaction itself is conclusive evidence of a fraudulent intent." Id. See also McElvain, 219 S.W. at 77.

243. JMG gave, to Ken Woolley, $1 million of the funds that were supposed to be used to repay the Term Loan. Since then, over two years have elapsed. During this period of time, JMG has not used any *other* funds to repay any portion of *either* the Term Loan *or* the Judgment. In sum, JMG took money from an arm'slength lender; converted that money into a windfall for a JMG insider, and then never made the arm's-length lender whole. This is fraud.

244. Here, defendants offered no contemporaneous evidence of any written agreement, between JMG and Ken Woolley, obligating JMG to transfer these funds to Ken Woolley.

245. JMG's conduct here is even less defensible because, if Ken Woolley's testimony is accurate, he was not a lender to JMG at this time (see 11/20/19 Tr. at 592:19-593:4) – but JMG nevertheless gave him $1 million that JMG was contractually obligated to pay to Jet Midwest International, which was a lender.

246. The 12/7/15 Woolley Cash Transfer displays nearly every one of the badges of fraud enumerated in the MoUFTA:

| Badge of Fraud | Applicability |
|---|---|
| Was transfer to an insider? | Yes – the transferee was Ken Woolley, an insider. |
| Did debtor retain possession or control of the property? | N/A. |

| Badge of Fraud | Applicability |
|---|---|
| **Was transfer or obligation concealed?** | **Yes – it was concealed. Jet Midwest International did not find out about this transfer until it obtained JMG's bank records in postjudgment discovery in the Term Loan Action, over two years after the transfer was made.** |
| **Was the debtor being sued or threatened with suit?** | **N/A.** |
| **Was the transfer of substantially all the debtor's assets?** | **Yes – the Term Loan Aircraft sale proceeds were virtually all of JMG's cash in the fourth quarter of 2015.** |
| **Did the debtor abscond?** | **N/A.** |
| **Did the debtor remove or conceal assets?** | **Yes – by making this payment, JMG took $1 million of the Term Loan Aircraft sale proceeds from its bank accounts and removed them to Ken Woolley's personal bank account.** |
| **Did the debtor fail to receive reasonably equivalent value?** | **Yes – JMG paid $1 million to Ken Woolley, but Defendants did not offer into evidence a copy of any promissory note, or other debt instrument, satisfied by this payment.** |
| **Was the debtor insolvent, or did it become insolvent shortly after the transfer was made?** | **Yes – JMG was insolvent at this time.** |
| **Did the transfer occur shortly before or shortly after a substantial debt was incurred?** | **Yes – the transfer occurred shortly after JMG entered into the Term Loan Agreement.** |

| Badge of Fraud | Applicability |
|---|---|
| **Did the debtor transfer the essential assets of the business to a lienor who transferred the assets to an insider?** | N/A. |

247. As shown above, there are *seven* distinct badges of fraud here. Because so many of the badges of fraud are applicable to this transfer, it was JMG's burden to rebut the presumption that it acted with fraudulent intent. JMG did not do so.

248. Because JMG acted with fraudulent intent, the burden further shifts to Ken Woolley to prove, as an affirmative defense, that he received the 12/7/15 Woolley Cash Transfer in good faith and for reasonably equivalent value. Ken Woolley cannot meet this burden.

249. Ken Woolley cannot show that he was a good faith transferee. First, Ken Woolley was on notice of JMG's insolvency at this time, in light of:

- his knowledge of JMG's default on its debt obligations to Amur;

- his review of JMG's financial records in January 2015, in which he detected numerous red flags that JMG was a financially troubled company;

- his own stated position that, because of the red flags he had detected during that January 2015 review, he would not personally loan any funds to JMG;

- his receipt, in September 2015, of MB Bank's further analysis of JMG's financial records and decision to reject JMG's loan application;

- the fact that he had guaranteed JMG's repayment of the Ohadi Note despite the fact that he did not have the cash on hand to satisfy that guarantee;

- his knowledge of the insolvency of Dynamic, combined with his knowledge of the fact that Dynamic owed JMG over $3 million at this time; and

- his decision to make Dynamic the guarantor of JMG's Term Loan repayment obligation, despite knowing that Dynamic could not meet that obligation.

250. This information was more than sufficient to put Ken Woolley on notice of JMG's insolvency. Ken Woolley not only was on notice of JMG's financial plight, but had participated in the events that led JMG to this point.

251. Ken Woolley also knew about the Term Loan Agreement. See P389 (September 4, 2015 email in which Paul Kraus noted that Ken Woolley was "aware of transaction"); P312 at 10-11 (Ken Woolley's signature on resolution authorizing Dynamic to enter into Dynamic Guarantee); 11/19/19 Tr. at 582:25 (Ken Woolley's admission that he knew about the Term Loan transaction). Ken Woolley knew that JMG planned on "flipping" the Term Loan Aircraft. See P389. Because he was aware of JMG's financial distress, he had reason to know that the sale of that aircraft was the source of the $1 million JMG had given him.

252. Ken Woolley also cannot show that he gave reasonably equivalent value in exchange for this transfer. There is no evidence that, at this time, Ken Woolley had paid $1 million (or anything at all) to JMG, or that JMG was contractually obligated to pay $1 million to him.

253. On July 1, 2015, Ken Woolley had wired $1 million to American Airlines "for Paul Kraus." See OW-40. There is no evidence of any contemporaneous, written

agreement in which JMG assumed an obligation to repay this money, let alone to do so by using the Term Loan Aircraft sale proceeds that JMG had pledged, in the Term Loan Agreement, to Jet Midwest International. In re Southern Health Care of Arkansas, Inc., 309 B.R. at 319 (transfers made by debtor "for the benefit of a third party, by themselves, do not provide any reasonable equivalent benefit for the debtor"). Accord Petters II, 603 B.R. at 606; In re Bargfrede, 117 F.3d 1078, 1080 (8th Cir. 1997).

### 2. The 12/7/15 Woolley Cash Transfer Was Constructively Fraudulent

254. Even if it were a transfer for an antecedent debt, the 12/7/15 Woolley Cash Transfer would be constructively fraudulent under Mo. Stat. Ann. § 428.029.2 because (i) JMG was insolvent; (ii) the transferee (Ken Woolley) was a JMG insider, and (iii) Ken Woolley had reasonable cause to believe JMG was insolvent. See CL §§ III, IV and V, supra.

255. The 12/7/15 Woolley Cash Transfer also was fraudulent under all three of the other constructive fraud tests: JMG did not receive reasonably equivalent value (or any value) for making the 12/7/15 Woolley Cash Transfer. JMG was undercapitalized, had knowingly incurred debts beyond its ability to pay when due and was insolvent. Thus, all of the elements of Mo. Stat. Ann. §§ 428.024.1(2)(a) and (b), and 428.029.1, are met.

## B.  The 11/2/15, 12/4/15 and 12/30/15 Ohadi Cash Transfers Were Fraudulent

### 1. The Transfers Were Intentionally Fraudulent

256. JMG used Term Loan Aircraft sale proceeds for three other transfers: the 11/2/15 Ohadi Cash Transfer, the 12/4/15 Ohadi Cash Transfer, and the 12/30/15 Ohadi Cash Transfer.

188

257. These transfers were intentionally fraudulent in the same way that the 12/7/15 Woolley Cash Transfer was intentionally fraudulent. JMG not only breached its agreement with Jet Midwest International, but did so in order to enrich a corporate insider (the Ohadi Trust) at the direct expense of Jet Midwest International. This is fraud.

258. In the Ohadi Release, the Trust released any possible claim with respect to the Term Loan Aircraft sale proceeds. At the same time, JMG pledged, to Jet Midwest International, that any proceeds from the sale of that aircraft would be used to prepay the Term Loan. But JMG then proceeded to act in a manner that was the exact opposite of *both* of those agreements; instead of using the Term Loan Aircraft sale proceeds to prepay the Term Loan, JMG used millions of dollars of those proceeds to pay the Ohadi Trust. JMG gave the Ohadi Trust a gratuitous benefit by doing something that, far from complying with the Term Loan Agreement, and far from complying with the Ohadi Release, directly controverted both of these agreements. In re Heritage Org., L.L.C., 413 B.R. 438, 472 (Bankr. N.D. Tx. 2009) (no reasonably equivalent value when purported obligation "completely illusory.").

259. These payments not only gave a gratuitous benefit to the Ohadi Trust, but also to Ken Woolley. Under the Woolley Guaranty, because JMG had no means of paying the Ohadi Trust, it was Ken Woolley's obligation to pay the Ohadi Trust. JMG delayed the onset of that obligation by raiding the funds that it had pledged to Jet Midwest International.

189

260. These maneuvers did not benefit JMG. JMG could have used the Term Loan Aircraft sale proceeds to meet its obligations under the Term Loan Agreement, to repay Jet Midwest International. JMG instead paid part of *Ken Woolley's* obligation, as guarantor of the Ohadi Note, to pay the Trust. JMG then defaulted on the Term Loan. After the Term Loan Aircraft sales proceeds were gone, JMG defaulted on the Ohadi Note; Ken Woolley still made no payments as guarantor. By any measure, Ken Woolley's gain was JMG's loss.

261. Defendants' argument that the Ohadi Trust had a blanket lien cannot help Defendants here. That argument was waived in the Ohadi Release. Even if it were preserved, it would still be baseless because the SAA was not signed until years after these transfers were made.

262. The 11/2/15 Ohadi Cash Transfer, 12/4/15 Ohadi Cash Transfer, and 12/30/15 Ohadi Cash Transfer display nearly every one of the badges of fraud enumerated in the MoUFTA:

| Badge of Fraud | Applicability |
|---|---|
| **Was transfer to an insider?** | **Yes – the transferee was the Ohadi Trust, a JMG insider, and the indirect beneficiary was Ken Woolley, a JMG insider.** |
| **Did debtor retain possession or control of the property?** | **N/A.** |
| **Was transfer or obligation concealed?** | **Yes – it was concealed. Jet Midwest International did not find out about these transfers until it obtained JMG's bank records in post-judgment discovery in the Term Loan Action, over two years after the transfer was made.** |
| **Was the debtor being sued or threatened with suit?** | **N/A.** |

190

| | |
|---|---|
| **Was the transfer of substantially all the debtor's assets?** | **Yes – the Term Loan Aircraft sale proceeds were virtually all of JMG's cash in the fourth quarter of 2015.** |
| **Did the debtor abscond?** | **N/A.** |
| **Did the debtor remove or conceal assets?** | **Yes – JMG removed millions of dollars of the Term Loan Aircraft sale proceeds to the bank account of the Ohadi Trust.** |
| **Did the debtor fail to receive reasonably equivalent value?** | **Yes – as discussed above, JMG did not receive any value in exchange for these payments.** |
| **Was the debtor insolvent, or did it become insolvent shortly after the transfer was made?** | **Yes – JMG was insolvent at this time.** |
| **Did the transfer occur shortly before or shortly after a substantial debt was incurred?** | **Yes – the transfer occurred shortly after JMG entered into the Term Loan Agreement.** |
| **Did the debtor transfer the essential assets of the business to a lienor who transferred the assets to an insider?** | **Yes – Defendants have claimed that the Ohadi Trust – which is an insider of JMG – was a lienor.** |

263.    Here, there are *eight* badges of fraud – eight times the number that would be
sufficient for a finding of fraud under the MoUFTA. JMG failed to rebut the
inference of fraudulent intent.  Accordingly, JMG acted with intent to hinder, delay
and defraud.

191

264. Because JMG acted with fraudulent intent, the burden further shifts to the Ohadi Trust (the recipient of these payments) and Ken Woolley (the indirect beneficiary of these payments) to prove, as an affirmative defense, that they acted in good faith and provided reasonably equivalent value to JMG. The Ohadi Trust and Ken Woolley cannot meet this burden.

265. The fact that JMG did not receive reasonably equivalent value has already been discussed, above. The Ohadi Trust and Ken Woolley cannot show that they were good faith transferees. Ken Woolley's knowledge of JMG's insolvency, and his involvement in the Term Loan transaction, also have been discussed, above. The Ohadi Trust was no less aware than Ken Woolley of the relevant events, including the Term Loan transaction, that had occurred. After all, Paul Ohadi signed the Ohadi Release, waiving any rights with respect to the Term Loan Aircraft. Thus, the good faith defense is unavailable to the Ohadi Trust, just as it is unavailable to Ken Woolley.

266. The Ohadi Note was a bad investment for the Ohadi Trust and Ken Woolley. See 11/20/19 Tr. at 597:2-4 (Ken Woolley admitting that the Ohadi Note was "a mistake.") JMG did not even have the cash flow to make *the first payment* of principal under the Ohadi Note.

267. Defendants did not breach the MoUFTA by making these bad business decisions. They breached the MoUFTA by trying to shift the financial consequences of those bad decisions from the Ohadi Trust (as lender) and Ken Woolley (as guarantor) to Jet Midwest International.

268. This was not good faith conduct. It was a bad faith attempt to use Jet Midwest

192

International's money to fix Defendants' undisclosed financial problems –

problems of the Defendants' own making, and that Jet Midwest International

neither caused nor had knowledge of when it loaned $6.5 million to JMG. The

MoUFTA contains no safe harbor for bad faith conduct.

### 2. The Transfers Were Constructively Fraudulent

269. If construed as transfers for an antecedent debt, these transfers are constructively

fraudulent under Mo. Stat. Ann. § 428.029.2. All three elements of that test are

satisfied. As previously noted, (i) JMG was insolvent; (ii) the transferee (the

Ohadi Trust) and indirect beneficiary (Ken Woolley) were JMG insiders, and (iii)

the Ohadi Trust and Ken Woolley had reasonable cause to believe JMG was

insolvent.

• These transfers also were fraudulent under the other three constructive fraud

tests: Mo. Stat. Ann. §§ 428.024.1(2)(a) and (b), and 428.029.1. As

discussed, JMG did not receive reasonably equivalent value for these

transfers. To the contrary, JMG gave the Ohadi Trust funds with respect to

which the Trust had expressly waived any possible right or interest. When

JMG made these gratuitous transfers, JMG was undercapitalized, had

knowingly incurred debts beyond its ability to pay and was insolvent.

## X.   THE ADDITIONAL CASH TRANSFERS AT ISSUE WERE FRAUDULENT

### A. OVERVIEW

270.   The cash transfers at issue in this case include not only the transfers of the Term

Loan Aircraft sale proceeds, but certain additional cash transfers as well. See FF

193

§ XII ("Defendants' Course of Conduct Regarding Uses of Cash"), supra.

271. The cash transfers described in FF § XII (the "Additional Cash Transfers") are relevant in two separate ways.

272. First, as previously discussed, the Additional Cash Transfers are evidence of Defendants' course of conduct with respect to uses of cash. In this way, such cash transfers undermine Defendants' position that, prior to the SAA, the Defendants treated the Ohadi Note as being secured by a blanket, first priority lien over JMG's assets.

273. Second, the Additional Cash Transfers are fraudulent transfers unto themselves.

274. The Additional Cash Transfers include:

- The payments to Ken Woolley itemized in FF Table 1, supra, all of which were a byproduct of Defendants' profit-sharing arrangement;

- The indirect payments to Ken Woolley itemized in FF Table 2, supra, which also were a byproduct of that profit-sharing arrangement;

- The 1/19/16, 6/14/16, 7/18/17, 8/18/17 and 9/12/17 Woolley Cash Transfers;

- The 9/7/16 Ohadi Cash Transfer; and,

- The Additional Ohadi Note Payments.

275. Chronologically, the Additional Cash Transfers are bracketed by two key events. Before the Additional Cash Transfers were made, JMG dissipated the Term Loan Aircraft sale proceeds, including by distributing over $4.5 million of those proceeds to Ken Woolley and the Ohadi Trust. After the Additional Cash Transfers were completed, JMG filed for bankruptcy, at which point JMG reported to the Bankruptcy Court that it had exactly zero dollars and zero cents

194

remaining in all of its bank accounts. JMG then told the Bankruptcy Court that its financial condition was so dire that it was unable to reorganize, and the JMG Bankruptcy Case was then dismissed.

276. The Additional Cash Transfers, and underlying transactions, provided no financial benefit to JMG, as evidenced by JMG's financial condition upon filing for bankruptcy. Defendants' profit-sharing arrangement – the core of the Additional Cash Transfers – caused JMG to suffer a net loss of $2,422,238.58, while distributing a supposed "profit" of $5,642,156.48, including $1,597,503 for the purpose of repaying Paul Kraus' personal debt to Ken Woolley. See FF ¶ 377. Through these transactions, Defendants benefitted from JMG's demise while Jet Midwest International was left holding the bag – the exact opposite of how the relationship between an arm's-length creditor and a shareholder is supposed to work.

277. Conducting a badges of fraud analysis with respect to the Additional Cash Transfers leads to the same result:

| Badge of Fraud | Applicability |
|---|---|
| Was transfer to an insider? | Yes – the transferees were the Ohadi Trust and Ken Woolley. |
| Did debtor retain possession or control of the property? | N/A. |
| Was transfer or obligation concealed? | Yes – all of these transfers were concealed until Jet Midwest International uncovered them during post-judgment discovery. |

| Badge of Fraud | Applicability |
|---|---|
| Was the debtor being sued or threatened with suit? | Yes – Jet Midwest International issued default notices to JMG in September 2016, and filed the Term Loan Action in January 2017. |
| Was the transfer of substantially all the debtor's assets? | Yes – by the time JMG filed for bankruptcy, it had no cash remaining in any of its bank accounts. |
| Did the debtor abscond? | N/A. |
| Did the debtor remove or conceal assets? | Yes – by making these payments, JMG moved all of its available cash out of the jurisdictions (California and Missouri) in which JMG maintains its offices and bank accounts. |
| Did the debtor fail to receive reasonably equivalent value? | Yes – viewing these payments in context, the only individuals who received value were JMG's insiders, who received supposed "profits" from JMG while the company was spiraling toward bankruptcy. |
| Was the debtor insolvent, or did it become insolvent shortly after the transfer was made? | Yes – JMG was insolvent during the entirety of the Assessment Period. |
| Did the transfer occur shortly before or shortly after a substantial debt was incurred? | Yes – all these transfers occurred shortly after JMG entered into the Term Loan Agreement. |
| Did the debtor transfer the essential assets of the business to a lienor who transferred the assets to an insider? | Yes – Defendants have claimed that the Ohadi Trust – which is an insider of JMG – was a lienor. |

196

278. *Nine* badges of fraud are present here – thus, these transfers were intentionally fraudulent.

279. The affirmative defense of good faith and reasonably equivalent value is inapplicable to the Additional Cash Transfers. As previously discussed JMG not only was insolvent throughout the Assessment Period, but Defendants had a long list of concrete reasons to know that JMG was insolvent. Moreover, any further investigation Defendants might have conducted would only have validated those concerns, because JMG's own financial statements showed JMG's insolvency.

280. For precisely the same reasons, all of the Additional Cash Transfers also are constructively fraudulent under Mo. Stat. Ann. § 429.029.2. All of the elements of that constructive fraud test are met, since JMG was insolvent, the transfers were to insiders, and those insiders had reasonable cause to believe that JMG was insolvent when each of the transfers was made.

**B. PAYMENTS THAT DID NOT DISCHARGE ANY JMG DEBT**

281. A total of nine Additional Cash Transfers did not discharge any valid debt held by JMG.

282. Four of these profit-sharing distributions were made for the sole and express purpose of repaying the personal debt that Paul Kraus owed to Ken Woolley. These include:

- The 6/2/17 Woolley Cash Transfer, in the amount of $295,867.00.
- The 9/14/16 Woolley Cash Transfer, in the amount of $940,000.00.

197

- The 9/15/17 Woolley Cash Transfer, in the amount of $199,975.00.

- The Second 9/26/17 Woolley Cash Transfer, in the amount of $161,652.00.

283. These payments did not satisfy any debt legitimately held by JMG. They satisfied *Paul Kraus'* debts, by using JMG's funds. The 9/15/17 and Second 9/26/17 Woolley Cash Transfers were particularly egregious because they were made not only during the Term Loan Action, but after Jet Midwest International had moved for summary judgment in that litigation.

284. JMG also made three cash distributions to Ken Woolley, on behalf of JM Inc., under the China Air Consignment Agreement:

- The 7/18/17 Woolley Cash Transfer of $855,000.00;

- The 8/18/17 Woolley Cash Transfer of $1,214,716.00; and,

- The 9/12/17 Woolley Cash Transfer of $1,177,631.80.

285. There is no evidence of any contemporaneous, written, contractual agreement requiring JMG to make these payments. JMG was not a party to the China Air Consignment Agreement. The consignee under that agreement was JMG's affiliate, JM Inc.

286. The 7/18/17, 8/18/17 and 9/12/17 Woolley Cash Transfers – like the 9/15/17 and Second 9/26/17 Woolley Cash Transfers – were made not only during the Term Loan Action, but after Jet Midwest International had moved for summary judgment in that litigation.

287. Likewise, Defendants have identified no contemporaneous loan agreement or other contemporaneous written agreement that logically explains why the 1/19/16

198

Woolley Cash Transfer or the 6/14/16 Woolley Cash Transfer were made by JMG.

288. Because these Additional Cash Transfers were not made to discharge debts legitimately held by JMG, these payments were not made for reasonably equivalent value. In addition, JMG was undercapitalized, insolvent, and had incurred debts it knew it could not pay. As a result, these transfers not only were fraudulent for the reasons set forth in Section § IX(A), supra, but also pursuant to Mo. Stat. Ann. §§ 428.024.1(2)(a) and (b), and 429.029.1.

## XI. THERE IS NO APPLICABLE DEFENSE TO THE CLAIMS AT ISSUE

289. As discussed above, the affirmative defense of good faith and reasonably equivalent value is not a legally cognizable defense to a constructive fraud claim. As to Jet Midwest International's intentional fraud claim, Defendants have not proven any of the elements of this defense.

290. In this litigation, the only *other* affirmative defense that Defendants have tried to argue with specificity is that they somehow had a lien over all of the transferred cash at the time of transfer, and that such cash therefore was not an "asset" of JMG's in the first place.

291. This defense is legally unsupportable.

292. It is true that, in the MoUFTA, the definition of assets excludes property "to the extent it is encumbered by a valid lien." See Mo. Stat. Ann. § 428.009(2)(a). However, "valid lien" is defined as "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings."

199

Id. § 428.009(13).

293. "[T]he only logical reading" of this rule is that "'valid lien' means *perfected lien*
such that the perfection of the lien would be 'effective' with respect to judicial, i.e.,
nonperfected liens." Bash v. Textron Fin. Corp., 592 B.R. 819, 830 (N.D. Ohio
2018) (emphasis added).

294. Under the UCC, "[i]t is clear that a security interest in money can be perfected
only by possession." See 2 The Law of Secured Transactions Under the UCC §
7.02.

295. This rule "means exactly what it states: the secured party must have actual,
physical possession of money in order to have perfected a security interest in
that form of collateral." In re Wright Group Inc., 443 B.R. 795, 804 (Bankr. N.D.
Ind. 2011).

296. The only exception to this rule is when "money is identifiable cash proceeds
generated from the sale of collateral for which a proper filing was made." See 2
The Law of Secured Transactions Under the UCC § 7.02 n. 4.

297. Similarly, under the UCC, it is legally impossible to perfect a security interest in a
depository bank account (which might contain cash) without having "control" over
the account. See 1 The Law of Secured Transactions Under the UCC § 1.08.

298. Under these rules, Defendants cannot show that, at the time of transfer, they had
a valid (*i.e.*, perfected) lien over *any* of the cash they received from JMG.

299. First, Defendants clearly did not have physical possession of the cash at the time
of transfer – if they did, there would have been no need for JMG to wire it to
them.

300. Second, Defendants have made no attempt, in this litigation, to show that any of the cash they received was traceable to the sale of their collateral.

301. Any such tracing argument, by Defendants, would in any event be hopeless.

302. The blanket lien that Defendants purport to assert over JMG's assets was not created by Defendants until after this fraudulent transfer case was filed, when Defendants signed the SAA. That was long after the cash transfers at issue were made. To trace any cash transfer to collateral that Defendants had *at the time of transfer*, Defendants would have to make a particularized showing of what collateral they had *then*, and the flow of funds from each sale. Defendants have made no attempt to do this, not even through Mr. McDonough.

303. Defendants cannot show that the Term Loan Aircraft sale proceeds were proceeds of Defendants' collateral. That cash was derived from the sale of the Term Loan Aircraft, in which the Ohadi / Woolley Defendants had no security interest or other legal interest. The Ohadi Trust had expressly released any possible interest in the Term Loan Aircraft, while Ken Woolley had no security agreement with JMG when these cash transfers were made.

304. Defendants cannot show that the profit-sharing distributions were proceeds of their collateral, as there was no security agreement securing the Profit-Sharing Agreements. See FF § XII(C)(2), *supra*. Thus, there was no collateral to which these payments could be traced. Defendants in any event, as noted above, have offered no such tracing analysis.

305. Similar reasoning applies to the Additional Cash Transfers described in CL §

IX(B), supra.  These were not payments on JMG's debts, let alone debts for which JMG signed a security agreement – thus, there was no collateral to which a payment could be traced.

306.    Defendants also have not argued that they had control over any of JMG's bank accounts.

307.    Accordingly, this defense to shield the cash transfers at issue in this case cannot succeed.

308.    Such a defense is equally inapplicable to the transfer of the AWN share certificates.  At the time of that transfer, there was no security agreement granting the Ohadi Trust a lien over the AWN share certificates – the SAA was executed only after this transfer was made (and after this fraudulent transfer case was filed).  Nor has the Ohadi Trust tried to argue that the certificates were proceeds of any collateral that, at the time of transfer, had been pledged to the Ohadi Trust.  In addition, Brad Helsten acknowledged at trial that, before the certificates were transferred to the Ohadi Trust, the Ohadi Trust could not have had a perfected lien over them.  That is because, as he conceded at trial, physical possession is a prerequisite to perfecting a lien over certificated securities.  See 11/20/19 Tr. at 810:5-12.

309.    In their answers to Jet Midwest International's complaint, Defendants do not specifically state any other affirmative defense that is recognized in the MoUFTA.  See Ohadi/Woolley Answer at 24-25; JMG Answer at 22-23.  Nor was any such defense specifically raised in summary judgment briefing or pre-trial briefs.  Thus, any such defenses have been waived.  See Fed. R. Civ. P. 8(c) (defendant must

"affirmatively state any avoidance or affirmative defense").

• <u>**SUMMARY OF FRAUDULENT TRANSFERS**</u>

310. In sum, the following transfers are both intentionally and constructively fraudulent:

| Description of Fraudulent Transfer | Section of CL Explaining Why Transfer Intentionally Fraudulent | Section of CL Explaining Why Transfer Constructively Fraudulent |
|---|---|---|
| **Transfer of the AWN share certificates** | **CL § VI(A)** | **CL § VI(B)** |
| **The SAA** | **CL § VII(A)** | **CL § VII(B)** |
| **The Proposed Foreclosures** | **CL § VIII(A)** | **CL § VIII(B)** |
| **The 12/7/15 Woolley Cash Transfer [transfer of Term Loan Aircraft sale proceeds]** | **CL § IX(A)(1)** | **CL § IX(A)(2)** |
| **The 11/2/15 Ohadi Cash Transfer [transfer of Term Loan Aircraft sale proceeds]** | **CL § IX(B)(1)** | **CL § IX(B)(2)** |
| **The 12/4/15 Ohadi Cash Transfer [transfer of Term Loan Aircraft sale proceeds]** | **CL § IX(B)(1)** | **CL § IX(B)(2)** |

| Description of Fraudulent Transfer | Section of CL Explaining Why Transfer Intentionally Fraudulent | Section of CL Explaining Why Transfer Constructively Fraudulent |
|---|---|---|
| The 12/30/15 Ohadi Cash Transfer [transfer of Term Loan Aircraft sale proceeds] | CL § IX(B)(1) | CL § IX(B)(2) |
| The Additional Cash Transfers | CL § X(A) | CL § X(A), (B) |

## XII.   REMEDIES

311.   To facilitate payment of the Judgment, several forms of relief are appropriate.

312.   First, the SAA is hereby declared legally void.

313.   Second, a permanent injunction is hereby entered to bar Defendants from proceeding with the Proposed Foreclosures.

314.   Third, monetary damages will be awarded against Ken Woolley, the Ohadi Trust and Paul Ohadi, as appropriate, to recover the value of the assets that JMG already has fraudulently transferred to those corporate insiders of JMG.  Such transfers include:

- Each fraudulent transfer of the Term Loan Aircraft sale proceeds, including the 12/7/15 Woolley Cash Transfer, and the 11/2/15, 12/4/15 and 12/30/15 Ohadi Cash Transfers;

- The transfer of the AWN share certificates; and,

- Each of the Additional Cash Transfers.

315.   In determining the appropriate amount of monetary damages for the fraudulent transfer of the AWN share certificates, it is appropriate to look to the value of the

204

certificates at the "at the time of transfer, subject to adjustment as the equities may require." <u>See</u> Mo. Stat. Ann. § 428.044.3. Here, Defendants have proven to be unable or unwilling to specify the exact date on which the transfer of the AWN share certificates occurred; Defendants offered conflicting representations regarding the timeline of this transfer. What is known for certain is that the transfer was made in response to Jet Midwest International's submission of its TRO application, and in response to the impending seizure of the certificates by the U.S. Marshals Service. Also, in its own bankruptcy case – which was filed shortly after this transfer was made – JMG assigned the certificates an aggregate value of $2,842,000. Mr. Yormark confirmed that $2,842,000 was an accurate valuation as of that point. That valuation is an appropriate and practical measure of monetary damages for this transfer.

316. That valuation is particularly fair and reasonable because, when Jet Midwest International moved for its TRO application, JMG placed Defendants on notice of the price at which the AWN shares were trading at that date. Paul Kraus believed the value of the certificates to be far higher – $5.4 million. <u>See</u> 11/19/19 Tr. at 499:13-16. Thus, when Defendants transferred the certificates, Defendants knew that what they were transferring had significant value. Between the date of the TRO application and the date of JMG's bankruptcy filing, the per-share trading value of the certificates declined. Therefore, using the valuation that JMG subscribed to in its bankruptcy case as a benchmark of

monetary damages gives Defendants the benefit of the lowest of all valuations from this time frame.

317.   An award of monetary payments for the fraudulent transfers at issue in this case is appropriate based solely on the fact that Defendants violated the MoUFTA.  It is doubly appropriate because Defendants not only violated the MoUFTA, but also colluded with each other in doing so, and thus also committed the tort of civil conspiracy.  Under Missouri law, "[a] civil conspiracy is an agreement or understanding between two or more persons to do an unlawful act or use unlawful means to do an otherwise lawful act."  See Trimble v. Pracna, 51 S.W.3d 481, 500 (Mo. App. 2001). These elements are satisfied in light of Defendants' course of conduct in this matter. The function of a civil conspiracy claim is solely to establish "the joint and several liability of co-conspirators." See id. at 501.[8]

318.   The Court finds that a receiver should be appointed to conduct an orderly liquidation of all such remaining assets, including inventory, and to equitably distribute the sale proceeds.

319.   As stated by the Eighth Circuit in Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314 (8th Cir. 1993):

> Although there is no precise formula for determining when a receiver may be appointed, factors typically warranting appointment are a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic

---

[8] There is an alternative predicate for Jet Midwest International's civil conspiracy claim in 10 Del. C. § 7387, which prohibits a debtor "in contemplation of insolvency" from making "an assignment of his or her estate or effect for the benefit of creditors," if such assignment

equitable remedy; and likelihood that appointing the receiver will do more good than harm.

Id. at 316-17.

320.    All six of the Aviation Supply criteria are met here.  Specifically:

- Jet Midwest International is a judgment creditor and garnishor, and therefore by definition has a valid claim against JMG and what remains of JMG's estate.

- JMG has engaged in fraudulent conduct to frustrate the enforcement of the Judgment.  Such conduct includes: (i) creating a fraudulent lien (the SAA); (ii) providing materially inaccurate information in postjudgment discovery and in bankruptcy proceedings; (iii) transferring assets across state lines to evade levy by the U.S. Marshals Service and evade a TRO application filed under seal *before this Court*; (iv) colluding with insiders on a plan to "scrap" JMG, and (v) colluding with insiders on a fraudulent foreclosure.  There is no doubt that JMG will continue engaging in such conduct unless a receiver is appointed.

- There is an imminent risk of property being concealed, lost and diminished in value. JMG already concealed inventory during postjudgment discovery and during the JMG Bankruptcy Case.  If this Court had not entered a TRO and preliminary injunction to bar

---

"prefers any creditor to others" or "secures or pays to any creditor a greater proportion of his or debt or demand than shall be secured or paid to all his or her creditors."  See 10 Del. C. § 7387.  See Brown v. Wilmington & Brandywine Leather Co., 9 Del. Ch. 39, 58 (Del. Ch. 1910) (describing 10 Del. C. § 7387); King v. Johnson, 5 Del. 31, 32 (Del. Super. Ct. 1848) (grant of security interest in all of the debtor's collateral held void); Groff v. Cooper, 11 Del. 36, 42 (Del. Super. Ct. 1880) (sale of goods to a creditor in satisfaction of a debt would be void if the creditor knew that the debtor was proposing the sale to prefer the creditor to the debtor's general creditors); Waters v. Comly, 3 Del. 117, 129-30 (1840) (judgment bond given by debtor to one creditor, for the purpose of securing the payment of preferred creditors, held void); Maberry v. Shisler, 1 Del. 349, 353 (Del. Super. Ct. 1834) (assignment is void if the debtor retains an interest in its property while granting a preferred creditor a voluntary security agreement or mortgage while the debtor is approaching insolvency).

207

Defendants from proceeding with the Proposed Foreclosures, all of JMG's remaining inventory already would be gone. JMG continued concealing highly relevant documents during fact discovery in this fraudulent transfer case, both before and after this Court entered an Order expressly requiring JMG to produce responsive documents. See FF ¶ 41.

- Jet Midwest International has made exhaustive efforts to enforce the Judgment through ordinary legal means, such as garnishing JMG's bank accounts and levying on JMG's property. However, Defendants have obstructed all such efforts. That is why, at this point, the Judgment has gone totally unpaid for over two years.

- Defendants have not proposed any less drastic equitable remedy. Also, there is nothing drastic about appointing a receiver under these circumstances. By announcing the Proposed Foreclosures, Defendants in effect have stipulated that all of JMG's remaining assets should be liquidated. Thus, the only question is *how* and *by whom* they should be liquidated. The answer to that question is self-evident. Mr. Tokoph demonstrated that, to maximize the likelihood of the Judgment being paid, the inventory needs to be liquidated in an orderly fashion by a disinterested receiver who is qualified to conduct such a liquidation.

- Appointing a receiver will do more good than harm. As noted, Mr. Tokoph demonstrated that a receiver can liquidate JMG's remaining inventory for a higher price than would be obtained at the foreclosures that Defendants wish to conduct. Again, Defendants did not rebut, or even attempt to rebut, Mr. Tokoph's opinion regarding this matter. Defendants nevertheless oppose the appointment of a receiver. The reason why is set forth in Ken Woolley's October 3, 2017 email: Defendants' goal is to use a foreclosure as a way of the Ohadi Trust "taking" JMG's assets, at which point those assets would "then be sold." See P834. But this is not a proper basis for opposing a receivership.

321. Having concealed assets from a bankruptcy court – and having moved assets across state lines to evade the U.S. Marshals Service – JMG cannot demonstrate that its managers and insiders are the appropriate fiduciaries to continue with the wind down of JMG's estate.

208

322.     As the Eighth Circuit explained in <u>Aviation Supply</u>, "[a] receiver may be appointed 'to protect a judgment creditor's interest in a debtor's property when the debtor has shown an intention to frustrate attempts to collect the judgment.'" <u>Aviation Supply</u>, 999 F.2d at 317. Having declared the SAA legally void, the Court finds that a receiver should be appointed to wind down JMG's remaining assets. As Mr. Tokoph has demonstrated his experience and expertise in the area of aviation asset appraisals and inspections and is already intimately familiar with JMG's inventory of planes and parts, the Court finds the Mr. Tokoph would be particularly well suited to serve in the role of receiver to wind down JMG's remaining assets. Plaintiff is directed to inquire of Mr. Topkoh if he is willing and able to be appointed in this role. If not, the parties may suggest other suitable individuals for the receiver position.

323.     The Defendants concealed from Jet Midwest International the existence of the Ohadi Release, which states that the Trust has no right to any funds from the sale of the Aircraft.  There is also no documentary evidence to support Paul Kraus' claim (<u>see</u> 11/19/19 Tr. at 489:1-9) that, prior to the closing of the Term Loan transaction, he told Jet Midwest International that the Ohadi Trust had a lien (let alone a blanket lien) over JMG's assets.  In all of the emails exchanged between JMG's counsel and Jet Midwest International and its counsel at that time, not one email suggests that such a lien existed.  <u>See</u> P312-P315.  The notion that such a lien was disclosed is inconsistent with JMG's covenant, in the Term Loan Agreement, not to allow or create any competing liens over the Term

Loan Aircraft and its covenant to use any sale proceeds to prepay the Term

Loan.  See P112,Term Loan Agreement §§ 2.10, 6.1.  As the Court noted at trial,

it simply "makes no sense" that Jet Midwest International would "enter into an

agreement knowing that that agreement couldn't be kept."  See FF ¶317

324.     The Court also finds that Jet Midwest International should be awarded its costs

and fees from litigating this proceeding. Plaintiff shall file a motion for an award

of attorney fees within forty-five days of the date of the Order.

325.     Additionally, as the Court has now entered judgment in favor of plaintiff, the

Court hereby **GRANTS** Jet Midwest International's Motion for Release of the

Bond (Doc. # 589).

## CONCLUSION

326.     For all of the reasons stated above, judgment is hereby entered in favor of

plaintiff, Jet Midwest International.


Date:  May 26, 2020                    **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                  Fernando J. Gaitan, Jr.
                                       United States District Judge